

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP **3 0** 2020

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

KEITH HUMPHREY

      Plaintiff,

v.

ALICE FULK, individually,
CRISTINA PLUMMER, individually,
HAYWARD FINKS, individually,
DUANE FINKS, individually,
REGINALD PARKS, individually,
LITTLE ROCK FRATERNAL ORDER OF
POLICE, LODGE #17, a non-profit corporation,
RONNIE MORGAN, individually,
ERIK TEMPLE, individually,
KEVIN SIMPSON, individually,
KENNETH HAMBY, individually,
STEVE DODGE, individually,
MICHAEL MCVAY, individually,
CHRIS RINGGOLD, individually,
KYLE HENSON, individually,
TRAVIS CUMMING, individually,
MARK ISON, individually,
JOHN GILCHRIST, individually,
KEVIN SEXSON, individually,
CHARLES STARKS, individually,
SHELLA ATLAS-EVANS, individually,
MATT MURSKI,
MOTOROLA SOLUTIONS d/b/a
WATCHGUARD, and
RUSS RACOP,

      Defendants.

Case No. 4:20-cv-1158-JM

***JURY TRIAL DEMANDED***

This case assigned to District Judge **Moody**
and to Magistrate Judge **Harris**

## COMPLAINT

NOW COMES Plaintiff, KEITH HUMPRHEY (hereafter "PLAINTIFF"), by and

through his attorneys, LAUX LAW GROUP, and for his cause of action against Defendants,

ALICE FULK, individually, CRISTINA PLUMMER, individually, HAYWARD FINKS,

individually, DUANE FINKS, individually, REGINALD PARKS, individually, LITTLE ROCK FRATERNAL ORDER OF POLICE, LODGE #17, a non-profit corporation, RONNIE MORGAN, individually, ERIK TEMPLE, individually, KEVIN SIMPSON, individually, KENNETH HAMBY, individually, STEVE DODGE, individually, MICHAEL MCVAY, individually, CHRIS RINGGOLD, individually, KYLE HENSON, individually, TRAVIS CUMMING, individually, MARK ISON, individually, JOHN GILCHRIST, individually, KEVIN SEXSON, individually, CHARLES STARKS, individually, SHELLA ATLAS-EVANS, individually, MATT MURSKI, MOTOROLA SOLUTIONS d/b/a WATCHGUARD and RUSS RACOP, and states as follows:

INTRODUCTION—A HOUSE DIVIDED

On June 16, 1858, at the Republican State Convention in Springfield, Illinois, State Senator Abraham Lincoln arose from his seat, to great applause, and with a long, slow stride, took his place behind the podium.  A majority of the convention delegates had just selected him to be the Illinois' next candidate for the U. S. Senate.  Addressing an anxious electorate split by ongoing social strife over the institution of slavery, State Sen. Lincoln delivered what has come to be known as his "House Divided" speech.  The distinguished lawyer and former rail splitter explained to the assembly the perils of trying to maintain a functioning governing body while an insidious infestation pervades and gnaws at that very body from within:

> **Mr. President and Gentlemen of the Convention.**
>
> **If we could first know *where* we are, and *whither* we are tending, we could then better judge *what* to do, and *how* to do it.**
>
> **We are now far into the *fifth* year, since a policy was initiated, with the *avowed* object, and *confident* promise, of putting an end to slavery agitation.**
>
> **Under the operation of that policy, that agitation has not only, *not ceased*, but has *constantly augmented*.**

2

In *my* opinion, it *will* not cease, until a *crisis* shall have been reached, and passed.

"A house divided against itself cannot stand."

I believe this government cannot endure, permanently half *slave* and half *free*.

I do not expect the Union to be *dissolved*–I do not expect the house to *fall*–but I *do* expect it will cease to be divided.

It will become *all* one thing, or *all* the other.

PLAINTIFF submits that the grave dilemma long ago described by Sen. Lincoln exists today, in the current matter, with near equal urgency. PLAINTIFF files the instant complaint because the remnants of the deep racial inequities articulated by State Sen. Lincoln remain firmly embedded in the fabric of our social institutions, including our police departments. Indeed, it is prevalent within the Little Rock Police Department and has been for generations.

Now, like in 1861, there is an open, illegitimate revolt against a duly elected, legitimate governmental body seeking to cure societal and racial ills while simultaneously charting a forward course. This revolt seeks to stifle—and ultimately destroy—the embodiment of social reform Little Rock's citizens demanded at the polls in a decisive December 2018 mayoral election. The revolt is being led by the LITTLE ROCK FRATERNAL ORDER OF POLICE, LODGE #17 ("LRFOP") and a sizable group of disgruntled individuals who fear their free ride is coming to end.

## JURISDICTION

1.      Jurisdiction and venue of this Court are invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1391 and 42 U.S.C. § 1983. The unlawful conduct and constitutional violations alleged to have been committed against PLAINTIFF were committed in the State of Arkansas, and in

Pulaski County, Arkansas.   PLAINTIFF adopts and incorporates herewith the Addendum attached hereto as Exhibit 1.

## PARTIES

2.     At all relevant times, PLAINTIFF was and is a citizen of the United States of America, and he is, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.

3.     PLAINTIFF is Chief of Police of the Little Rock Police Department (LRPD).   As such, when acting his official capacity, PLAINTIFF is the final policy maker at the LRPD.   Per policy and by design, PLAINTIFF possesses the final authority relating to departmental vision, officer discipline and the promulgation of police policies.

4.     PLAINTIFF came to Little Rock after having been Chief of the Norman (OK) Police Department from 2011 to 2019.

5.     PLAINTIFF started as an officer with the City of Fort Worth (TX) Police Department in 1988.   In 1995, he joined the City of Arlington (TX) Police Department, being promoted to Sergeant (2000) and later Commander (2005) in that department.   In 2008, he was named the Chief of Police of Lancaster (TX) serving in that position until 2011, before taking the position as  the City of Norman's Police Chief.

6.     At all relevant times, ALICE FULK (hereafter "FULK") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.   Moreover, at all relevant times, FULK, a private citizen, was also an assistant chief with the LRPD.

4

7.     At all relevant times, CRISTINA PLUMMER (hereafter "PLUMMER") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, PLUMMER, a private citizen, was also a lieutenant with the LRPD.

8.     At all relevant times, HAYWARD FINKS (hereafter "H. FINKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, H. FINKS, a private citizen, was also an assistant chief with the LRPD.

9.     At all relevant times, DUANE FINKS (hereafter "D. FINKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, FULK, a private citizen, was also a police officer with the LRPD.

10.     At all relevant times, REGINALD PARKS (hereafter "PARKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, PARKS, a private citizen, was also a police officer with the LRPD.

11.     At all relevant times, the LRFOP was a police union and non-profit organization, physically located at 1700 E. 2nd Street, Little Rock, AR 72202, in Pulaski County.  At all relevant times, the LRFOP is and was the exclusive bargaining agent for the City of Little Rock.

12.     At all relevant times, RONNIE MORGAN (hereafter "MORGAN") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, MORGAN, a private citizen, was also a police officer with the LRPD and a president/director of the LRFOP.

13.     At all relevant times, ERIK TEMPLE (hereafter "TEMPLE") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, TEMPLE, a private citizen, was also a police officer with the LRPD and a director of the LRFOP.

14.     At all relevant times, KEVIN SIMPSON (hereafter "SIMPSON") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, SIMPSON, a private citizen, was also police officer with the LRPD and a director of the LRFOP.

15.     At all relevant times, KENNETH HAMBY (hereafter "HAMBY") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, HAMBY, a private citizen, was also a police officer with the LRPD and a treasurer of the LRFOP.

16.     At all relevant times, STEVE DODGE (hereafter "DODGE") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or

omissions occurring there. Moreover, at all relevant times, DODGE, a private citizen, was also a police officer with the LRPD and member of the LRFOP executive board.

17.    At all relevant times, MICHAEL MCVAY (hereafter "MCVAY") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there. Moreover, at all relevant times, MCVAY, a private citizen, was also a police officer with the LRPD and member of the LRFOP executive board.

18.    At all relevant times, CHRIS RINGGOLD (hereafter "RINGGOLD") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there. Moreover, at all relevant times, RINGGOLD, a private citizen, was also a police officer with the LRPD and member of the LRFOP executive board.

19.    At all relevant times, KYLE HENSON (hereafter "HENSON") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there. Moreover, at all relevant times, HENSON, a private citizen, was also a police officer with the LRPD and member of the LRFOP executive board.

20.    At all relevant times, TRAVIS CUMMING (hereafter "CUMMING"), was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there. Moreover, at all relevant times, CUMMING, a private citizen, was also a police officer with the LRPD and member of the LRFOP executive board.

21.     At all relevant times, MARK ISON (hereafter "ISON"), was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, ISON, a private citizen, was also a police officer with the LRPD and member of the LRFOP executive board.

22.     At all relevant times, JOHN GILCHRIST (hereafter "GILCHRIST") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, GILCHRIST, a private citizen, was also a police officer with the LRPD and former LRFOP president.

23.     At all relevant times, KEVIN SEXSON (hereafter "SEXSON"), was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, SEXSON, a private citizen, was also a police officer with the LRPD.  Upon information and belief, SEXSON was member of the LRFOP at all relevant times.

24.     At all relevant times, CHARLES STARKS (hereafter "STARKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, STARKS, a private citizen, was also a police officer with the LRPD.  Upon information and belief, STARKS was a member of the LRFOP at all relevant times.

8

25.     At all relevant times, SHELLA ATLAS-EVANS (hereafter "ATLAS-EVANS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.   Moreover, at all relevant times, ATLAS-EVANS, a private citizen, was also an employee of the City of Little Rock, working in the Human Resources division.

26.     At all relevant times, RUSS RACOP (hereafter "RACOP") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.

27.     At all relevant times, MATT MURSKI (hereafter "MURSKI") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.

28.     At all relevant times, MOTOROLA SOLUTIONS d/b/a WATCHGUARD (hereafter "MOTOROLA") was a corporation duly organized under the laws of the State of Arkansas and, further, was the employer of MURSKI.

## FACTUAL BACKGROUND

29.     In 2000, Lawrence Johnson (hereafter "Chief Johnson"), an African American man, was named Chief of Police of the LRPD.   Almost immediately after he started, Chief Johnson began to bring reforms to the department, including transparency in handling citizen complaints and Internal Affairs Division (IAD) investigations.   Moreover, promotions of female

9

and minority officers—previously scant—enjoyed an increase under Chief Johnson's tenure because of his deliberate efforts to advance diversity.

30.     The LRFOP, a police union dominated by white males, strongly opposed Chief Johnson's reforms.   As early as 2000, the LRFOP began a campaign of harassment and insubordination, intended to undermine Chief Johnson's authority and frustrate his reform efforts.  After several years of open revolt against their leader, the LRFOP successfully eroded Chief Johnson's stature among rank-and-file officers which signaled an end to his tenure.   In 2005, Chief Johnson's contract was not renewed, and he left the LRPD.

31.     In 2005, Stuart Thomas (hereafter "Chief Thomas"), a former LRPD officer, came out of retirement to become Little Rock's next police chief.  Chief Thomas made clear his intent to undo the reforms implemented by Chief Johnson, and he did so.  Chief Thomas was favored by the LRFOP and, under his leadership, the police union's power grew.  Under Chief Thomas' leadership, there was also an increase in police-involved shootings, departmental retaliation and general police misconduct.  Chief Thomas retired from the LRPD in June 2014.

32.     In 2014, LRFOP-endorsed candidate, Kenton Buckner (hereafter "Chief Buckner"), replaced Chief Thomas as Little Rock's new chief.  Under Chief Buckner's tenure, significant police misconduct occurred, including alleged constitutional violations in the service of "no-knock" warrants, departmental employment discrimination against women and minorities and investigatory malfeasance during internal criminal and administrative reviews of LRPD police-involved shootings.  This police misconduct resulted in civil rights litigation which made local and national news.

33.     In December 2018, Chief Buckner left the LRPD and began his tenure as the police chief of the Syracuse Police Department, leaving no chief in place.  Consequently, the

10

police chief position was filled in rotation by the LRPD's assistant chiefs, Wayne Bewley, H. FINKS and FULK, with the latter two applying for the now-vacant chief position. It is a fact that the rate of police-involved increased during the time the assistant chiefs were charge.

34.     Throughout 2018, there was a mayoral race afoot in Little Rock and the candidates who qualified for a December 2018 run-off election were Frank Scott and Baker Kurrus.   During their months-long campaigns, Frank Scott and Baker Kurrus distinguished themselves considerably and generally presented to Little Rock citizens visions of significant reform and promises of *status quo*, respectively.

35.     During his campaign, Frank Scott vowed to revise the LRPD's "no-knock" warrant policy to bring it within the confines of the law.   He proposed the creation of an independent citizen review board to increase accountability among officers.   Frank Scott promoted the notion of community policing, known by this time as "21st Century Policing."   By way of contrast, when Baker Kurrus was asked about the propriety and legality of the LRPD's execution of "no-knock" warrants, he responded that revisions were unnecessary because mechanisms were already in place to handle such things.

36.     Frank Scott's citizen-empowering vision was met with stiff opposition from the LRFOP and others, such as CHRIS BURKS (hereafter "BURKS"), a politically active Little Rock attorney.   For instance, BURKS commissioned a biased poll in which he planted questions designed to portray Frank Scott as intolerant homophobe, and then provided the results of the poll to the press without fully disclosing his involvement.   Likewise, the LRFOP posted messages and photographs on its official Facebook page which attempted to paint Frank Scott as a criminal.   This attack was widely panned by the public as an obvious race-tinged smear attempt

on Frank Scott who, if successful, would become the city's first elected African American mayor.

37.     The LRFOP's racist Facebook post garnered bad national press for the police union.  In fact, Frank Scott was invited onto CNN where he explained the LRFOP's naked political attack against him, causing his popularity to increase at an even sharper rate.  In discussing the attack, Frank Scott avoided retribution, instead lamenting the unfortunate nature of the LRFOP's actions.  Despite countless opportunities, the LRFOP refused to apologize to Frank Scott or admit the false, divisive nature of its post.

38.     On December 4, 2018, Frank Scott (hereafter "Mayor Scott") was elected mayor of Little Rock.  He immediately began to implement the reform he promised to the citizens of Little Rock, including a revised "no-knock" policy, independent citizen review of police-involved shootings, an increase in community policing and a top-to-bottom independent third-party investigation of the LRPD's patterns and practices.  In March 2019, Mayor Scott selected PLAINTIFF—well known for the institutional reforms he brought to the Norman Police Department from which he came—to be the new Chief of Police of the LRPD.

39.     From the very start, PLAINTIFF made it clear that he would use his authority and discretion as police chief to bring serious reforms to the LRPD, the very type of which Mayor Scott repeatedly promised throughout his successful mayoral campaign.  One of PLAINTIFF's first tasks was to terminate STARKS, who was videotaped violating LRPD policy during an avoidable police-involved shooting that took the life of a black motorist.  PLAINTIFF was met with a fierce backlash from the LRFOP as well as H. FINKS and FULK, the two assistant chiefs who vied for the position eventually give to PLAINTIFF, an outsider.

40.     The LRFOP vehemently opposed the reforms PLAINTIFF sought to implement, ones articulated by Mayor Scott on the campaign trail and desired by Little Rock citizens as evidenced by their votes for him.  Rather abruptly, PLAINTIFF's command staff and several other high-ranking officers, such as PLUMMER, began a campaign of retribution, insubordination and subterfuge, all designed to frustrate PLAINTIFF's vision of reforming the LRPD and, ultimately, to run him out of town like they did Chief Johnson.

41.     Certain individuals—H. FINKS, D. FINKS, PARKS, FULK and PLUMMER—resorted to filing abusive lawsuits in court, alleging phony misconduct committed by PLAINTIFF, a black man, such as the sexual harassment of white women.  Each of these lawsuits was filed by their lawyer, BURKS, who commissioned the biased poll targeting Mayor Scott.

42.     Upon information and belief, these abusive lawsuits are funded, at least in part, by the LRFOP. Other individuals, namely MORGAN, TEMPLE, SIMPSON, HAMBY, DODGE, MCVAY, RINGGOLD, HENSON, CUMMING, ISON and GILCHRIST—most of whom comprise the executive board of the LRFOP—have made false, scurrilous claims to local media about the baseless lawsuits and otherwise impugned PLAINTIFF's character in the community.

43.     Yet other individuals—SEXSON and STARKS—have furthered the campaign initiated by their co-defendants insofar as they each have either themselves knowingly made untruthful claims against PLAINTIFF in the community and media, or have arranged for false, damaging information to be made on their behalf.  Upon information and belief, former LRPD officer, MURSKI, who now works for MOTOROLA, which is the LRPD's bodycam provider, assisted his co-defendant PLUMMER access and download confidential police video footage of PLAINTIFF's vehicle at the home of a friend in order to use the footage to damage PLAINTIFF.

44.     These conspiratorial acts were jointly performed by MURSKI and PLUMMER so that PLUMMER (or another of her co-defendants) could provide the video footage to a third co-defendant, RACOP, who would then release it to the public on his original content blog along with the knowingly false accusation that PLAINTIFF was engaged in an extramarital affair.  The false story of PLAINTIFF's extramarital affair—which was covered by local media—was then used as a basis for motion practice in the cases involving H. FINKS, D. FINKS, PARKS, FULK and PLUMMER.  In short, these individuals created false stories and then cyclically treated those false stories as newfound facts to use as ammunition in their lawsuits, repeat *ad nauseum*.

45.     Worse yet, while the City of Little Rock burned and her citizens faced great peril of body and property during the George Floyd protests, H. FINKS and FULK intentionally sabotaged the LRPD response in order to make PLAINTIFF look bad and to create yet more ammunition to use in the abusive lawsuits filed by H. FINKS, D. FINKS, PARKS, FULK and PLUMMER.

46.     These reckless, callous actions indeed had the desired effect, as PLAINTIFF was scapegoated on local television during a post-protest hearing at the State Capitol which reviewed law enforcement response to the protests.  Indeed, H. FINKS, D. FINKS, PARKS, FULK and PLUMMER's lawyer, BURKS, was present at the hearing and allowed to publicly criticize PLAINTIFF for a response compromise by his own clients.  While certain defendants attack PLAINTIFF in court, and while others undermine his authority and control in the field, RACOP barrages PLAINTIFF and PLAINTIFF's wife with profane, creepy, threatening and violent emails and original-content blog postings which impugn PLAINTIFF.

**COUNT I**
**LRFOP**
**FIRST AMENDMENT RETALIATION**

47.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through forty-six (46) as though fully alleged in Count I.

48.     The LRFOP is the exclusive bargaining agent for the City of Little Rock. Therefore, the LRFOP is a state actor, endowed by the state with powers or functions governmental in nature. *Chicago Teachers Union Local No. 1 v. Hudson*, 475 U.S. 292, 301, 106 S. Ct. 1066, 1073 (1986). The LRFOP is therefore an agency or instrumentality of the state and subject to its constitutional limitations.

49.     Alternately, the LRFOP was a willful participant in joint action with the state. Therefore, the LRFOP was jointly engaged with the state and acting under color of law for purposes of § 1983 at all relevant times.

50.     Retaliation by a government actor in response to an exercise of First Amendment rights forms a basis for § 1983 liability. To establish such a claim, a plaintiff must prove (1) he or she engaged in a protected activity, (2) the defendant responded with adverse action that would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

51.     In the current matter, PLAINTIFF engaged in protected activity as a private citizen when he—prior to his official hire as LRPD police chief—discussed his policing philosophy which included instilling a sense of value and respect for diversity of race, gender, religion and sexual orientation, and his intent to build a culturally responsive police force,. PLAINTIFF's private citizen speech clearly related to a matter of political and social concern to the community and thus was a matter of public concern. An adverse employment action is that

15

which would likely dissuade a reasonable person from engaging in protected conduct. Coercion and threats are adverse employment actions.

52.     At all relevant times, including 2018, the LRFOP was aware of PLAINTIFF'S policing philosophy, and was aware that the department and the public was being apprised of the reform measures he intended to implement. PLAINTIFF's policing philosophy—his protected speech—played a substantial part in the LRFOP's decision to take adverse employment action against him.

53.     The LRFOP violated PLAINTIFF's First Amendment rights when it engaged in various instances of adverse employment acts, such as using the legal system to coerce PLAINTIFF to leave his position as LRPD Chief of Police and accept lesser employment elsewhere, even if technically it lacked the power to take tangible employment action against PLAINTIFF.

54.     The LRFOP is liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against LRFOP in an amount which will fully and fairly compensate him for damages suffered.

**COUNT II**
**LRFOP**
**EQUAL PROTECTION UNDER THE**
**FIFTH AND FOURTEENTH AMENDMENTS VIA 42 U.S.C. § 1983**

55.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one fifty-four (54) as though fully alleged in Count II.

56.     To act under color of state law for 42 U.S.C. § 1983 purposes does not require that the defendant be an officer of the State. Conduct that is formally "private" may become so

entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.

57.     The Equal Protection Clause of the U.S. Constitution requires that the government treat all similarly situated people alike.  Furthermore, successful equal protection claims may be brought by a "class of one" where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

58.     In the current matter, PLAINTIFF, an African American male, alleges that he is intentionally being treated differently by the LRFOP due to his race.  PLAINTIFF's race is not a legitimate basis to treat him differently than his similarly-situated white counterparts.

59.     Alternatively, PLAINTIFF alleges that he is intentionally being treated differently and there is no rational basis for the difference in treatment.  PLAINTIFF's intent to implement reform measures at the LRPD, including 21st Century Policing, is not a legitimate basis to treat him differently than his similarly-situated counterparts.

60.     The LRFOP's conduct is irrational and wholly arbitrary and motivated by ill will resulting from PLAINTIFF's race and/or his policing philosophy.

61.     The LRFOP acted either with the intent to deprive PLAINTIFF of his rights or in reckless disregard of his rights.

62.     The LRFOP is liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against LRFOP in an amount which will fully and fairly compensate him for damages suffered.

## COUNT III
## H. FINKS, D. FINKS, PARKS, FULK AND PLUMMER
## ABUSE OF PROCESS—ARKANSAS STATE LAW

63.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one sixty-two (62) as though fully alleged in Count III.

64.     The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required.

65.     The standard has elsewhere been articulated as requiring, among other things, a willful act in the use of legal process after its issuance that is not proper in the regular conduct of the proceeding.

66.     In the current matter, H. FINKS, D. FINKS, PARKS, FULK and PLUMMER, and each of them, have abused the legal system in the Pulaski County Circuit Court by filing baseless, vexatious lawsuits against PLAINTIFF, not to further the ends of justice or to seek redress, but rather to inflict personal pain, distress and embarrassment upon PLAINTIFF and to force him out of his position as LRPD Chief of Police.

67.     H. FINKS, D. FINKS, PARKS, FULK and PLUMMER are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against H. FINKS, D. FINKS, PARKS, FULK and PLUMMER in an amount which will fully and fairly compensate him for damages suffered.

## COUNT IV
## LRFOP, STARKS AND RACOP
### DEFAMATION/LIBEL

68.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through sixty-seven (67) as though fully alleged in Count IV.

69.     To recover for defamation, a plaintiff must prove six elements: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) the damages suffered by the plaintiff.

70.     In the current matter, the LRFOP, STARKS and RACOP repeatedly defamed PLAINTIFF by publishing incendiary and knowingly false statements on their respective websites and blogs, including false accusations that PLAINTIFF was having an extramarital affair, spying on Little Rock citizens, engaging in dangerous high speed chases or otherwise engaging in improper or illegal acts.

71.     At all relevant times, the LRFOP holds itself out as a "publisher" of its blog.  The LRFOP, therefore, is an information content provider.  The LRFOP does not merely archive, cache or provide access to content that is created by third parties.  The LRFOP publishes original content.

72.     Upon information and belief, STARKS is the publisher of "Make Little Rock Great Again," a website he facilitates.  At all relevant times, STARKS holds himself out as a "publisher" of his blog.  STARKS, therefore, is an information content provider.  STARKS does not merely archive, cache or provide access to content that is created by third parties.  STARKS publishes original content.

73.     At all relevant times, the RACOP holds himself out as a "publisher" of his blog. RACOP, therefore, is an information content provider.  RACOP does not merely archive, cache or provide access to content that is created by third parties.  RACOP publishes original content.

74.     LRFOP, STARKS and RACOP have acted with actual malice when they knowingly publish false accusations which were reasonably calculated to harm PLAINTIFF's reputation and standing in his family and in the community.

75.     The LRFOP, STARKS and RACOP are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against LRFOP, MORGAN, STARKS and RACOP in an amount which will fully and fairly compensate him for damages suffered.

**COUNT V**
**ALL DEFENDANTS**
**CIVIL RIGHTS CONSPIRACY**

76.     PLAINTIFF hereby incorporates and re-alleges Paragraphs (1) through seventy-five (75) as though fully alleged in Count V.

77.     In order to show a civil rights conspiracy under 42 U.S.C. § 1985(3), plaintiffs must prove: (1) the defendants conspired, (2) with the intent to deprive them, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4)…they were deprived of exercising any right or privilege of a citizen of the United States.

78.     In the current matter, DEFENDANTS, and each of them, have engaged in various overt acts establishing the basis of a widespread conspiracy, such as filing abusive lawsuits against PLAINTIFF in order to chill his First Amendment rights, coercing PLAINTIFF to quit his job, threatening to publish false information about PLAINTIFF if he does not quit his job,

20

attempting to intimidate PLAINTIFF with threats of embarrassment and improperly assisting co-conspirators with technical expertise so as to leak information to the press, *inter alia*.

79.     DEFENDANTS are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANTS in an amount which will fully and fairly compensate him for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, KEITH HUMPHREY, by and through his attorneys, LAUX LAW GROUP, seeks the following relief for the conduct described above:

1.     That DEFENDANTS be required to pay PLAINTIFF's compensatory damages;

2.     That DEFENDANTS be required to pay punitive damages;

3.     That DEFENDANTS be required to pay reasonable costs and attorney fees per 42 U.S.C. § 1988; and

4.     That PLAINTIFF receive any other equitable, legal and just relief as this Honorable Court deems appropriate.

Respectfully submitted,

Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for Plaintiff
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
         mikelaux@icloud.com

## *HUMPHREY V. FINKS, ET AL.*—COMPLAINT ADDENDUM

1.  The following paragraphs of this Addendum are a chronological recitation of many distinct—but interrelated and overlapping—events. This Addendum may be read front-to-back or by citation reference as a companion document to Plaintiff's Complaint.

### CHIEF LAWRENCE JOHNSON ERA: LRPD—2000-05

### 2000

2.  On **March 1, 2000**, Lawrence Johnson ("Chief Johnson"), a high-ranking African American officer from Oklahoma City, began his tenure as the Little Rock Police Department (LRPD) Chief of Police, making him the LRPD's first black police chief (at least since the Reconstruction Era). According to Chief Johnson, soon after he took command of the department, then-Little Rock Fraternal Order of Police, Lodge #17 (LRFOP) president, Mike Verkler ("Verkler"), a white male, told him that his time in Little Rock will go smoothly, provided that he sit back and let his assistant chiefs—both of whom were white males—make the major decisions at the department. Chief Johnson declined the advice and instead embarked on instituting reform measures at the LRPD.

3.  One of the first things that Chief Johnson learned upon his arrival was that the LRPD was racially segregated in terms of professional ranks and officer attitude. Moreover, according to Chief Johnson, there was a noticeable lack of minorities and women in high rank positions at the LRPD when he arrived.

4.  Instead, starting almost immediately, Chief Johnson began a robust implementation of progressive police reforms. For instance, he rewrote the policy for reporting citizen complaints so that the process was more accessible and less intimidating. Chief Johnson encouraged minority and female officers to apply for vacant supervisory positions. He reformed the Internal Affairs Division (IAD) investigation request process so that there was more intra-office involvement—more sets of eyes—which led to greater accountability. Chief Johnson further modified the process so that the IAD, which previously enjoyed virtually unfettered autonomy, reported directly to the chief, ending the *de facto* IAD fiefdoms.

5.  In litigation, years after Chief Johnson's tenure, Lt. Johnny D. Gilbert Jr. ("Gilbert"), an African American officer, testified that when Chief Johnson ran the department, he encouraged Gilbert to get his master's degree and facilitated professional training opportunities—such as ones offered by the FBI Academy—for officers who were historically overlooked at the LRPD, such as minorities and women.

6.  Gilbert, an Air Force veteran, was an officer with LRPD from 1984 to 2018, achieving the rank of lieutenant. He served under multiple chiefs of police over his tenure at LRPD, including Chief Johnson, Chief Thomas, Chief Buckner and CHIEF HUMPHREY. During his career at LRPD, Gilbert was an active member of Little Rock Black Police Officer's Association (LRBPOA).

7.  The LRBPOA was formed in the 1970s because African American LRPD officers were denied meaningful membership in the LRFOP by virtue of their race, a reflection of the systemic racism in the United States at the time. The historical purpose of the LRBPOA is to advance the interests of black officers and to address inequality at the LRPD in terms of hiring, promotions and discipline. It seeks to abolish racism within the LRPD.

8.  Gilbert provided testimony in civil rights lawsuit, *Perkins v. Hastings, et al.*, Eastern District of Arkansas Case No. 4:15-CV-310 BSM ("*Perkins*"), in which the topic of Chief Johnson was raised. Gilbert testified that early in Chief Johnson's tenure the chief drew the antipathy of the LRFOP because he was black and because he was not from Arkansas. Gilbert testified that Chief Johnson implemented significant reforms at the LRPD which resulted in black officers getting more opportunities for leadership positions, and this was strongly disfavored by the white male LRFOP leadership.

<u>2002</u>

9.   Gilbert testified regarding the growing tension between the LRFOP and Chief Johnson in 2002, which "was playing itself out in the public sector, in the public square, in the news media."  Gilbert continued:

> <u>…There was a battle between who was going to be in charge of the police department</u>, was it going to be one person, Chief Johnson, or was it going to be people who, in fact, were resistant to change he was trying to bring about [LRFOP].  (emphasis added)

10.  By **February 2002**, less than two years into Chief Johnson's tenure, the white-dominated LRFOP's resistance to his reforms turned into a deliberate, coordinated effort to terminate him from his employment with the City.  The LRFOP initiated a large-scale public messaging campaign to undermine Chief Johnson's authority and get him terminated.  On two separate occasions in as many months, the LRFOP issued a "no-confidence" vote against Chief Johnson, a race relations development in Little Rock notable enough to be covered in the *New York Times*.  *See Image 1 below.*



Image 1: February 28, 2002 New York Times (Regional—
South Subsection).

11.  According to Gilbert, one specific way the LRFOP undermined Chief Johnson's authority as the LRPD's final decision-maker was to post huge billboard signs along major Arkansas highways which read: "*The Little Rock Police Department is in Need of New Leadership.*"

<u>2005</u>

12.  Gilbert testified that the campaign the LRFOP waged against Chief Johnson started to take its toll and "people's confidence in Chief Johnson began to erode."  He added, "And so Chief Johnson was hailed for his accomplishments, thank you, have a nice day, and they put him on a horse, he went back out to Oklahoma City."  In **January 2005**, after many months of LRFOP attacks, Chief Johnson's City contract was not renewed, and he left Little Rock.

13.  On **January 2, 2005**, the Associated Press (AP) wire service ran an article entitled "*Little Rock police chief steps down.*"  In the January 2 article, Chief Johnson was quoted as saying "I've done my best.  I

feel that I've given not only this police department but the city of Little Rock…100 percent…" The article addressed the racial nature of the LRFOP's efforts to terminate Chief Johnson's employment with the City:

> During his tenure, Johnson's leadership was criticized by the Little Rock Fraternal Order of Police. In March 2002, about half of the 450-member union voted no-confidence in the chief and called for his resignation.
>
> The state chapter of the National Association for the Advancement of Colored People and the [Little Rock] Black Police Officers Association backed the chief, suggesting that the union vote was racially tinged. FOP President Mike Verkler denied any racial motivation.
>
> At the same time, the union accused the chief of discriminating against white officers in promotion and transfer decisions. (emphases added)

## CHIEF STUART THOMAS ERA: LRPD—2005-14

14. On **April 11, 2005**, Stuart Thomas ("Chief Thomas")—a white male and former officer—came out of retirement and was appointed chief of police of the LRPD. According to Gilbert, early on, Chief Thomas made his leadership style clear, advising a group of officers that he believed in the "good ol' boy system." According to Gilbert, Chief Thomas openly boasted that he would be the "HMIC" or "head motherfucker in charge." The primary goal envisaged and articulated by Chief Thomas was "[t]aking our police department back." Gilbert took these statements to mean Chief Thomas intended to reestablish the white power hierarchy that existed prior to Chief Johnson's tenure.

15. And that is what precisely happened, according to Gilbert. One by one, Chief Thomas rolled back the reforms implemented by Chief Johnson, including those changes regarding IAD investigations and citizen complaints. Chief Thomas eliminated the safeguards against favoritism Chief Johnson put in place. Gone were the efforts at opening promotional processes to minorities and women.

### 2006

16. On **August 9, 2006**, a well-connected, LRPD recruit, Josh Hastings ("Hastings") took a pre-employment polygraph test to determine his suitability to be a Little Rock police officer. Hastings is the son of Lt. Terry Hastings ("T. Hastings"), who was a high-ranking LRPD public information officer and also a close friend and 1978 police academy classmate of Chief Thomas. When asked during his pre-employment polygraph test whether he had ever been a member of a racist organization or had ever attended a racist organization meeting, Hastings stated "no." *See Image 2 below.*



**Image 2: Hastings' pre-employment polygraph questionnaire excerpt, Question No. 49, regarding membership in raciest (sic) organizations.**

17. However, when Hastings took the actual polygraph test and was asked the same questions that he previously answered on the pre-employment polygraph test—specifically, whether he associated with

racist organizations—the machine showed deception by Hastings. The polygraph test administrator provided by the LRPD, Lisa Dawson ("Dawson"), who was also the mother of one of Hastings' childhood friends, abruptly disconnected Hastings from the machine and terminated the test.

18. Following the unauthorized termination of Hastings' polygraph test, Dawson went back over his pre-employment polygraph test and helped reconcile his false answers with the polygraph admissions. *See Image 3 below.*



**Image 3: Hastings' pre-employment polygraph questionnaire excerpt, Questions 51 and 52, regarding association with racist organizations.**

## 2007

19. On **January 25, 2007**, Gilbert, then part of the LRPD training division which administers tests, recommended that Hastings not be hired. The primary reason for Gilbert's position was Hastings' untruthfulness regarding a prior association with the Ku Klux Klan (KKK), which were detected by the polygraph and which Gilbert considered acts of moral turpitude.

20. Gilbert called Hastings' association with the KKK an "abomination," and voiced further concerns regarding institutional racism and a lack of fundamental fairness, insofar as prior black LPRD applicants with relatively weaker links to street gangs were summarily barred from becoming an officer with the department. Gilbert drafted an official memo containing his concerns. *See Image 4 below.*

> Hastings provided a written explanation indicating that he was only curious about what was going on at the meeting. I have serious reservations regarding this applicant's judgment and maturity. How does a person go about attending a Ku Klux Klan meeting? Who are his friends and associates? Why would he place himself in such a bad position based on his upbringing as the son of a police officer? How does this organization justify to the public the hiring of an applicant who has had a one-time peripheral association with the Ku Klux Klan? The views of this subversive group to undermine the American government and to suppress minorities groups are common knowledge.
>
> The Civil Service Commission has established criteria when considering applicants for employment. One broad standard is "moral turpitude". Hastings' behavior of attending a Ku Klux Klan meeting is an abomination. The actions of the applicant are so extreme that I cannot in clear conscious endorse his employment with the Little Rock Police Department. Applicants in the past have been disqualified for similar affiliations.

**Image 4: Excerpt of Gilbert's January 25, 2007 memorandum recommending Hastings not be hired by the LRPD.**

21. Despite Gilbert's well-articulated memo which explained the risks posed by Hastings' hire, Chief Thomas nonetheless authorized Hastings join the LRPD. During his five-year career at the department,

Hastings would amass nearly forty days of suspension and other significant discipline for scores of police misconduct he committed, such as excessive force, untruthfulness, improper investigation, profanity, failure to contact communications and sleeping on the job, among others.

## 2010

22. On **December 9, 2010**, Eugene Ellison ("Mr. Ellison"), a black 67-year-old Vietnam veteran, was shot and killed in his own apartment by Donna Lesher ("Lesher"), a white LRPD officer working off-duty at his apartment complex. Mr. Ellison was the father of Lt. Troy Ellison ("Ellison"), a black veteran officer. Even though physical evidence and bullet trajectory totally refuted Lesher's account that she shot Mr. Ellison while he was standing upright, no criminal charges were filed against her and the subsequent IAD investigation of the shooting found no policy violations. The criminal investigation was internally handled by the LRPD homicide unit, which was headed by Lesher's sergeant husband, Sgt. James Lesher.

## 2011

23. On **October 17, 2011**, Ellison filed a civil rights lawsuit against the City of Little Rock and Lesher, *Ellison v. Lesher, et al.*, Eastern District of Arkansas Federal District Court Case No. 11-CV-752 BSM ("*Ellison*"). Through the course of the lawsuit, the City steadfastly denied that Lesher violated policy when she killed Mr. Ellison and denied that her account of the shooting was inconsistent with the physical evidence. According to black LRPD officers who testified in that litigation, the City's refusal to acknowledge the facts of Mr. Ellison's shooting deepened an already considerable racial divide at the LRPD.

24. Ellison and his brother, former LRPD officer, Spencer Ellison, were never given an official LRPD account of what occurred leading up to, and during, the shooting of their father. Three black detectives involved in the criminal investigation complained that it was slanted in favor of the white shooter. One of them, Sgt. JC White ("White"), an African American male and former president of the LRBPOA, said that immediately after the shooting, the homicide unit took concerted steps to make Mr. Ellison look like a "monster" so that his shooting seemed justified.

## 2012

25. On **June 13, 2012,** the LRBPOA sent a letter to the Chairman of the Civil Service Commission (CSC), complaining about irregularities in the promotional testing process which had a disparate effect on minority applicants. The LRBPOA also complained in the June 13, 2012 letter about favoritism and lack of uniformity in promotional test scoring, citing evidence in support of the group's claims.

26. On **June 26, 2012**, City employee Don Flegal responded to the LRBPOA's June 13 letter. In the June 26, 2012 letter, Mr. Flegal acknowledged some of the deficiencies noted by the LRBPOA but denied that those deficiencies had any negative effect on anyone.

27. On **October 19, 2012**, the LRBPOA sent a letter to City leaders regarding racial discrimination within the LRPD. The October 19, 2012 letter highlighted patterns of "inequities within the police department" relating to transfers, promotions, and discipline for black officers. The letter detailed "a disparity in disciplinary actions and critical decision-making, which affects the overall service provided to all citizens of Little Rock, and the morale of the officers." It contained statistical data. It described feelings of mistrust among the public and among black officers.

28. On **October 29, 2012**, on behalf of the LRFOP, KEVIN SIMPSON ("SIMPSON") sent to those same City leaders a letter attacking the points raised in the LRBPOA's letter from ten days earlier. In the October 29, 2012 LRFOP letter, SIMPSON seemed to mock the intelligence of the LRBPOA stating he and his LRFOP colleagues "found several parts of the…letter difficult to decipher…" SIMPSON said

the LRFOP found the LRPBPOA's letter "disturbing" and decried unidentified "slanderous and false statements."   SIMPSON called the LRBPOA's letter complaining about racism within the LRPD "insulting and divisive."

29. In his **October 29, 2012** letter, SIMPSON emphasized that the LRFOP was the exclusive bargaining agent for the City.  *See Image 5 below.*

> The Little Rock Fraternal Order of Police is the **EXCLUSIVE** bargaining unit for Police Officers and Sergeants of the Little Rock Police Department (LRPD), and as such, we should be the only point of contact for any grievances within the LRPD.  The LRFOP is not a race-based organization—we equally represent all officers of the LRPD, regardless of race or sex.  Issues that are brought to our attention are addressed with an emphasis of fairness for all members of the police department—not just a select group.

**Image 5: SIMPSON's October 29, 2012 LRFOP letter excerpt regarding the LRFOP's exclusive bargaining powers.**

30. SIMPSON closed his **October 29, 2012** letter by attacking the LRBPOA, stating that the LRBPOA's decision to  publicly articulate its concerns "showed reckless disregard for fellow officers."  *See Image 6 below.*

> Additionally, the LRFOP has a Minority Issues Committee to specifically address concerns of any minorities within the department.  The members of the LRBPOA who chose to send this letter to each of you and to the media, circumvented these processes, and showed reckless disregard for fellow officers and the Little Rock Police Department as a whole.

**Image 6: SIMPSON's October 29, 2012 LRFOP letter excerpt attacking the LRBPOA.**

31. During civil litigation of a police-involved shooting, Chief Thomas admitted that he did nothing in response to the concerns contained in the LRBPOA's October 19, 2012 letter.  He did nothing to address the racial disparities described in the letter.  Chief Thomas created no new policies to remedy the concerns.  He did not modify or supplement any policies in response to the LRBPOA's October 19 letter.

<u>2013</u>

32. *Ellison* was still pending in 2013, and certain black officers who spoke out about the biased nature of the LRPD criminal investigation of Mr. Ellison's shooting claimed they were retaliated against.  On **June 3, 2013**, White testified that when he gave his statement to IAD—an inquiry which should have focused on the adequacy of the criminal and IAD investigations—he was frequently cut off and treated as an adversary:

> WHITE: Yes, sir.  I'll say this.  I mean, <u>the interview wasn't pleasant whatsoever, so you'll understand.</u>
>
> Q:      Well, what do you mean by that?
>
> A:      <u>I felt it was hostile.</u>
>
> Q:      And can you elaborate on that?
>
> A:      <u>Yeah, I felt it was hostile, and that the whole purpose of the investigation was itself was to find a scapegoat because information had come out about…[the victim's] mental status, and I don't understand how we got the medical records that fast.</u>

*****

Q:      When you say "hostile," do you mean that you were getting cut off a lot?

A:      Well, yes, sir, that they were trying to control the interview and only wanted me to answer certain questions and if I didn't answer it a certain way, then they didn't like that.  (emphases added)

33. At his **June 3, 2013** deposition, White testified that he was accused by his superiors of leaking information about the criminal investigation of Mr. Ellison's shooting to the media.  Another African American officer, Dewana Phillips, was disciplined for insubordination when she complained about the racial favoritism enjoyed by Lesher—her husband driving her home after the shooting, the termination of video recording during her interview, her OC spray and uniform not taken from her for testing, among other things—during the investigation of Mr. Ellison's shooting.

34. On the morning of **May 20, 2013**, with his civil rights lawsuit against the City still pending, Ellison arrived at work and was summoned to an unscheduled police in-service lecture on the use of deadly force.  When Ellison got to the meeting classroom, he saw multiple LRPD officers involved in Mr. Ellison's shooting—or who were witnesses to the shooting—present and seated in the meeting classroom, including Lesher.  Several homicide investigators of the shooting were there as well.

35. City Attorney Thomas M. Carpenter, who represented Lesher in *Ellison* at the time, and who had deposed Ellison just a few months earlier, was the lecturer of the **May 20, 2013** deadly force in-service to which Ellison was summoned.  A few minutes after Ellison sat down in his classroom seat, Mr. Carpenter used the "Socratic" method on Ellison, singling him out in front of all those present and asking him a pop question on the propriety of using deadly force on a fleeing felon.  Again, this incident transpired while Ellison was suing the City for the shooting death of his father.  In a sworn statement, Ellison said the incident caused him shock and considerable anxiety.

36. On **October 18, 2013**, in *Sullivan, et al. v. Ellison, et al.*, Pulaski County Circuit Court Case No. 60cv-13-4132, white LRFOP members, Stuart Sullivan and Lela Folsom ("Folsom"), sued Ellison in retaliation for his filing a lawsuit against Lesher, who shot and killed his father.  The retaliatory lawsuit caused Ellison great anxiety and consternation but was dismissed ultimately because, per the Pulaski Co. Circuit Court, "[t]here has been no activity in [the] case for over a year."

## 2014

37. On **January 31, 2014**, Chief Thomas announced that he would retire as chief from the LRPD, effective in June 2014.  At the time of his retirement, *Ellison* was still pending in federal court.  During the Chief Thomas era, the LRPD had approximately fifty (50) police-involved shootings, which equates to a shooting by police of one (1) Little Rock citizen every 5.2 weeks.

## CHIEF KENTON BUCKNER ERA: LRPD—2014-18

38. On **June 30, 2014**, with the staunch backing of the LRFOP, Kenton Buckner ("Chief Buckner"), a black male, was named LRPD chief of police.  From the beginning, it was widely perceived at the LRPD that Chief Buckner shared Chief Thomas' vision for the department.  Despite early mishaps in Chief Buckner's tenure—such as losing his department-issued firearm during his move to Little Rock and the specter of a black judge publicly calling him out for insensitive comments he made during a civil rights town hall—the LRFOP never questioned his integrity, competence or motives.

39. On **July 24, 2014**, Chief Buckner gave an interview to the *Arkansas Times*.  In his July 24, 2014 interview, Chief Buckner acknowledged the existence of "historical scars" on the relationship between minority communities and police in Little Rock.  During the interview, Chief Buckner was asked about

the possibility of implementing citizen oversight to help review instances of force used by LRPD officers. He would not commit to the idea, saying that it would be "reckless" on his part to make "any blanket statement or broad-brush statement" on the subject.

40. On **December 18, 2014**, in response to a number of serious incidents between law enforcement and the communities of color, President Barack Obama issued an Executive Order appointing a task force on 21st Century Policing. President Obama stated that he wanted a quick but thorough response that would begin the process of healing and restoring community trust across the country. The mission of the Executive Order was clear: *The Task Force shall, consistent with applicable law, identify best practices and otherwise make recommendations to the President on how policing practices can promote effective crime reduction while building public trust.*

41. In **December 2014**, the 21st Century Policing task force released an Implementation Guide for local law enforcement agencies. *See Image 7 below.* Among other things, the guide expressed the societal value of embracing diversity in our communities and within our police departments:



**Image 7: Cover Excerpt of President Barack Obama's 21st Century Policing Implementation Guide.**

42. While discussing the 21st Century Policy model in subsequent months, President Obama stressed that police officer accountability is vital to building the type of public trust envisaged by the model:

> But the importance of making sure that the sense of accountability when, in fact, law enforcement is involved in a deadly shooting is something that I think communities across the board are going to need to consider. Or some recommendations around prohibiting racial profiling. That's a step that we've already taken at the federal level. If you talk to the FBI, if you talk to our federal law enforcement, it may be challenging for them to change old practices, but they are confident that they're able to continue to do their job effectively. The same is going to be true at the local level as long as it is an intentional policy coming from the top that is followed up with key metrics so the people know exactly what is going on. (emphases added)

## 2015

43. On **June 1, 2015**, Sylvia Perkins, mother of slain 15-year-old Bobby Moore, filed *Perkins*, which concerned the police-involved shooting of her son by Hastings. Hastings was terminated as a result of

the shooting because, among other reasons, he was untruthful about his actions during the shooting and violated LRPD General Order (GO) 303 (*Use of Force*) during the incident by voluntarily placing himself in the path of a vehicle and then opening fire.

44. GO 303 (*Use of Force*), the policy Hastings violated when he shot Bobby Moore, reads in pertinent part:

> Officers will not voluntarily place themselves in a position in front of an oncoming vehicle where Deadly Force is the probable outcome. When confronted by an oncoming vehicle, officers will move out of its path, if possible, rather than fire at the vehicle.

45. To justify the killing of Bobby Moore, who was behind the wheel the car, Hastings alleged that the car was trying to run him over and he shot the young man to stop the car. All of the physical evidence refuted Hastings' false account and he was terminated by Chief Thomas in October 2012. The LRFOP did not challenge Chief Thomas' decision to terminate Hastings. Nor did it hold any "no-confidence" votes against him. The LRFOP did not issue any press releases attacking Chief Thomas for terminating Hastings. The LRFOP president at the time did not appear on local news to decry Chief Thomas' personnel decision.

### 2016

46. On **February 12, 2016,** LRPD officer, Charles Starks ("Starks"), a white male, witnessed his police colleague, Shelton Bull ("Bull"), a white male, physically assault a Little Rock citizen at The Rave, a movie theater on Little Rock's southwest side. The citizen was beaten by Bull while Starks watched and did nothing. Bull never reported his use of force and tried to conceal the incident. Likewise, Starks did not notify his supervisor after the incident nor file any type of report regarding the use of force he witnessed. The matter was concealed until the citizen came forward and IAD Case No. 2016-0001 was opened.

47. Ten days later, on **February 22, 2016,** Chief Buckner authorized an IAD investigation in IAD Case #2016-0002, a separate Starks matter. In that case, Starks, Bull and two other white officers were involved in a scheme where they tried to sell property confiscated during official police business at a pawn shop and then pocket the money from the sale. Rather than face the investigation, Bull quit the LRPD and the investigation continued against Starks and the others.

48. On **May 15, 2016,** Stan Harmon ("Harmon"), a white LRPD officer, emailed Tommy Hudson ("T. Hudson"), also a white male, who was an LRFOP executive board member at the time. In his May 15, 2016 email, Harmon reported two (2) alleged instances of "reverse racism," neither of which was experienced by him or involved him. First, he alleged that Capt. Tanya Washington ("Washington"), a black female, committed "reverse racism" against not him, but rather a white officer named Lt. Nathan Tackett ("Tackett") when she used the term "lily white" in Tackett's presence. Second, Harmon claimed that the reluctance of another black officer, Andre Dyer, to accompany a certain group of white officers on a long road trip due to concerns of racial hostility constituted another instance of "reverse racism."

49. Social scientists call "reverse racism" a myth because it attempts to ignore the fundamental question of who holds more power or privilege between the individuals/groups involved; the myth of reverse racism assumes that racism occurs on a so-called level playing field.

50. **On May 16, 2016,** the *Washington Post* published a comprehensive article by Scott Higham and Kimbriell Kelly regarding Mr. Ellison's shooting, entitled "*A tragedy plays out in Little Rock when a police officer kills a colleague's father.*" The May 16, 2016 *Post* article focused not only on the impropriety of the shooting of Mr. Ellison but also on the protocol deviations in the criminal investigation conducted by Lesher's husband's homicide unit. The article stressed how the institutional favoritism enjoyed by

Lesher allowed her to escape criminal liability and even any professional discipline, despite her proven violations of LRPD policies.

51. **On May 16, 2016,** the day the *Washington Post* article was published, the City of Little Rock and Mr. Ellison's family settled the *Ellison* lawsuit.  The settlement was reported to be the highest settlement of its kind involving the City. The lengthy, heavily researched article cast the LRPD in an unfavorable light insofar as it revealed at the department disturbing deviations from investigatory protocol and norms, rampant favoritism, investigatory incompetence and retaliation for officers who protested the internal malfeasance.

52. On **May 18, 2016,** in response to the request by Harmon made through the LRFOP, via T. Hudson, Chief Buckner and one of his assistant chiefs, ALICE FULK ("FULK"), a white female, authorized an IAD investigation into the "reverse racism" allegations against Washington for her alleged "lily white" statement in Tackett's presence. Tackett, a high-ranking lieutenant, did not himself make the complaint against Washington or request an investigation be opened.  Instead of going through his chain of command with his allegations, Tackett told Harmon, a lower-ranked officer nearing retirement, who, in turn, told the LRFOP through T. Hudson.  Thus, it was the LRFOP, through T. Hudson, who had Chief Buckner and FULK open an IAD investigation against Washington for an alleged "reverse racism" statement heard by Tackett and reported by Harmon.

53. On or about **August 1, 2016,** rebuking Chief Buckner's position on race relations at the LRPD, Gilbert explained to him in conversation the widespread racial inequality that still plagued the department at that time and the price exacted for standing up against it:

> A:   I was in Chief Buckner's office a couple days ago – he's the current chief of police – and we had a conversation about those same things we talked about earlier in our conversation, about [African-American officer] recruiting, promotions, transfers, hiring, discipline, and <u>Chief Buckner was touting how far the police department had advanced</u>.
>
> <u>I said respectfully, "I disagree with you, sir." We have the same problem in 2016 that we had in 1978 when the Black Police Officers Association was formed. It still exists. It's prevalent and pervasive in our ranks. No one wants to talk about it because it's like airing our dirty laundry. But you can't clean it up unless you talk about it; it should be in the light of day.</u> Those problems still exist, and they dog us.  It's not just the Little Rock Police Department, it's law enforcement around the country.  We are so cocky and arrogant to think that we could never make a mistake, that we're always 100 percent right, and we're not.  I tell my subordinates, "We're not to be perfect, but we've got to be right. <u>Just be right, just be righteous in your conviction about what is it – whatever it is that you're trying to do. But if you make a mistake, own up to it."</u>
>
> And when people do that, Mr. Laux, they're on their way of being a better human being.  <u>But when people stand up to power and say this is wrong and you're a small piece of cog – a cog in the machinery, they will relegate you to the ash pile; they'll call you crazy; they'll marginalize you; they'll isolate you; they will treat you less than what's fair.</u>   That's what has happened to me. (emphases added)

54. At his **August 16, 2016** deposition in *Perkins*, Gilbert testified regarding his personal experience of many years at the LRPD trying to fix the pervasive racial problems there. He testified that institutional retribution historically awaited those who attempted to fight for equal rights within the department.

55. On **September 1, 2016**, possessing an erroneous "no-knock" warrant which was only intended for a single residence located at 3220 King Road in Little Rock, LRPD narcotics and SWAT officers nonetheless executed the raid on two (2) separate residential dwellings: 3220 King Road; and the other at 3114 King Road. Although the officers did not have a warrant to enter 3114 King Road, they forcefully entered the dwelling and one of the SWAT officers, Matthew Thomas ("M. Thomas"), shot an occupant of the dwelling, Lloyd St. Clair, through a wall without a warning. The drugs sought in the warrant were not in either dwelling.

56. On **September 19, 2016**, Capt. Heath Helton ("Helton"), a white male, who heads the LRPD training division was deposed in Perkins. At his September 19, 2020 deposition, Helton viewed video footage of a routine traffic stop in which a patrol officer, Kelly Morris ("Morris") drew her service pistol and pointed it at the motorist, despite there being no legitimate reason to do so, and despite it being a violation of proper police practices.

57. Though he initially defended Morris' actions by saying there is "100 million different ways to do traffic stops," Helton eventually acknowledged the clear raining deficits in Morris' conduct and testified that the stop was "something that should be addressed and [is] something to use as a training tool going forward." Despite his sworn testimony on **September 19, 2016**, Helton never addressed Morris' reckless traffic stop with anyone at the LRPD. Nor did the LRPD use Morris' stop as a training tool going forward.

58. On **September 19, 2016,** Gilbert drafted a supervisory evaluation report in IAD Case #2016-0001, which regarded Starks role in the movie theater assault by Bull. Gilbert unequivocally recommended Starks be terminated, stating:

> When the group became involved in the altercation at the Rave Theater and former officer Bull struck [Little Rock citizen] Mr. Christopher Davis, Officer Starks and Officer Phillips took no direct action to stop it in a manner consistent with responsible policing. They did not identify themselves as police officers, did not warn Davis of potential arrest, did not take Davis to the floor and subdue him, nor did they inform the Pulaski County Sheriff's Deputy working there in an off duty capacity of their dilemma. Instead, Officer Starks telephoned Officer Justin Taynor, who works in the Northwest 2300-0700 Watch…After the incident, Officer Starks went to his home. He did not call an on-duty supervisor nor did he call his supervisor.
>
>            \*\*\*\*\*
>
> The point I am making is Officer Starks and Officer Phillips had options to the situation they faced. <u>Both officers were complicit in behavior I find unacceptable for a professional police officer in today's environment that demands appropriate accountability</u>.
>
>            \*\*\*\*\*
>
> I have come to the conclusion that both of these employees are complicit in multiple infractions previously listed. The violations should be classified as sustained.

> Additionally, Officer Starks appeared to be committed to the group of academy classmates as opposed to the interest of his peers on the Watch or the Department.   This was an unfortunate decision that must be corrected through discipline.   Officer Starks has been a difficult employee to manage over several years and seems to gravitate toward conflict.   In 2015, he utilized an excessive amount of sick leave, he called in sick during a black-out period and posted pictures of the hunt on his personal Facebook page for his coworkers to see.   He has deliberately undermined the authority of police supervisors repeatedly.   Consequently, I recommend Officer Starks is terminated for the violation listed above. (emphases added)

59. On **October 13, 2016**, despite Gilbert's September 19 recommendation that Starks be terminated for the movie theater incident, FULK disregarded the recommendation and instead ordered that Starks receive a ten (10) day suspension for violations of: GO 303; Rule 1/4001.00 (*Dereliction of Duty*); Rule 1/4002.00 (*Conduct Unbecoming*); and Rule 1/4003.00 (*Justified Criticism*).

60. In her **October 13, 2016** suspension letter to Starks, FULK advised as to the basis for the discipline she imposed:

> You violated the aforementioned sections of the General Orders and Rules and Regulations on February 12, 2016, when you were off-duty and went to the Rave Theater to watch a movie with two other officers, one of which got into an altercation with a citizen at the end of the movie.   You failed to identify yourself as a police officer, call for a patrol unit or immediately notify a supervisor of the incident.   The incident was also commented on by local television stations and on their website.   Your conduct during this incident is not consistent with the conduct expected of a Little Rock Police Officer.   (emphases added)

61. On **November 9, 2016**, M. Thomas was questioned by IAD investigators regarding the shooting of Mr. St. Clair, alongside his companion officer, JOHN GILCHRIST ("GILCHRIST"), who was the president of the LRFOP at the time.   During his questioning, M. Thomas confirmed that he shot Mr. St. Clair through his bedroom wall and therefore, necessarily, could not determine if Mr. St. Clair posed an objectively reasonable threat of imminent death or serious bodily at the time he fired, which is required by the Constitution and GO 303.   Moreover, because he fired into a room through a wall, M. Thomas necessarily had no idea who, if anyone, might be in the room with Mr. St. Clair when he began firing his weapon.

## 2017

62. **On April 13, 2017,** after an 8-day trial, the jury in *Perkins* returned verdict for the plaintiff, Sylvia Perkins. In rendering its April 13, 2017 verdict, the *Perkins* jury rejected Hastings' claim that he opened fire on Bobby Moore because the car containing the young man was about to run him over.   The jury was advised that violations of police policy—such as Hastings' violation of GO 303 when he placed himself in the path of a vehicle—can be considered in assessing the propriety of an officer's conduct in Fourth Amendment lawsuits.

63. Based on the *Perkins* verdict, by at least **April 2017**, LRPD officers were on notice that they can not only be terminated and criminally charged, but also held civilly liable, if they voluntarily place themselves in front of a moving vehicle and then use the purported danger of the moving vehicle as a basis for using deadly force against the occupants of the moving vehicle.

64. On **July 5, 2017**, the LRBPOA sent a letter to the City of Little Rock Board of Directors detailing its continued concern "with the administration of the Little Rock Police Department." The issues raised in the July 5, 2017 letter concerned overall racial inequality at the LRPD just like the 2012 LRBPOA letter to Chief Thomas. The LRBPOA requested "an independent investigation into the discrimination, inequities, and disparaging treatment of minority officers and supervisors, under the command of Chief Kenton Buckner." The letter complained of racial hostility, and unequal treatment in discipline, training, opportunities and career advancement under Chief Buckner.

65. Nine days later, on **July 14, 2017**, Chief Buckner responded to the LRBPOA's July 5 letter in an official "All Police Personnel" memorandum. In his July 14, 2017 memo, Chief Buckner declined to address the concerns expressed by LRBPOA stating, "[g]iven the nature of the subject, and consistent with past departmental practice, neither I nor other members of the LRPD leadership can address specifics which were mentioned in the letter." Chief Buckner stated that any concerns presented by the LRBPOA can be resolved through grievance process with the help of the LRFOP:

> Discipline was another area of concern by the BPOA. It is perhaps one of the most difficult parts of my job…As I have stated earlier, officers have the right to disagree with management decisions, but disagreement does not mean you have been the victim of discrimination. For those who think they have been treated unfairly, the department has a thorough and well-documented grievance process. One of the FOP's roles is informing officers of their rights in this area. (emphases added)

66. On **August 3, 2017**, the *Washington Post* published an article by Kimbriell Kelly, Wesley Lowery and Steven Rich entitled "*Fired/Rehired*," about the generally futile efforts of reform-minded police chiefs to rid their departments of officers who engage in police misconduct. According to the August 3, 2017 article, police departments where it is difficult for chiefs to permanently eliminate bad cops "have one commonality: a police union contract that guarantees an appeal of disciplinary measures." An expert cited in the article stated that the phenomenon "undermines a chief's authority and ignores the chief's understanding of what serves the best interest of the community and the department." (emphases added)

67. In or around **October 2017,** Brandon Gurley ("Gurley"), a black LRPD police recruit in Recruit Class #88, contacted Sgt. Willie Davis ("Davis"), his mentor and an outspoken department veteran. Gurley confided in Davis, also a black male, that he had come across a social media post on the Facebook page of a white fellow recruit, Brandon Schiefelbein ("Schiefelbein"), in which the "N" word was used beneath the photo of a sleeping black man. Based on Gurley's account, Davis was concerned that Gurley might face retaliation if he reported the matter, so Davis provided the information to the LRBPOA executive board which would forward it to Chief Buckner. This matter became known as the "racist recruit" incident.

68. Davis was concerned about the "racist recruit" incident not only because it reflected poorly on the LRPD but also because it harkened back to the institutional concealment by Chief Thomas of Hastings' association with the KKK which ultimately permitted Hastings a means to shot and kill Bobby Moore a few years later.

69. On **October 13, 2017,** Davis and three other African American veteran LRPD officers, Gilbert, Washington and Lt. Earnest Whitten ("Whitten"), submitted an "Official Letter of Complaint" to City of Little Rock Human Resources (HR) Department heads, STACY WITHERELL ("WITHERELL") and SHELLA ATLAS-EVANS ("ATLAS-EVANS"), in which the senior officers complained about a pervasive pattern of many years of racial discrimination, race-based retaliation and a hostile work environment at the LRPD, all of which they each experienced.

70. In their **October 13, 2017** letters, Davis, Gilbert, Washington and Whitten referenced hostility toward the LRBPOA from Chief Buckner and indicated that their October 13 complaint was "being filed as a last resort." LRPD assistant police chiefs, HAYWARD FINKS ("H. FINKS") and FULK were among the LRPD supervisors of whom Davis, Gilbert, Washington and Whitten complained in their October 13 letters. ATLAS-EVANS denied all of the officers' allegations.

71. **On November 17, 2017,** the LRBPOA sent a letter concerning the "racist recruit" incident to Chief Buckner. Entitled "*Here We Go Again!,*" the November 17, 2017 LRBPOA letter voiced concern about the possibility of a white supremacist infiltrating the LRPD, the state's largest police force which serves and protects a city with an African American population of 42%. The November 17 LRBPOA letter compared the concealment of Hastings' racist associations with the "racist recruit" incident and reminded how the former led to the unconstitutional shooting of 15-year-old Bobby Moore. The letter warned:

> There is a legitimate belief within the African American community that this current administration is not willing to initiate opportunities to regain trust and build partnerships with its community members.

72. On **November 20, 2017**, three days after the LRBPOA letter, Chief Buckner opened an IAD investigation of the "racist recruit" incident. Rather than commend Davis for bringing the alarming incident to the attention of the LRPD, Chief Buckner imposed a severe ten (10) day suspension on him for not reporting it through his chain of command. Davis alleged in a subsequent lawsuit that his discipline was an illegal act of retaliation by Chief Buckner for Davis exposing the LRPD's apparent indifference to the disqualifying moral deficits of its recruits.

73. On **November 21, 2017**, accompanied by the LRFOP president, GILCHRIST, Schiefelbein, the alleged "racist recruit," gave his statement to IAD investigator CRISTINA PLUMMER ("PLUMMER"), a white female, in the IAD investigation of the "racist recruit" matter. In essence, Schiefelbein told investigators that his post with the "N" word was all a misunderstanding, just a funny quote from a stand-up comic. In November 2017, Schiefelbein maintained that statements made to Gurley and others about Kool-Aid and fried chicken was just talk about food they all like. He stated that he called Gurley "Shrek" merely in jest.

74. On **November 21, 2017**, Gurley was questioned by PLUMMER regarding his concerns over the "racist recruit" incident. He explained his sadness and disappointment at learning about Scheifelbein's racist post. During his questioning, Gurley mentioned other instances of racism at the academy.

75. On **November 30, 2017**, again accompanied by GILCHRIST, Schiefelbein gave a second statement during the investigation of the "racist recruit" incident. PLUMMER read a Facebook message from Gurley to Schiefelbein in which read Gurley asked Schiefelbein to stop making Kool-Aid, fried chicken and Shrek jokes at his expense due to the racial implications. Schiefelbein claimed ignorance to any racial aspect of his comments, which IAD investigator Stephens, also present, accepted.

76. On **November 30, 2017**, Gurley was again questioned by PLUMMER regarding his concerns over the incident. PLUMMER noted that Gurley initially said that a black fellow recruit was not upset by Schiefelbein's racial comments but then later stated a belief that the black fellow recruit was upset. Based on these statements, PLUMMER determined that Gurley, the victim of the incident, was untruthful and he was terminated.

### 2018

77. On **February 2, 2018**, Little Rock ABC affiliate, KATV Channel 7 ("KATV-7"), reported that Chief Buckner was a finalist for a vacant police chief position with the Charleston (S.C.) Police Department (CPD), meaning he had applied for the spot prior to February 2, 2018. At the time the story broke, City

Manager Bruce Moore had not responded to questions from KATV and calls made to Chief Buckner were not returned.

78. On **February 3, 2018**, the Arkansas Democrat-Gazette (ADG) published an article about the revelation that Chief Buckner was pursuing the CPD police chief position entitled "*Little Rock police chief goes after position in S.C.*" The February 3 ADG article began:

> To the surprise of Little Rock officials, Police Chief Kenton Buckner is seeking to become the next chief of Charleston, S.C., less than four years after taking the helm of Arkansas' largest police force.
>
> \*\*\*\*\*
>
> Little Rock City Manager Bruce Moore said Friday that he was taken by surprise when Buckner told him he was a candidate. Buckner told Moore before the news release was issued Friday. (emphases added)

79. GILCHRIST, LRFOP president at the time of the **February 3, 2018** ADG article, was also quoted:

> John Gilchrist, president of the...union, said Friday that he would be disappointed to see Buckner leave. Gilchrist said the union's relationship with Buckner has been the best out of all of Little Rock's police chiefs since Gilchrist joined the union's executive board in 1990.
>
> Buckner had told Gilchrist a couple of days earlier that he is being considered for the Charleston position, the union president said.
>
> \*\*\*\*\*
>
> Buckner "is an exceptional speaker. He has a knowledge of police work that is very superior, and he has the ability to communicate very well...Why would a chief of his caliber look for something that doesn't on the outside look to be a step up? You've got to imagine that a black chief in a community that has a large African American population, you've got to wonder what drives a man of that caliber out of this situation into something that may not be a step up," said Gilchrist, who is white.
>
> Gilchrist said that a small group of anti-violence advocates in the community have the ability "to politically interfere with the day-to-day operations of the Police Department." (emphases added)

80. According to LRFOP president GILCHRIST, Chief Buckner told him he was being considered for the vacant CPD police chief position before Chief Buckner even told the city manager.

81. LRBPOA president, Rodney Lewis ("Lewis"), who is black, was also featured in the **February 3, 2018** ADG article. The February 3, 2018 article chronicled several instances of conflict between Chief Buckner and the LRBPOA. Lewis was quoted on the effect of Chief Buckner's desire to leave the LRPD and his relationship with the LRBPOA, expressing relative positivity:

> Asked Friday if Buckner seeking employment elsewhere will put more of a strain on relations, Lewis said the [LRBPOA] is willing to move forward.
>
> "There's been disagreements between our organization and him, but he's the chief and we have to work with him on ways that we can improve our

department and improve all the officers on the street, and that still stands," Lewis said.  "Even if he doesn't get the job in Charleston, we still stand on our word to work with this chief and see if we can iron out the problems between our organization and him and the community."   (emphases added)

82. On **February 3, 2018**, Max Brantley of the Arkansas Times ran an article about Chief Buckner which was also critical of the LRFOP, entitled "*The Little Rock Police Department: The chief isn't the only problem*."  In the article, Mr. Brantley opined that Chief Buckner's pursuit of the open chief position in Charleston "is being viewed properly as a commentary on the fraught relationship of police with the Little Rock community and a city government structure in need of change."

83. In his **February 3, 2018** article, Mr. Brantley continued:

The Fraternal Order of Police, a politically conservative, white-dominated group on an overwhelmingly majority white force in a majority-minority community, loves the chief, who happens to be black.  His authoritarian manner works for them, because he's sided with them time and again, particularly against criticism of racially unfair practices brought by the Black Police Officers Association.  This, remember, is a force in which most white officers don't live in the city (too dangerous, the majority-black schools considered poor) and dozens of them get a valuable perk in the form of free transportation in police cars to and from suburban homes in white-flight communities.

*****

That brings us to city government.  The combination of a semi-strong mayor with a city manager and a City Board controlled by three at-large members is a failure.  We need mayor-council government, even though I happen to appreciate Bruce Moore's efforts to exercise some leadership when it is otherwise lacking.  Moore stepped in after white police officers arrested civil rights lawyer John Walker for filming them during a dubious traffic stop and arrest of another black driver.  This happens routinely to poor people in black neighborhoods at all hours of the day and night without consequences for overbearing officers. Some white officers detest John Walker because he will not be silenced, a fact made clear on video of the arrest.  I'm sure it still rankles the FOP that the police, in the person of Buckner but not the offending officers, were made by Moore to apologize for Walker's arrest.

The FOP likes their black folks quiet and obedient, even when they're being murdered.  Too many of them seem to view these citizens as a dangerous element to be guarded or kept under watch rather than served. They've found a friend in Buckner. Only in Little Rock would traffic stop harassment be viewed as "community policing." Only here would frightened, crime-ravaged citizens be depicted as part of the problem. If Buckner leaves, you could be forgiven for wishing he'd take the head of the FOP with him.  (emphases added)

84. On **February 18, 2018**, Little Rock lawyer, CHRIS BURKS ("BURKS") filed an appearance on behalf of Warwick Sabin ("Sabin") and his mayoral exploratory committee in the matter of *City of Little Rock, Arkansas v. Sabin for Mayor Exploratory Committee, et al.*, Pulaski County Circuit Court Case No. 60CV-18-379.  On Sabin's behalf, BURKS argued against statutory prohibitions on Sabin's ability to

raise money for Sabin's mayoral aspirations.  BURKS publicly backed Sabin in the mayoral race to be held in November 2018.

85.  On **March 12, 2018**, Davis, Whitten and other senior black officers filed a racial discrimination and retaliation lawsuit based on the prior HR complaints presented to WITHERELL and ATLAS-EVANS and rejected by them.  In the lawsuit, *Davis et al. v. City of Little Rock*, Eastern District of Arkansas Case No. 4:18-CV-183-BSM (hereafter "*Davis, et al.*"), the plaintiffs alleged that Chief Buckner and other high-ranking LRPD officers, including H. FINKS and FULK, violated their constitutional rights and engaged in discriminatory conduct and retaliation.

86.  On or about **May 8, 2018**, three-term Little Rock mayor, Mark Stodola, announced that he would not run for reelection in the November 2018 mayoral race.

87.  **On June 2, 2018,** Frank Scott announced his mayoral candidacy in the City of Little Rock mayoral race, joining Sabin and Baker Kurrus ("Kurrus"), who had announced weeks earlier.

88.  On **August 1, 2018**, The Arkansas Times published an article entitled "*Two-thirds of Little Rock officers live elsewhere*," which addressed the "white-flight" phenomenon of overwhelmingly white LRPD officers working in the city while living in various white suburbs and nearby towns.  According to the August 1, 2018 article, "[t]he heavy preference of white officers to live elsewhere (almost 80 percent), which we've reported before, continues.  A majority of black officers live in the city."  Per the article, of 316 white male officers employed by the LRPD in August 2018, 255 reside outside city limits.

89.  On **October 14, 2018**, Radley Balko of the *Washington Post* published an article in the Opinion Section entitled "*Little Rock's dangerous and illegal drug war*."  In his October 14 article, Mr. Balko explained that the LRPD's "no-knock" warrantless raids rarely turn up the contraband sought and run afoul of the protections afforded by the Fourth Amendment on at least two different bases.  Mr. Balko discussed the research that went into his article and some of the conclusions he reached:

> I've talked to [ten] people who have been raided by the LRPD's narcotics unit over the past two years.  I've also reviewed more than 100 search warrants executed by the unit since 2016.  <u>According to policing and Fourth Amendment experts, these interviews and warrants show that the LRPD narcotics cops and SWAT teams are routinely violating the Fourth Amendment rights of Little Rock residents.</u>  They're also putting people at unnecessary risk.  <u>And there's strong evidence that, in some cases, officers have made demonstrably false statements under oath.</u>
>
> \*\*\*\*\*
>
> <u>Nearly all the people raided that I spoke to were lower-income, and all but one were black.  Of the 105 warrants I reviewed, 84 were for black suspects, 16 were for white and five were for Latinos.</u>  Little Rock as a whole is 46 percent white and 42 percent black.  Hispanics and Latinos of any race make up just under 7 percent of the population.  (emphases added)

90.  On **October 15, 2018**, lawyers of victims of LRPD "no-knock" raids held a press conference attended by the public, including mayoral candidate, Frank Scott.   At the October 15 event, a black no-knock victim described the allegedly phony justification for entry into his home and the terror he felt when LRPD SWAT officers blew his door off its hinges and entered his apartment stormtrooper-like.  The "no-knock" victim had video to corroborate his account.  The lawyers argued that the raid of the victim's home was part of an unconstitutional pattern and, further, that there was a racial profiling element to these indiscriminate raids.

91. On **October 15, 2018**, the Little Rock mayoral candidates—Frank Scott, Sabin, Kurrus, Vincent Tolliver and Glen Schwarz—met for a debate co-hosted by KUAR.   During the October 15 debate, the candidates were asked to explain their positions on the LRPD's "no-knock" warrant policy, as described in Radley Balko's *Washington Post* opinion piece.

92. In response to questions about the **October 14, 2018** *Washington Post* article, Frank Scott said that he was appalled by the revelations and told the audience that he sent a letter to the Department of Justice (DOJ) earlier in the day in which he requested a robust investigation of the LRPD's practices. Regardless of the investigation request, Frank Scott responded that he was decidedly against "no-knock" warrants, primarily because of the inordinate targeting of minorities involved.   He then proposed a citizens' review board for addressing instances of police misconduct and brutality.

93. At the **October 15, 2018** KUAR debate, when asked what he thought of the breaking news on LRPD's "no-knock" raids, Kurrus responded that the news was unfortunate but the LRPD was already equipped with IAD which was perfectly capable of determining whether any Little Rock citizen's constitutional rights were violated by the LRPD's "no-knock" search warrant policy, regardless of their race.

94. On **October 16, 2018**, in follow-up to his debate statements favoring the *status quo*, Kurrus reaffirmed his position on the LRPD's "no-knock" warrant policy, again distinguishing himself from his opponent, Frank Scott, who urged police reform.   Kurrus was quoted in the ADG stating that he was concerned about the reported "no-knock" raid issues, but mechanisms to review it already exist.   Kurrus said "We have to be very, very certain that our policies are sound, our processes and procedures are sound, that our tactics are only utilized in accordance with law and that we have complete review every time we have a problem, and there is a process for that within the Police Department."  (emphasis added)

95. On or around **November 2, 2018**, Little Rock news agencies reported that Chief Buckner was named the next chief of police for the Syracuse Police Department (SPD) in Syracuse, NY.   During the Chief Buckner era, the LRPD had 15 police-involved shootings, which amounts to the shooting of one (1) Little Rock citizen approximately every 15.2 weeks.   Chief Buckner would be sworn in as the chief of police of the SPD on December 3, 2019.

96. On or about **November 14, 2018**, the LRFOP posted a photograph of candidate Frank Scott on the official LRFOP Facebook page.   The photograph—taken at the October 15, 2018 "no-knock" lawsuit press conference—depicted Frank Scott giving inspirational words to the no-knock raid victim.   That victim was subsequently accused of committing an unrelated crime in another county and fleeing arrest.

97. Next to the photograph of Frank Scott and the no-knock victim, the LRFOP made the following statement in its **November 14, 2018** Facebook post:

> The guy on the left is Frank Scott Jr. who's running for Little Rock Mayor. The guy on the right is ["no-knock" victim].  Tonight, ["no-knock" victim] is running from law enforcement after fleeing the Cross County Court House and hitting a Deputy Sheriff with a car.  Tell the guy on the left to help us find the guy on the right who's publicly supporting his campaign.
>
> The Little Rock Fraternal Order of Police want (sic) the citizens of Little Rock to know that candidates who align themselves with fleeing felons fail the qualifications for any public office.
>
> The LRFOP has publicly endorsed Baker Kurrus for Little Rock Mayor. We ask for your support and vote for Baker Kurrus during the upcoming runoff elections December 4th.  (emphases added)

98. On **November 16, 2018,** PLUMMER gave her deposition in the matter of *Cole v. Hutchins, et al.*, Eastern District of Arkansas Case No. 4:17-CV-553-DJM, a federal civil rights lawsuit filed over the 2016 officer-involved shooting of Roy Richards Jr. ("Richards"), a black man, by LRPD officer, Dennis Hutchins ("Hutchins"), a white man.  In April 2018, PLUMMER was the IAD investigator assigned to determine, among other things, if any police policies—such as GO 303—were violated in the shooting. One of PLUMMER's jobs was to get to the bottom of any inconsistencies in Hutchins' account.

99. When PLUMMER took Hutchins's IAD statement, Hutchins' companion officer for the statement was GILCHRIST, the LRFOP president.  Prior to PLUMMER's questioning of Hutchins, in both his homicide investigation statement and his official report, he stated that he did <u>not</u> fear death or serious bodily injury for himself when he shot Richards.

100.    However, when PLUMMER drafted her official IAD report on the shooting, she put in her report that Hutchins "advised he had no other viable option to protect himself…other than deadly force," which was a false assertion because Hutchins stated the opposite—he never feared death or physical harm when he shot Richards.

101.    At her **November 16, 2018** deposition, PLUMMER was asked why she put false information in her official report:

> Q:    Why did you put in your file that Hutchins claimed that he shot Roy Richards in part to protect himself?
>
> A:    Sir, this was a summary.   That was my interpretation of the statement.
>
> Q:    Why did you add that to the statement?
>
> A:    Sir, this was a summary of his statement to me.  That's how I interpreted that.  And that's why I put that in there.
>
> Q:    Are you telling me that Hutchins told you that during his statement?
>
> A:    Sir, that was my interpretation from his overall statement.
>
> Q:    <u>Did Hutchins tell you that he was protecting himself, in part, when he shot Roy Richards, yes or no?</u>
>
> A:    <u>He did not say those exact words, no.</u>
>
> Q:    Did he tell the homicide detectives that he was protecting himself, in part, when he shot Roy Richards, yes or no?
>
> A:    Not in those particular words, no.
>
> Q:    <u>He didn't say that in any words, did he?</u>
>
> A:    <u>No.</u>
>
> Q:    In fact, he was asked if he was protecting himself and he said, no, didn't he?
>
> A:    I'm not sure if he was asked that or not.

Q:    Why did you – I don't understand.  Where do you get the notion that adding facts is a part of summarizing statements?

A:    Sir, that was my interpretation.  In our policy it even says in order to use deadly force you fear for yourself or others.  That was my summary.  That was my interpretation.  That's why I put that in there.

Q:    Yea.  But if someone deviates from that policy, then those criteria aren't met.  Isn't that what you're trying to determine?

A:    Sure.

Q:    So again, just tell me where you got the information that he was protecting himself, in part?

A:    Sir, again, that was my interpretation of his statement.

*****

Q:    In this case during your investigation were you putting your interpretations of facts in your report, even though those facts are not found in the record?

A:    No.

Q:    <u>So where then is it found in the record that Hutchins claims he was protecting himself, in part, when he shot Roy –</u>

A:    <u>Sir –</u>

Q:    <u>– where is that found?</u>

A:    <u>– it's not in his statement anywhere.</u>

Q:    <u>Where is it found in the record anywhere?</u>

A:    <u>No.</u>

Q:    So that's something you made up out of whole cloth, correct?

A:    Again, that is my interpretation of what I gathered from his statement.  (emphases added)

102.    During her **November 16, 2018** deposition, PLUMMER eventually admitted to falsifying the IAD report to make it look as though Richards presented a threat of death or serious bodily injury to Hutchins, which Hutchins had already said was not the case:

Q:    At any time during either investigation, did Dennis Hutchins say that he was fearful for his life or that of his partner?

A:    In what I read so far, no.

Q:    You've read all of the statements that Dennis Hutchins made in this case.  There are no more statements that he made.  He did one report, one statement to the detective division, and one statement to you.  <u>In those materials did you see him advising anyone that he had no other viable option to protect himself or the citizen other than deadly force?</u>

A:    <u>No.</u>

Q:    So what you've written here in your internal affairs case summary or report is false.  Are you willing to admit that?

A:    No.

Q:    So what are you basing your belief or your – what you've written here, and again, you're not saying that you think he had no viable option, you're saying that Hutchins advised that he had no viable option.  Where are you getting that information that you put in the report?

A:    That is probably an inappropriate term to use, advised.

Q:    I don't know if it's inappropriate. It's false.

A:    Okay.

Q:    Is it true or is it false?

A:    He did not – I did not see where he advised that, no.

Q:    Well, you wrote that he advised that though?

A:    That's apparent, yes.

Q:    So that makes what you wrote a false statement?

A:    I probably could have worded it differently.

Q:    Is that a false statement or is that a true statement?

A:    Like I said, I probably misworded it.

Q:    Are you not prepared to admit – Lieutenant, we all make mistakes.

A:    Absolutely.

Q:    Are you – are you not prepared to admit that what you wrote there is not factually true?

A:    No.

Q:    You're not prepared for that?

A:    No.

Q:     You think a jury is going to buy what you're saying right now?

A:     I'm not sure.

Q:     The fact of the matter is, is that you wrote that Officer Hutchins advised you of something that he never advised you of.

A:     After reading that, I probably misworded how that should have been wrote.

Q:     Well, by "misworded" do you mean wrote something that was false?

A:     No.

Q:     Because that's false.  Isn't that false?

A:     No.

Q:     You know you're under oath right now, don't you?

A:     Yes.

Q:     You're under oath and you know we talked about untruthfulness –

A:     Correct.

Q:     – right?  So –

A:     I think I just stated that I probably miswrote that.

Q:     – you got a duty to tell the truth because you're under oath?

A:     Correct.

Q:     And so I'm going to say to you do you agree with me – strike that. Officer Hutchins never advised that he had no other viable option to protect himself or the citizen other than deadly force, did he?

A:     I did not see where he said that, no.

Q:     And so that makes what you wrote a false statement, true or false?

A:     Okay.  Sure.

                              *****

Q:     You know what I mean, because – because what you've written here is an exculpatory statement on behalf of Hutchins that he never said.  Don't you find that problematic?

A:     I think I answered your question.

> Q:     Do you find that problematic?
>
> A:     Sure.  (emphases added)

103.   PLUMMER falsified information in an official police report in the IAD investigation of Hutchins' shooting of Richards.

104.   PLUMMER perjured herself during her **November 16, 2018** deposition in *Cole*.

105.   On **November 16, 2018,** Frank Scott held a press conference about the November 14, 2018 LRFOP Facebook post, which was covered by local CBS station THV11.  In the November 16 TVH11 article, Frank Scott said of the LRFOP Facebook post, "[t]hese types of divisive comments and practices are unwarranted, unnecessary and unwelcomed by our city.  These are things of the past and an attempt to maintain the *status quo*."  (emphasis added)

106.   In the **November 16, 2018** THV-11 article, Frank Scott stated that he was disappointed by the LRFOP's injection of race into the mayoral contest.  Frank Scott purported to strike an optimistic tone, saying although the post caused some tension, there was still time to fix it.  "I think the damage has been done, but there's a great opportunity to repair that damage," he said.

107.   In the same **November 16, 2018** THV-11 article, GILCHRIST responded to Frank Scott, stating that Frank Scott "has failed to communicate with the local law enforcement when it matters the most, including his recent call for an investigation of the Little Rock Police Department by the U.S. Department of Justice."

108.   On **November 16, 2018,** in a piece entitled "*No apology from Little Rock police union for claiming mayoral candidate aligns with felons*," KATV-7 reported that the inflammatory LRFOP Facebook post had been deleted, but the LRFOP president, GILCHRIST, told KATV-7 he still would not apologize for the post.  "Everything in the post was correct and factual, I'm not apologizing for the post," said GILCHRIST.  GILCHRIST said the organization publicly endorsed Kurrus prior to the post, and they wanted voters to know who they're voting for.

109.   Technically, at the time of the LRFOP Facebook post, the "no-knock" victim referenced therein was not a "fleeing felon" as claimed by the LRFOP.  At the time of the post, the "no-knock" victim was a fleeing felony suspect, presumed innocent until proven guilty.  Therefore, "[e]verything in the post" was not "correct and factual," as publicly stated by the LRFOP through GILCHRIST.

110.   Kurrus, the beneficiary of the LRFOP Facebook post, apparently understood it to be inaccurate and racially charged.  He distanced himself from the ideas expressed in the post and asked the LRFOP to take it down.  On **November 16, 2018** Kurrus admonished the LRFOP for its divisive tactics, publicly stating:

> The Fraternal Order of Police has endorsed me. I interviewed for their endorsement, as did the other candidates in the mayoral race.  The FOP supports our police officers and their families, as do I.  I have no control over any of their messaging or what they choose to post.  I have asked the Fraternal Order of the Police to pull down the controversial post which has caused a great deal of discussion.  The decision to do so, or not, will lie with the FOP.  My fervent wish for our city is for its leaders to consider carefully the actions which we take, so that we can heal our city, and build a better future.  (emphases added)

111.   On **November 16, 2018,** THV11 also quoted GILCHRIST on the LRFOP Facebook post.  While acknowledging the LRFOP post was deleted, GILCHRIST nonetheless used the opportunity to cast

Frank Scott as anti-law enforcement, complaining about "[a] periphery of [Frank Scott] pointing fingers at law enforcement to gardener (sic) a segment of the vote that does not support law enforcement."

112.  The ADG ran an article by Rachel Herzog on **November 16, 2018** entitled "*Little Rock police union criticizes mayoral hopeful; Scott says post meant to distract*."  The November 16, 2018 ADG article featured comments from Joe Howard, president of the local chapter of the International Association of Black Professional Firefighters, who said he thought the post was inappropriate.  Mr. Howard wrote: "[w]e have a responsibility as professionals and members of a uniformed community to be better...It troubles me that as an organization your [LRFOP] members would allow you to post such a derogatory and divisive message.  No matter your choice, the tactics should remain honorable."

113.  The **November 16, 2018** ADG article continued:

> Many online commenters and Little Rock residents who spoke to a *Democrat-Gazette* reporter were critical of the union's post, which by Thursday night had garnered nearly 250 comments and been shared almost 400 times.
>
> "I think it's politically ugly," said Michael Biddle, a 34-year-old deputy clerk in the Pulaski County Clerk's office.
>
> Biddle said he believed the post had racial undertones and represented longstanding attitudes about "black criminality."…
>
> Robert Coon, a 39-year-old lobbyist, said he thought it perpetuated an idea of guilt by association that was inappropriate for law enforcement to put out.
>
> Darius Walton, a 27-year-old consultant, said he believed the post was meant to be divisive and misleading.  Though it might not represent the attitudes of every member of the union, Walton said, its leadership should be held accountable.
>
> "It just makes you wonder," Walton said. "I'm not going to say it was racially motivated, but it sure looks like it."

114.  On **November 16, 2018**, the City of Little Rock mayoral election proceeded with Frank Scott earning 37% of the vote while Kurrus earned 29%.  Because no candidate secured the necessary threshold percentage of 40%, a run-off election between Frank Scott and Kurrus was warranted.  The run-off election was scheduled for December 4, 2018.

115.  On **November 18, 2018**, Frank Scott appeared on a nationally televised CNN broadcast to address the LRFOP Facebook post and statements made by GILCHRIST and other LRFOP members.  In the November 18, 2018 CNN piece entitled "*Little Rock police union criticized for injecting race into politics*," Frank Scott stated his belief that the LRFOP refused to support his campaign because he was in favor of a citizen's review board.  He also reaffirmed his support of community policing and repeated his call for an independent citizen's review board as a check for the LRPD.

116.  On **November 29, 2018**, John Brummett of the ADG wrote an opinion piece about the Little Rock mayoral race entitled "*The Gloves come off*."  The article concerned a recent "push poll" conducted in Little Rock which included a suggestion that Frank Scott was opposed to same-sex marriages—a classic "wedge" issue.

117. In his **November 29, 2018** article, Mr. Brummett stated that he saw the result of the poll on a local news station's website and that it showed Frank Scott leading Kurrus 43%-38%. The local news website included a quote from BURKS—identified only as a Little Rock lawyer—in which he said that the poll result meant that Kurrus was tied with Frank Scott, considering the five-point margin of error.

118. In his **November 29, 2018** article, Mr. Brummett revealed that BURKS, "a lawyer…and openly avowed and staunch Kurrus-for-mayor supporter," was actually responsible for commissioning the poll. Mr. Brummett wrote:

> Long story short: A few of us started asking questions on social media about this odd poll and KARK's weird treatment. That piqued the interest of the *Arkansas Times* blog, to which <u>Burks revealed that he—acting personally, on his own—ordered up the poll</u>, not to push negativity on Scott, but because he believes in the progressive agenda.
>
> The poll, it turned out, contained the aforementioned question about Scott's church membership.
>
> <u>Let me summarize: A man highly partisan for Kurrus in the mayor's race commissioned on his own poll that contained a revelatory and conceivably negative detail about Scott, and the poll got leaked to Channel 4, which blithely posted an article quoting the Kurrus partisan without citing that partisan's affiliation</u>.
>
> Beyond that, for further curiosity, the poll showed Burks' candidate, Kurrus, down five points. That would seem to be nothing to brag about or leak unless a TV reporter let him get away with calling the poll a tie. (emphases added)

119. By the time of the **December 4, 2018** run-off election, Frank Scott had established himself as the reform candidate with Kurrus representing the *status quo*. During his campaign, Frank Scott made several promises regarding police reform to Little Rock citizens, including:

- creating a citizen's review board for police misconduct;

- revamping the LRPD's "no-knock" warrant policy;

- increasing community policing; and

- initiating an independent, third-party investigation of LRPD practices by the DOJ.

120. By **December 4, 2018,** the voters of Little Rock were presented with a well-defined choice for their next mayor: a reform-minded candidate, Frank Scott, or an avowed *status quo* candidate, Kurrus.

121. On **December 4, 2018,** Frank Scott ("Mayor Scott") won the mayoral run-off election, making him the first black elected mayor of Little Rock in the history of the city. During his acceptance speech, he discussed the appointment of a new police chief and assured the assembled crowd and the City at large that he would follow through on the promises he made on the campaign trail.

122. On **December 5, 2018,** the USA Today published an article by Andrew DeMillo of the AP about Mayor Scott's historic win, entitled "*Little Rock, Arkansas elects banking executive Frank Scott as first black mayor.*" The article read in part:

> Some voters Tuesday said they hoped electing Scott would send a message about Little Rock.
>
> "I just thought maybe it would help race relations in our town, which is not very good right now," said Mary Leckie, a 73-year-old white retiree who voted for Scott.
>
> *****
>
> Scott's election makes him the highest-profile black official in a state that hasn't elected an African-American to Congress or statewide office since Reconstruction. Blacks make up about 42 percent of the city's population, compared to nearly 16 percent statewide.  (emphases added)

123. On **December 5, 2018,** the *Washington Post* published an article entitled, "*Police reformer Frank Scott is Little Rock's first elected black mayor.*"  The December 5, 2018 piece correctly predicted that Mayor Scott would face resistance from the LRFOP, especially in light of their controversial race-tinged pre-election attacks:

> Scott will also face a hostile FOP.  He'll get a lot of resistance that promises to make reform difficult, particularly in a city police department that's still understaffed.  One big issue that lots of people cited when I asked about the problems at LRPD was that most of the white police officers live outside the city.  It's important that cops feel as if they're a part of the communities they serve–and it's just as important that those communities see police officers in the same way.  (emphases added)

## 2019

124. By **February 13, 2019,** the officer candidates for the LRPD police chief position vacated by Chief Buckner were narrowed to four.  The four finalists included: two department insiders, H. FINKS and FULK; Todd Chamberlain, formerly a commander with the Los Angeles Police Department; and KEITH HUMPHREY whom, at the time, was the chief of police of the Norman Police Department in Norman, Oklahoma.

125. In **February 2019**, during the chief selection process, H. FINKS and FULK made public statements expressive of their policing philosophies. Neither of them mentioned a desire to advance concepts consistent with 21st Century Policing.

126. On **February 22, 2019,** Starks shot and killed Bradley Blackshire ("Blackshire"), shooting a total of fifteen (15) rounds into the vehicle containing Blackshire, a black male, and another individual, including eleven (11) shots fired while he was splayed out on top of the hood.  *See Image 8 below.*



**Image 8: Video Still of Starks on the hood of the vehicle containing
Blackshire during the February 22, 2019 shooting of Blackshire.**

127. Starks' account of his actions immediately preceding the **February 22, 2019** Blackshire shooting was similar to that given by Hastings several years earlier in *Perkins*, insofar as Starks also claimed that he had no choice but to shoot because he was about to be run over.  IAD investigators viewed the video and concluded that Starks voluntarily placed himself in front of the vehicle prior to opening fire on the occupants just as Hastings was found to have done by IAD in August 2012.

128. One of errant bullets fired by STARKS on **February 22, 2019** lodged in the car of a Little Rock motorist bystander.

129. During the investigation of the Blackshire shooting, investigators listened to audio recordings of STARKS in which he described violating LRPD policy by not wearing his vest during off-duty employment.

130. In 2007, Gilbert voiced grave concerns about Hastings before he shot and killed Bobby Moore  No one in a supervisory position listened.  Nine years later, in 2016, Gilbert voiced grave concerns about STARKS before he shot and killed Blackshire.  No one in a supervisory position listened.

131. On **March 20, 2019,** Mayor Scott named KEITH HUMPHREY ("CHIEF HUMPHREY") chief of the LRPD.  CHIEF HUMPHREY's first day was scheduled to be April 15, 2019.

132. On **March 25, 2019,** prior to CHIEF HUMPHREY's employment with the City of Little Rock, the ADG published an article entitled "*Ex-colleagues praise Little Rock's new police chief.*"  Citing Mayor Scott's prior campaign promises to reform the LRPD, the March 25, 2019 ADG article described the type of philosophy CHIEF HUMPHREY was expected to bring to the LRPD:

> Mayor Frank Scott Jr. said the hiring of Keith Humphrey, chief of police in Norman, Okla., would be a turning point for a city that needs to heal.
>
> *****
>
> In the months since former chief Kenton Buckner announced his intention to leave the department, city leaders and residents alike have called for a chief who could change things.  A recent officer-involved fatal shooting—and the outcry of the victim's family in the weeks since—spurred those demands.
>
> *****

<u>A primary goal for his first 100 days on the job, [CHIEF HUMPHREY] said, is to lay the groundwork for a citizen review or advisory board.</u>  Scott said in a city Board of Directors meeting last week that he wanted a draft of a city ordinance to create such a board…

*****

"<u>We've got to get that set up,</u>" Humphrey said.  "<u>I can tell you right now that's something I believe in.</u>"  <u>Humphrey said he intended to have the board fully functioning and in place six months from now.</u>

Stacy Bruce, vice president of the Norman Citizens Advisory Board said Humphrey began the committee in part out of his desire for transparency.

"He felt like having an advisory board made up of people in the community could look at things from citizens' eyes and advise," Bruce said.  "The more people that understand what officers are doing, and trying to do, the stronger [the] community.   His philosophy is a community-policing philosophy, and he wants [residents] involved in that."

*****

"The way he thinks is just incredible," [] said.  "Easy to like, easy to get to know."

In a community forum before his hiring, <u>Humphrey said he wanted officers in Little Rock to change from a warrior mentality to that of a guardian.</u>

*****

In his speech to residents at the community forum this month, Humphrey said he intended to review and publish all department policies.  When asked if that was still his intention, Humphrey emphatically said yes.  "For a long time, only officers saw policies," Humphrey said.  "There's nothing in the policy that citizens shouldn't be able to see.   <u>They need to understand what we do, and why we do what we do.</u>"

*****

<u>Members of the community need to know they've been heard, Humphrey said,</u> and they need to know he is the kind of leader who listens.  "If it comes from my heart, and I know that I'm doing what I need to be doing, I think that's what they want," Humphrey said.  <u>"I want them to know that I'm holding the officers accountable and the community accountable."</u>

*****

"<u>[CHIEF HUMPHREY] doesn't try to hide things,</u>" Major Kevin Foster of the NPD said.  "I think that's what the community appreciates.  They don't want to feel like you're hiding something.  They want you to admit your mistakes and keep going, and he's very good at that."

133. The **March 25, 2019** ADG article included mention of CHIEF HUMPHREY's outreach efforts to all of the officers at the LRPD and ended with a description of his vision of creating an open, transparent police department that treats citizens like partners:

> "I wanted [all of the officers at the LRPD] to know that I am here, that I'm going to be accessible," Humphrey said. "I really think we can do this, but I wanted to say that I can't do it alone. <u>This isn't going to change overnight. It's got to be a partnership. I don't want them to think it's us versus [the community]. It's all of us together.</u>" (emphases added)

134. On **April 5, 2019,** the newspaper The Transcript (Norman, Okla.) ran an article entitled "*Police Chief Keith Humphrey says farewell.*"  The April 5, 2019 article noted that during CHIEF HUMPHREY's "tenure at the department, he has made a lot of friends and connections." *See Image 9 below.* CHIEF HUMPHREY was quoted as saying "You don't stay somewhere eight years and not develop family feelings for everyone.  It's not possible."



**Image 9: CHIEF HUMPHREY and a Norman, OK citizen at NPD Farewell Ceremony (Photo by Kyle Phillips/The Transcript).**

135. In the **April 5, 2019** article, one of CHIEF HUMPHREY's colleagues said of his Little Rock destination, "I'm very happy for him achieving his goal, <u>but I don't envy him.  He has lots to deal with [at the LRPD].</u>  I believe he'll do an outstanding job there." (emphasis added)

136. Another colleague referenced in the **April 5, 2019** article said of CHIEF HUMPHREY: "I value all that I have learned working directly with Chief Humphrey on a daily basis.  <u>His leadership encourages personal growth and development, and I value the many lessons learned and mentorship I have experienced over the last three years of being in this role.</u>  He values the opinion and expertise of his team…He definitely left his mark on both the Norman Police Department and the Norman community." (emphasis added)

137. The April 5, 2019 *Transcript* article listed the accomplishments CHIEF HUMPHREY achieved during his tenure at NPD:

> developing a vision statement for NPD in 2011; changing the crime analysis system; <u>expanding the community policing unit; creating a citizens advisory board;</u> starting a school resource officer program; <u>getting body cameras for officers;</u> creating a lateral police academy; adopting a

geographical policing concept; <u>increasing training in de-escalation tactics;</u> <u>increasing the number of officers trained in crisis intervention;</u> focusing on officer training in emotional intelligence (recognizing own emotions before arriving on scene); and firing a full-time public information officer (emphases added)

138. During his **April 5, 2019** farewell ceremony, CHIEF HUMPHREY discussed his goals for the LRPD, stating "I'm looking forward to a new challenge and <u>bridging the gap between the community and police.</u>" He continued, "<u>We're going to continue building on what we have worked on. We're going to continue to be visible and on the cutting edge when it comes to 21st century policing.</u>" (emphases added)

139. **On April 14, 2019,** CHIEF HUMPHREY was sworn in as the City of Little Rock's 38th Chief of Police. During the 19-week interim between the end of Chief Buckner's tenure but prior to CHIEF HUMPHREY's start date, the LRPD was run by a rotation of Bewley, H. FINKS and FULK. While the assistant chiefs were in charge, the LRPD had three (3) police-involved shootings, including Blackshire, which amounts to the shooting of one (1) Little Rock citizen approximately every 6.3 weeks.

140. **On April 16, 2019,** just two days after CHIEF HUMPHREY was sworn in, a large protest over the Blackshire shooting assembled near Markham St. and Broadway St. in downtown Little Rock, blocking traffic. Upon hearing of the protest, CHIEF HUMPHREY left his office and went to the intersection to meet with the protesters and listen to their concerns. *See Image 10 below.*



**Image 10: April 16, 2019, CHIEF HUMPHREY meets in downtown Little Rock with protesters of the Blackshire shooting.**

141. The **April 16, 2019** Blackshire protests in downtown Little Rock were managed peacefully and ended without major incident. No violence was reported. After meeting with the protesters, CHIEF HUMPHREY issued a statement, which read in pertinent part:

<u>In the spirit of transparency, I believed it was important to meet with those assembled and discussed their concerns today at the intersection of Markham and Broadway.</u> As you are aware, the Bradley Blackshire case has been a discussion in our community.

> Today I was able to speak with the Blackshire family and hear their concerns about the case. I respect their concerns, but encouraged them to allow due process. At the assembly, we discussed the concerns for a Review/Advisory Board, Body Cameras, and meeting with the Department of Justice.  (emphases added)

142. By meeting with protesters demonstrating against police violence, by meeting with Blackshire's family and by issuing a public statement on the shooting investigation just two days after his start date, CHIEF HUMPHREY was fulfilling Mayor Scott's campaign promise of providing increased police accountability and transparency.

143. On **April 22, 2019**, Sgt. James Stephens ("Stephens") submitted his IAD report regarding Starks' shooting of Blackshire in which he recommended sustaining a violation of GO 303 against Starks for his actions in the shooting.  Stephens' report read in pertinent part:

> *"Officers will not voluntarily place themselves in a position in front of an oncoming vehicle where Deadly Force is the probable outcome.  When confronted by an oncoming vehicle, officers will move out of its path, if possible, rather than fire at the vehicle."*
>
> Officer Starks placed himself in the path of the vehicle as it turned slowly in his direction in an attempt to avoid the police car.  After being "bumped" by the vehicle, and firing his weapon, he moved himself to the front of the vehicle endangering himself.   Officer Starks could have avoided the necessity to use deadly force by simply moving in the other direction, out of the path of the vehicle.  His explanation as to why he could not move to the other direction (fear that the driver might produce a weapon and he would have no cover) is not credible.   Choose to move yourself into an area with a known mortal danger as opposed to moving into an area with *a potential* mortal danger is not reasonable.
>
> I recommend that this violation be classified as "Sustained"…  (emphases added)

144. IAD investigator Stephens felt that STARKS' explanation for shooting Blackshire was "not credible."

145. FULK received Stephens' **April 22, 2019** report recommending that the violation of GO 303 by Starks be sustained, and she concurred with Stephens' "sustained" recommendation, signing her name at the bottom of Stephens' report to signify her concurrence with the finding. *See Image 11 below.*



**Image 11: FULK's signature on Stephens' recommendation that the GO 303 violation against Starks for shooting Blackshire be sustained.**

146. Based on her concurrence, FULK also felt STARKS' explanation for using deadly force was no credible.

147. On **May 6, 2019,** faced with the responsibility of presiding over a police-involved shooting investigation within a month of his swearing-in date, CHIEF HUMPHREY terminated Starks for violating GO 303 in the shooting of Blackshire.

148. In **May 2019**, per GO 105 (*Function and Responsibilities of Departmental Units*), the Chief of Police of Little Rock has the ultimate responsibility with the LRPD for the protection of life, preservation of law and order, investigation and suppression of all crimes and the enforcement of state laws and city ordinances.   Only the chief of police can modify the specific responsibilities and duties of the departmental units.

149. In **May 2019**, GO 106 (*Lines of Authority*) established that the chief of police, alone, sits atop the LRPD chain of command.  In May 2019, only the chief of police was vested with the authority to modify the chain of command.

150. CHIEF HUMPHREY acted entirely within his authority and discretion as chief of police on **May 6, 2019**, when he terminated Starks for violating GO 303.  It was not different than when Thomas used his authority and discretion as chief to terminate Hastings in 2012 for violating GO 303.

151. Based on CHIEF HUMPHREY's **May 6, 2019** letter terminating Starks, the decision to terminate Starks was based on a violation of GO 303.   Thus, CHIEF HUMPHREY adopted Stephens' recommendation with which FULK had already concurred.

152. Both CHIEF HUMPHREY and FULK agreed that Starks violated GO 303 during the Blackshire shooting incident.

153. By terminating Starks, CHIEF HUMPHREY was implementing the type of increased police accountability and transparency that Little Rock citizens expressly requested as evidenced by their majority votes for Mayor Scott in December 2018.

154. On **May 6, 2019**, the LRFOP, through new LRFOP president, RONALD MORGAN ("MORGAN"), issued the following statement regarding CHIEF HUMPHREY's termination of Starks for the Blackshire shooting:

> Today, I was present with Officer Charles Starks when he was informed by Chief Humphrey of his employment termination in reference to the incident on 02/22/19. Officer Starks was informed he was being terminated for violating LRPD General Order 303. II.E.2 which states, "Officers will not voluntarily place themselves in a position in front of an oncoming vehicle, where deadly force is the probable outcome. When confronted by an oncoming vehicle, officers will move out of its path, if possible, rather than fire at the vehicle."
>
> The Little Rock Fraternal Order of Police Executive Board strongly disagrees with this decision. Officer Starks did not voluntarily or intentionally place himself in the path of a moving vehicle. When the vehicle began to move, Officer Starks began backing away as the vehicle turned toward him. When the left front quarter panel of the vehicle struck him, Officer Starks fired. The events afterward were a continuation of that action, where deadly force had already been employed.

> Not only does the LRFOP Executive Board disagree with the Chief's decision to terminate Officer Starks, his entire chain of command disagreed with that decision as well. Officer Starks' chain of command (including a sergeant, lieutenant, captain, and assistant chief) with over 100 years combined police experience, reviewed the file and the evidence and recommended that he be exonerated.
>
> Officers are required to make split second decisions and today's decision has the potential to make officers hesitate in their actions, which could prove detrimental to the citizens of Little Rock and the officers themselves. Today's decision sends a message to officers of the department, that even when you're right, your employment can still be terminated.
>
> While the LRFOP Executive Board is greatly disappointed with the Chief's decision, we continue to support Officer Starks as he goes through the appeals process.  (emphases added)

155. Legally, the **May 6, 2019** LRFOP statement that "[t]he events afterward were a continuation of that action, where deadly force had already been employed" misstates the law insofar as deadly force that may be reasonable at a given moment may not be reasonable moments later, especially if the circumstances have materially changed.

156. The position generally articulated in the **May 6, 2019** LRFOP statement is that that Starks' discipline (*i.e.* his termination) was too harsh; the position articulated in the May 6, 2019 LRFOP statement is not that Starks should have been exonerated outright.

157. That CHIEF HUMPHREY's subordinates may have disagreed with his decision to terminate Starks—as described in the **May 6, 2019** LRFOP statement—is irrelevant by virtue of GO 106.  CHIEF HUMPHREY possesses the authority and discretion to terminate Starks.  Not surprisingly, Starks also disagreed with the decision, which is also irrelevant.

158. On **June 12, 2019**, CHIEF HUMPHREY announced an overhaul of the LRPD "no-knock" search warrant process, fulfilling an express promise made by Mayor Scott to the citizens of Little Rock during his successful mayoral campaign.  CHIEF HUMPRHEY unveiled three new policies Wednesday including a threat-assessment for no-knock warrants and more oversight of confidential informants."

159. During the June 12, 2019 announcement, CHIEF HUMPHREY reported that "[t]he department will now annually investigate its confidential sources and purge those informants who have not been used in the past year, adding that as of that week, the department had purged 59 informants because of non-use.

160. Per CHIEF HUMPRHEY's new no-knock policies, investigators seeking no-knock warrants will now first complete a threat assessment that ranks the warrant's subject by known violent offenses, drug or weapon possession and the fortification of the residence for which the warrant is being requested. After the submission of this information, a LRPD police sergeant and lieutenant must then approve each affidavit.  Further, per the policy changes, CHIEF HUMPHREY will personally review each no-knock warrant that was approved after investigators execute the warrant.

161. On **July 15, 2019,** Mayor Scott announced that he planned to present the city directors with an ordinance that would establish an independent citizen review board to oversee the LRPD.

162. The following day, **July 16, 2019**, the ADG ran an article entitled "*Little Rock mayor to present ordinance creating citizen review board for police department*" regarding the announcement.  As

reported in the July 16, 2019 article, the independent citizen review board proposed by Mayor Scott would review police actions, based on submitted complaints from the public, per the ordinance. The board would have the ability to investigate cases of use of force resulting in injury or death, corruption and discrimination.

163.   The **July 2019** ordinance proposed by Mayor Scott stated the measure would build public trust between the community and the LRPD and enhance public perception of the department, while ensuring that investigations are complete, thorough and fair.

164.   The July 16, 2019 ADG article quoted Mayor Scott saying the citizen's review board would help "build bridges between some communities and police and strengthen others." He stated that it would allow complaints to be heard and investigated while keeping both the public and officers safe.  (emphasis added)

165.   On **July 23, 2019**, The Arkansas Times published an article by Rebekah Hall entitled "*Scott makes tie-breaking vote to approve citizens review board ordinance.*"  The July 23, 2019 article detailed the procedural steps needed at a city board meeting to fulfill Mayor Scott's campaign promise of police reform.   Mayor Scott's tie-breaking vote enabled the ordinance he presented with CHIEF HUMPHREY to be enacted.

166.   The LRFOP unsuccessfully tried to block the ordinance at the Julye 23, 2019 meeting.   One the LRFOP complaints about the ordinance is that the proposed citizen's review board meetings would be open to the public, *i.e.*, fully transparent.   The LRFOP also complained, through their attorney, Chad Cumming, that the proposed board would initiate an investigation and reach conclusions on the propriety of police actions brought before it.

167.   The LRFOP represented a minority viewpoint.   According to the **July 23, 2019** article:

> Eve Jorgensen, leader of the Arkansas Chapter of gun violence prevention group Moms Demand Action, spoke in support of the ordinance, saying the ordinance isn't a "separate investigation," but a "much-needed quality control" to ensure the current investigative process is working as it should.
>
> One extra layer of review can only help, while the perceived lack of accountability can be very divisive," Jorgensen said.  "My hope is that this review board will help the citizens of Little Rock trust the process more, and that the number of these cases of use of force will be lower.   By allowing this level of transparency and empowering the community, I am hopeful we may finally see a new level of trust between our community and the police."
>
> State Sen. Joyce Elliott (D-Little Rock) also shared her support for the ordinance, saying she represents residents living in the 72204 zip code in Little Rock, which "sees more interaction with law enforcement than any other zip code."
>
> "We hear that there's not a need for [a citizens review board]," Elliott said.  "I understand that there is a need because of what I see and hear every day, and what I would really like is for the police officers not to think this is some kind of attack on them.  It is not.  It is really time for the community and the police to come together, and not see each other as the enemy. And this is one way of doing that, and we will work together, and not think of it as a zero-sum game."

*****

> "If we think about this only as a political endeavor, we're going to miss the
> point of this being community-building," Elliott said.  "We cannot see it that
> way."  (emphases added)

168. On **July 25, 2019**, at STARKS' CSC hearing, FULK gave sworn testimony in the CSC matter of
*Starks v. City of Little Rock*, Pulaski Co. Case No. CV-19-003, which challenged STARKS'
termination.  On July 25, 2019, FULK testified that she was the assistant chief over IAD on February
22, 2019, when Starks shot and killed Blackshire.  She testified that the investigating IAD sergeant,
Stephens, recommended that a violation of GO 303 be sustained against Starks because he
voluntarily placed himself in front of a moving vehicle before continuing to use deadly force on the
driver of the vehicle, Blackshire.

169. On **July 25, 2019**, FULK testified at STARKS' hearing that she agreed with the entire contents of
Stephens' report and also with his conclusion that STARKS violated GO 303:

> Q:  Have you seen [Stephens' IAD] report before?
>
> A:  Yes, sir.
>
> Q:  Have you read it?
>
> A:  Yes.
>
> Q:  <u>And is there anything in the report that you disagree with?</u>
>
> A:  <u>No, sir.</u>

*****

> Q:  There, Sgt. Stephens writes, on the bottom half of the page,
> "Based upon my review of this incident, which included a review
> of the criminal file, al the witness statements, and the videos
> contained in the file, <u>I believe that Officer Charles Starks is in
> violation of General Order 303, II.E.2."  Do you see that?</u>
>
> A:  Yes, sir.
>
> Q:  <u>And you concurred with Sergeant Stephens, correct?</u>
>
> A:  <u>Yes, sir.</u>  (emphases added)

170. On **August 23, 2019**, CHIEF HUMPHREY had a "meet and confer" with the LRFOP executive board,
H. FINKS and Capt. Ken Temple ("K. Temple").  At the August 23, 2019 meeting, MORGAN
addressed a "rumor" that the LRFOP called CHIEF HUMPHREY a "racist" at a prior LRFOP meeting.
The LRFOP described the discussion in a memo released to the public afterward:

> President Morgan opened the meeting with addressing a rumor that Chief
> Humphrey had heard after the monthly FOP membership meeting on
> Tuesday that the FOP said he was racist.  President Morgan advised Chief
> Humphrey that no one at any time at the meeting said he or his policies
> were racist and whoever told him that was misinformed and lying.
> <u>President Morgan advised that a legal term was used that means that his</u>

proposed changes in the Special Investigation Division (SID) could be
determined to be discriminatory in nature even if not intentional and two of
our FOP Attorneys were at the meeting and explained that.  Chief
Humphrey thanked President Morgan for addressing it and stated that the
explanation was "duly noted."  (emphasis added)

171.  Another topic the LRFOP executive board raised at the **August 23, 2019** "meet and confer" was the
LRFOP's complaint that discipline for policy violations was too severe.  MORGAN gave CHIEF
HUMPHREY examples of instances where he believed LRFOP members should not have been
disciplined despite violations of policy.  The instances cited by MORGAN were incidents which came
to light only because they were captured on the offending officer's MVR video.

172.  On **August 27, 2019**, FULK gave her deposition in another matter, *Davis et al.*, a case alleging
widespread racial discrimination at LRPD.  During her August 27 deposition, she was asked about
her prior recommendation that former LRFOP president GILCHRIST be terminated because he was
a liability to the department:

Q:      [H]ave you ever had an occasion to evaluate John Gilchrist for
some of the misconduct that he was accused of?

A:      I have.

***** 

Q:      So John Gilchrist is a – is – the Department had determined him
to be a liar, correct?

A:      I don't know that you use that term, but he has had an
untruthfulness violation sustained.

Q:      Well, when someone is untruthful, they're lying?

A:      Correct.  I just don't necessarily use the same wording you use,
but, yes, you're correct.

Q:      Okay.  So the president of the FOP for a while was a guy who's
been arrested twice and is a liar, right?

A:      Correct.

Q:      Does that give you any insight into the type of an organization that
that FOP is?

A:      When you say does it give me any insight, like what do you mean
give me any insight?

Q:      Well, I assume that he was voted to be president, right?

A:      Yes.

Q:      So that means a majority of people in the organization thought that
he was an appropriate person to represent the organization, right?

A:      Correct.

*****

Q:     Did you have any objection to him becoming president?

A:     No.

Q:     <u>You mean to say that his background and all didn't make you concerned about his fitness to be the president of the FOP?</u>

A:     <u>No.</u>

*****

Q:     <u>…Could you please tell me what you wrote about John Gilchrist—</u>

A:     <u>Sure.</u>

Q:     <u>–please?</u>

A:     <u>I sustained three violations.</u>  <u>I recommend termination.</u>  After reviewing his file, I concurred with Lieutenant Tyrell's recommendations.  The allegations have been properly identified. The evidence contained in this file supports a recommendation to classify all charges as, quote, sustained, end of quote.  <u>Sergeant Gilchrist has developed a pattern of behavior that's a liability to the Department.</u>  <u>Concur with termination.</u>  A. Fulk, 10/05/05.

Q:     So at least one time in history you felt that John Gilchrist was showing a pattern of behavior that might be a – that is a liability to the Department, right?

A:     Yes.

Q:     <u>So you went from thinking that he should be terminated as an officer to being a member of an organization where he's the president?</u>

A:     <u>Yes.</u>  (emphases added)

173.  During her **August 27, 2019** deposition, FULK was asked about the disclosure requirements of *Brady v. Maryland* and the appropriateness of GILCHRIST testifying as a witness in criminal cases in light of his prior sustained finding of untruthfulness:

Q:     <u>…And so if John Gilchrist was testifying in court on behalf of the state against a criminal defendant after this finding in 2005, do you agree with me that the defense should have been aware of his finding of untruthfulness?</u>

A:     <u>Yes.</u>

*****

Q:      ...It's the law in *Brady v. Maryland* that exculpatory information in the form of untruthful officers shall be relayed to the defense, correct?

A:      Yes.

*****

Q:      <u>And so if Gilchrist testified after 2005 in a criminal trial, and the defense was never apprised of his prior untruthfulness, that's not fair, is it?</u>

A:      <u>No.  They should have been aware.</u>

Q:      And if they were not aware, and the jury never heard it, that runs the potential risk of invalidating that conviction.  Do you agree with that or do you disagree with that?

A:      I agree that it runs the risk.

*****

Q:      ...If you accept that premise, do you agree that that represents a violation of the tenets of *Brady v. Maryland*?

A:      If what you're telling me is fact, then, yes.

174.    Based on the Pulaski County Clerk of Courts website, between October 5, 2005 and the filing of the instant lawsuit, GILCHIRST was listed as a testifying witness for the State of Arkansas in approximately 300 cases filed in criminal court.

175.    Based on FULK's testimony, the validity of any convictions premised wholly, or in part, on GILCHRIST's testimony, is in serious question.

176.    During her **August 27, 2019** deposition, FULK also testified that GILCHRIST was assigned to the training division in August 2019.  When questioned about the appropriateness of GILCHRIST's training assignment, she testified as follows:

Q:      <u>A guy who was terminated twice for various infractions, including untruthfulness, is involved in the Little Rock Police Department training, correct?</u>

A:      <u>He is.</u>

Q:      <u>You don't have any problem with that?</u>

A:      <u>No.</u>  (emphases added)

177.    During her **August 27, 2019** deposition, FULK testified that she and PLUMMER are good friends and that they worked together in IAD.  They were both assigned to IAD on October 25, 2016, when Richards was shot and killed by Hutchins.  However, FULK did not admit that she and PLUMMER had been romantically involved at any time.

178.  During her **August 27, 2019** deposition, FULK was asked about PLUMMER's questioning of Hutchins during the IAD investigation and the fact that PLUMMER put an exculpatory statement in her report that she falsely claimed Hutchins said:

Q:    So there was a police-involved shooting in October of 2016 of a gentleman by the name of Roy Richards, Jr.  Have you ever heard of that?

\*\*\*\*\*

A:    I remember responding out to the scene.

\*\*\*\*\*

Q:    So, again, you can look through [Hutchins'] statement all you like. You can even read his deposition.  He'll tell you honestly, he never said [he feared for his life when he shot Richards].  <u>If he never said that, and Plummer says he said that, that's a problem, isn't it?</u>

A:    <u>Yes.</u>

Q:    And that would be along the lines of a misrepresentation, wouldn't it?

A:    I don't know without reading the full file.

Q:    When I gave [PLUMMER] an opportunity to explain why she [falsely claimed in her IAD report that Hutchins told her he feared for his life], she said that she couldn't explain that, right?

A:    Yes, she did.

Q:    <u>Do you find that problematic?</u>

A:    <u>I do find that problematic.</u>

Q:    Why don't you – I mean, as we sit here today do you find that problematic?

A:    Yes, I do.

Q:    <u>As an assistant chief of the Little Rock Police Department, don't you think it behooves you to take this and bring it to someone's attention right now?</u>

A:    <u>Sure.</u>  (emphases added)

179.  Despite her **August 27, 2019** testimony under oath that she found that PLUMMER putting a false statement in an official investigation record problematic and despite her testimony that it would behoove her as an assistant chief of the LRPD to do something about PLUMMER's untruthfulness, FULK did nothing about PLUMMER's misconduct.  Despite her August 27 testimony, FULK did not bring the subject of PLUMMER's investigatory misconduct to anyone's attention.  FULK did not authorize or initiate an IAD investigation in August 2019 regarding PLUMMER's misconduct.

180.   During her **August 27, 2019** deposition**,** FULK was asked to identify all LRPD officers with whom she has been romantically involved.   In response, she testified that she had only been romantically involved with Bruce Maxwell and Annette Harrington, both of whom are white.

181.   On the evening of **August 27, 2019**, hours after FULK's deposition was completed, FULK's counsel notified plaintiffs' counsel that FULK had been thinking about her sworn deposition testimony earlier in the day and, specifically, about the question inquiring into her prior romantic work relationships. FULK now apparently remembered an additional romantic work relationship.   FULK's counsel told counsel for the *Davis, et al.* plaintiffs that FULK wished to come back the next day and change her deposition testimony.

182.   Therefore, in the interest of truth and completeness, on **August 28, 2019**, FULK was again put under oath and she attempted to correct her record.   FULK testified that she was also involved in a romantic relationship with a LRPD officer by the name of Lela Folsom, a white woman.

183.   In reality, prior to **August 28, 2019**, FULK was in a romantic relationship with PLUMMER, however, when given the opportunity to disclose this information on two (2) occasions, FULK intentionally concealed it while under oath each time.

184.   On **August 28, 2019**, H. FINKS gave his deposition in the matter of *Davis et al.*  H. FINKS testified that a few years earlier the was a defendant in a gender discrimination and retaliation lawsuit captioned *Patrice Smith v. City of Little Rock, et al.*  Capt. Patrice Smith ("Smith"), an African American woman and LRPD officer, alleged the existence of a hostile work environment at the department. H. FINKS testified that Smith's lawsuit was successful insofar as it settled for $135,000. H. FINKS stated his opinion under oath that Smith's discrimination lawsuit was not frivolous.

185.   On **August 28, 2019**, assistant chief Wayne Bewley ("Bewley") gave his deposition in the matter of *Davis et al.*  During his August 29, 2019 deposition, Bewley acknowledged that racism can pervade an organization even if that organization is headed by a minority—that it is not logical to believe that just because Chief Buckner, a black man, was the chief of the LRPD there was no racism at the department.   Bewley also testified that he previously filed a discrimination lawsuit against the City alleging "reverse racism" when he was passed over for a promotion given to a black man.

186.   On **August 30, 2019**, Washington gave her deposition in the matter of *Davis et al.*, in which she was a plaintiff.   At her deposition, Washington described a long-standing racially hostile work environment at the LRPD.   She testified regarding the frequency of race-based retaliation and multiple claims of "reverse racism" made by white officers at the LRPD which were unfounded.

187.   On **August 30, 2019**, Whitten gave his deposition in the matter of *Davis et al.*, in which he was a plaintiff.   At his deposition, Whitten testified regarding retaliation he experienced from his supervisor at the time, K. Temple, when Whitten reported that K. Temple engaged in an unseemly appearing act of favoritism with Bewley's sone, who was a LRPD recruit at the time.   Whitten testified that Chief Buckner and K. Temple jointly forced him out of his division in retaliation for voicing his legitimate concerns.

188.   On **September 4, 2019**, the CSC voted to uphold CHIEF HUMPHREY's termination of Starks in *Starks v. LRPD and City of Little Rock*, Pulaski Co. Case No. CV-19-003.

189.   In **mid-September 2019**, CHIEF HUMPHREY learned that PLUMMER may have admitted to putting a false statement in the Richards shooting IAD report in the Richards shooting.   CHIEF HUMPHREY relayed this information to FULK and told her these were serious allegations which needed to be investigated.   FULK responded that she agreed the matter was serious and asked for the opportunity

to look into it personally. Unaware of the prior romantic relationship between FULK and PLUMMER, CHIEF HUMPHREY agreed and expected FULK to open an IAD file.

190. **On September 20, 2019**, ATLAS-EVANS responded to a harassment complaint Officer Latrice Williams ("Williams"), a black woman, filed against PLUMMER. ATLAS-EVANS told Williams that "[t]he decision has been reached that the allegations [Williams] made against Lieutenant Cristina Plummer were unsubstantiated." In her September 20 response, ATLAS-EVANS then accused Williams of insubordination for her reaction to PLUMMER's conduct and threatened Williams' employment, stating:

> Although the investigation did not substantiate your allegations of harassment testimony from you and witnesses indicate that you displayed insubordinate and disrespectful behavior towards Lieutenant Cristina Plummer on July 16, 2018....I have determined that your account of what happened on July 6, 2018, differs from the accounts Sergeant Robert Oldham and Lieutenant Cristina Plummer reported. Your word cannot stand alone without factual support.

> Specifically, the accounts of Sergeant Oldham and Lieutenant Plummer revealed that you displayed insubordinate behavior towards Lieutenant Plummer by walking away from Lieutenant Plummer...

> \*\*\*\*\*

> Future occurrences of exhibiting insubordinate, unprofessional, and disrespectful behavior toward supervisors will not be tolerated. Such infractions warrant termination on the first occurrence [].

191. On **September 20, 2019**, ATLAS-EVANS emailed PLUMMER a copy of the response to Williams' complaint against PLUMMER, copying CHIEF HUMPHREY and WITHERELL.

192. Later that day, **September 20, at 4:08 pm**, CHIEF HUMPHREY emailed ATLAS-EVANS regarding her September 20 response to Williams' complaint against PLUMMER, articulating his concern with a pattern of harassment complaints made by minority officers against PLUMMER. CHIEF HUMPHREY explained his concerns to ATLAS-EVANS:

> I find it very concerning that everyone who files a harassment complaint against Lt. Plummer, for hostile work environment or unprofessional behavior, is accused of being insubordinate. What this does is provide a sense of entitlement for Lt. Plummer. I also find it concerning that the majority of employees who have filed hostile work environment complaints against her are minorities.

> \*\*\*\*\*

> ...I find it hard to believe that no one observes a pattern of concerning "bullying" behavior on [PLUMMER's] behalf. Employees of LRPD, especially of color feel as though they are being disciplined for reporting bad behavior.

> \*\*\*\*\*

> It is obvious that [PLUMMER] believes that the rules do not apply to her. <u>Frankly speaking I believe that she feels empowered to "bully" certain employees.</u>
>
> \*\*\*\*\*
>
> <u>I am not writing this email for you to change your ruling.  I am writing to let you know that officers, specifically minority officers, within the department believe their complaints are not being taken seriously</u>…I would be remiss if I didn't express my concerns…I have no reason to believe that Lt. Plummer is a bad person.  However, I do believe at some point her actions will rise to the level of a major lawsuit being filed against the City of Little Rock.  (emphases added)

193.  By articulating his concerns about potential discrimination in the disciplinary process at LRPD, CHIEF HUMPHREY was fulfilling Mayor Scott's campaign promises.  CHIEF HUMPHREY was also acting on the concerns articulated by the LRBPOA in its 2012 and 2017 letters.

194.  On **October 1, 2019, at 8:47 am**, ATLAS-EVANS responded to CHIEF HUMPHREY's September 20 email about PLUMMER.  In her October 1 response, ATLAS-EVANS told CHIEF HUMPHREY if he could "please share the basis of [his] comments [about PLUMMER's harassment] so [HR] can be more informed, that will be great."

195.  In early **October 2019**, after ATLAS-EVANS' email to CHIEF HUMPHREY, PLUMMER visited CHIEF HUMPHREY's office unannounced with a LRFOP representative.  Flanked by her LRFOP representative, PLUMMER told CHIEF HUMPHREY that she wanted to make sure that CHIEF HUMPHREY had no personal issues with her.  PLUMMER told CHIEF HUMPHREY that she wanted to make sure that he would give her a fair opportunity to advance in her career at the LRPD.  PLUMMER advised CHIEF HUMPHREY that she was informed by an unnamed source that he expressed concerns regarding her interpersonal skills and ability to work well with people.

196.  On **October 23, 2019, at 12:53 pm**, CHIEF HUMPHREY responded to ATLAS-EVANS' October 1 email, copying WITHERELL.  He informed them of PLUMMER's unannounced visit to his office with her LRFOP representative.  CHIEF HUMPHREY explained to ATLAS-EVANS that he was concerned that his comments to her regarding PLUMMER were shared with PLUMMER.  Because CHIEF HUMPHREY had never shared his concerns about PLUMMER to anyone else at that point, he stated to ATLAS-EVANS, "I do believe certain details from my [September 20] email [to ATLAS-EVANS] were disclosed to [PLUMMER]."

197.  Later that day, on **October 23, 2019, at 3:44 pm**, WITHERELL responded to CHIEF HUMPHREY's October 23 email, copying Mayor Scott, stating:

> <u>These allegations are very serious against a member of Human Resources.  The allegations will have to be investigated before Dr. Atlas-Evans will be able to continue any investigation.</u>  My question to the Mayor's office is should I do the investigation or ask a member of the City Attorney's office do it?  Are there any other options?  We have never been in this situation before.  Please advise on how I should proceed.  (emphasis added)

198.  On **October 30, 2019**, the LRPD's Deadly Force Review Board (DFRB) convened to review aspects of Starks' shooting of Blackshire.  In particular, the DFRB analyzed the IAD investigation of the shooting in the following areas: 1) avoidability of similar incidents in the future; 2) adequacy of training; 3) adherence to training; 4) adequacy of supervision; and 5) adequacy of investigation.  The DFRB

in the Blackshire shooting—IAD Case #2019-0005—included, among others, Ellison and Mr. Carpenter.

199. Among the findings of fact reached by the DFRB on October 30 were:

- STARKS did not verbally acknowledge on main channel that he was joining the motor vehicle pursuit of Blackshire;

- STARKS stopped Blackshire's vehicle in a parking lot on Kanis Rd. with his blues lights on and MVR equipment activated;

- Simultaneously, STARKS positioned his marked patrol unit in front of the suspect vehicle and instructed Central Communications to hold all radio traffic;

- STARKS moved from his unit between the front bumper of the Blackshire's vehicle to the driver side door of Blackshire's vehicle where he gave Bradley Blackshire verbal commands but did not warn Blackshire that he planned to use deadly force;

- STARKS then repositioned himself adjacent with the driver side front tire at which point Blackshire's vehicle slowly rolled forward towards him and Starks began to discharge his firearm; and

- STARKS repositioned himself in front of Blackshire's vehicle where he continued to discharge his firearm in one hand, while lying on the hood of the vehicle and operating his portable radio lapel microphone in the other. (emphases added)

200. Among the conclusions reached by the DFRB on October 30 were:

- STARKS' shooting of Blackshire could have been avoided;

- STARKS contributed to how the incident unfolded based on decisions he made prior to contact and during initial contact;

- Video footage of STARKS' shooting of Bradley Blackshire should be utilized as a training tool by the Training Division;

- The LRPD needs to expand training curriculum to include tactical approaches to vehicles that have backed in or are position in an oncoming manner;

- STARKS' initial approach was unsafe;

- STARKS' second volley of gunfire (11 gunshots) were not justifiable due to Starks' repositioning to a more dangerous position in front of the vehicle;

- STARKS put himself in jeopardy;

- STARKS did not adhere to his training or policy;

- STARKS' representation that he "blacked out" left the account of his actions incomplete and absent of further explanation; and

- Their review of the evaluations of the chain of command identified speculation and information not previously considered during administrative evaluations.  (emphases added)

201. The DFRB conclusion that STARKS should have warned Blackshire that he was going to use deadly force but did not, despite have time to do so, is consistent with Eighth Circuit and U.S. Supreme Court controlling case law.  The DFRB conclusion that STARKS' "second volley of gunfire" was not justifiable is also consistent with Eighth Circuit and U.S. Supreme Court case law.

202. The entire DFRB—which consisted of Capt. Crystal Haskins, Lt. James Wheeler, Ellison, Lt. Rusty Rothwell, Sgt. Angela Everett, Mr. Carpenter and Chief Deputy City Attorney Alex Betton—agreed with the findings articulated in the DFRB report for IAD Case #2019-0005 and, specifically, that Starks violated GO 303 when he shot and killed Blackshire.

203. From 2011-16, Mr. Carpenter represented the shooter, Lesher, in *Ellison* which alleged that her criminal investigation was compromised because her husband was the head of the homicide division which performed the criminal investigation.  Throughout that litigation, Mr. Ellison's police officer son, Ellison, urged outside agency investigation of officer-involved shootings and end investigation conflicts created by nepotism.

204. Despite their prior contested dealings, Mr. Carpenter and Ellison both agreed on October 30 that STARKS violated GO 303 when he shot and killed Blackshire.

205. On **November 1, 2019**, Ralph Breshears ("Breshears"), a white officer, gave a deposition in a "reverse racism" lawsuit he filed against the City of Little Rock in 2018.  In his deposition, Breshears testified regarding the significant clout of the LRFOP and GILCHRIST in officer personnel decisions, particularly in tandem with Chief Buckner:

> Q:   And in your opinion, how do you think you were retaliated against by the police department?
>
> A:   Well, I was arrested.  I was ousted from the position of being a police officer and forced to retire.
>
> Q:   Who forced you to retire?
>
> A:   The City.  The chief.  The police department.
>
> Q:   Chief Buckner said you need to retire?
>
> A:   Not—no, not in those words.
>
> Q:   How?  What words did they say, you must retire?
>
> A:   I was told that at the end of the Internal Affairs investigation that I was going to be terminated.
>
> Q:   Who told you that?
>
> A:   I want to say it was John Gilchrist.

Q:    And who is he?

A:    He's the president of the FOP.

Q:    So your basis for, in your words, being terminated at the end of the investigation was based on people with the FOP?

A:    For—yeah, I would agree with that.

Q:    Do you agree with me that the FOP is a separate organization, not part of the City of Little Rock, correct?

A:    Oh, yeah.

Q:    And they don't have any say in the Little Rock Police Department, correct?

A:    I wouldn't go that far.

Q:    They have no say in the management of the Little Rock Police Department.

A:    I wouldn't go that far.

Q:    Administrative decisions.

A:    I wouldn't go that far at all.

Q:    So you're saying the FOP can have somebody terminated?

A:    Or redeemed. Yes.

Q:    They have the power to redeem somebody?

A:    I've seen it happen where an officer gets 10, 30-day suspension rather than being terminated.

                              *****

Q:    [The FOP] just told you that you were going to be fired and that was it?

A:    Yes.

Q:    And, again, [the FOP] wouldn't actually have a say in the termination of a Little Rock Officer, correct?

A:    As far as documenting and saying, fire this guy?

Q:    Correct. They can't—

A:    Yeah, correct. No. but there's a lot of backdoor dealings that take place with the chief that they'll go in there and, hey, we need to do this, this, or this, and that occurs. (emphases added)

206. On **November 18, 2019**, FULK received the DFRB report in Case #2019-0005, regarding Starks' February 22 shooting of Blackshire.  As of November 18, 2019, FULK was aware that the DFRB agreed with the conclusion reached by Stephens and herself.

<u>2020</u>

207. On or about **January 1, 2020**, the City of Little Rock and the LRFOP entered into another serial exclusive bargaining agreement for the 2020 calendar year.  The ostensible purpose of the exclusive agreement "is to achieve and harmonious relations between the City of Little Rock and the LRFOP, Lodge #17; and…to maintain a spirit of cooperation and a willingness to work together to best serve this community" among other things.  The agreement contains many provisions which strongly benefit the LRFOP, including:

- The City paying LRFOP members time and a half pay for all court appearances with a two (2) hour minimum regardless of the circumstances (Article XV; Section 3);

- The City providing LRFOP members collectively with 1000 hours (125 8-hour business days) of "time off with pay to conduct LRFOP business" per year (Article III; Section 3(a));

- Agreeing that if, at the end of the calendar year, any balance of City-paid LRFOP hours remains, up to 400 City-paid hours will be carried over into the next calendar year and added to the new year's 1000 hours (Article III; Section 3(a)).

208. Based on the "time and a half" court pay provision of Section 3 of Article XV, a LRFOP member conceivably could appear in court for five minutes, learn the case has been dismissed or rescheduled, go home and take a nap and, later, be paid time and a half by the City for taking a nap.

209. The January 30 exclusive bargaining agreement reads that <u>"[t]he City and the FOP specifically recognize the necessity of continuous improvement in efficient and effective police protection and services of the City of Little Rock, and each party to this Statement of Agreement agrees to cooperate with the other in accomplishing this result."</u>  (emphasis added)

210. On **January 6, 2020**, Lt. Sidney Allen ("Allen"), an African American officer, gave his deposition in the matter of *Davis et al.*  He was asked about racism at the LRFOP and he confirmed its existence at the department:

> Q:  <u>Have you ever caught wind of there being a racist vibe at the FOP during your years of involvement there?</u>
>
> A:  <u>Yes.</u>
>
> Q:  <u>Have you ever seen that sometimes the majority of officers that the FOP backs in various allegations of police misconduct tend to be white officers more than black officers?</u>
>
> A:  <u>Yes.</u>

211. On **January 7, 2020**, H. FINKS gave another deposition in the matter of *Davis et al.*, testifying as to the effect that Chief Buckner's arrival apparently had upon his societal outlook.  He testified that he terminated his membership with the LRBPOA shortly after Chief Buckner's arrival after many years

of involvement. H. FINKS testified that he was a staunch supporter of the OK Program, which focused on advancing African American young men, for many years, even sending his son through the program. However, soon after Chief Buckner's arrival, H. FINKS not only began to oppose the OK Program, but he and Chief Buckner actually tried to eliminate the program, arguing incorrectly that it was tantamount to "reverse racism."

212.  On **January 10, 2020,** in the middle of a busy workday, local blogger and gadfly, RUSS RACOP ("RACOP") called CHIEF HUMPHREY's wife at the University of Oklahoma, where she has worked for several years. When CHIEF HUMPHREY's wife answered her work phone, RACOP launched into a diatribe about her husband, harassed her about her marriage and asked her why she was not with her husband. CHIEF HUMPHREY's wife told RACOP to never call her again and hung up the phone. She then informed her husband about RACOP's unprovoked harassment. *See Image 12 below.*



**Image 12: Photo of RACOP phone number calling
CHIEF HUMPHREY's wife at her place of employment.**

213.  On **January 24, 2020, at 7:25 pm**, RACOP made a FOIA request of the City of Little Rock, requesting materials "emails and attachments, memorandums (sic), letters, of any city employee that mentions or references CHARLES STARKS."

214.  On **February 7, 2020**, the City of Little Rock settled *Davis, et al.*, which alleged a long-standing pattern of racial discrimination and race-based retaliation at the LRPD. It alleged that the LRFOP had a documented history of attacking a prior African American police chief who tried to implement reforms aimed at fairness which threatened the LRFOP's oversized clout. The complaint also alleged that prior detailed, supported allegations of racial discrimination and race-based retaliation were not taken seriously by the HR Department run by ATLAS-EVANS and WITHERELL.

215.  The settlement of *Davis et al.* was covered locally and nationally. It was featured in a June 16, 2020 Wall Street Journal entitled "*Black Officers Say Discrimination Abounds, Complicating Reform Efforts.*" In the June 16 article, Davis stated that black officers sometimes had difficulty trusting white commanders to take action if they reported misconduct. CHIEF HUMPRHEY was also quoted in the article calling his officers "amazing," but noting that a small group of white officers stoke racial tensions within the department which causes problems for black colleagues.

216. On **February 26, 2020**, disappointed by the collective work ethic of H. FINKS and FULK, CHIEF HUMPHREY sent the assistant chiefs emails in which he asked them if they felt that they were living up to some of the philosophies they publicly espoused while they were applying for the position of chief of LRPD.

217. Based on records produced during prior litigation, H. FINKS was "out of the office" for twenty-nine (29) days in 2016, and FULK was "out of the office" for sixty-eight (68) days in 2016, combining for ninety-seven (97) total days missed in 2016.

218. Based on records produced during prior litigation, H. FINKS was "out of the office" for sixty-six (66) days in 2017, and FULK was "out of the office" for one-hundred and ten (110) days in 2017, combining for one hundred and seventy-six (176) total days missed in 2017.

219. Based on records produced during prior litigation, H. FINKS was "out of the office" for eighty (80) days in 2018, and FULK was "out of the office" for eighty-four (84) days in 2018, combining for one hundred and sixty-four (164) total days missed in 2018.

220. On **March 1, 2020, at 12:35 pm**, FULK responded to CHIEF HUMPHREY's February 26, 2020 email. In her March 1, 2020 email, FULK stated that she was essentially relieved of fulfilling the level of police services she promised when running for the chief position. *See Image 13 below.*

From: Fulk, Alice <AFulk@littlerock.gov>
Sent: Sunday, March 1, 2020 12:35 PM
To: Humphrey, Keith <khumphrey@littlerock.gov>
Subject: Follow up to your question

Chief,

    This is in response to you asking me if I felt like I delivered the type of service and implemented the programs that I promised during my community discussion. During the forum, the four of us were competing to be the CHIEF. I was not selected for the position. God has a plan and it did not include me being selected for that position, you were. As far as implementing the programs that I mentioned in the forum, that was if I were the CHIEF. I am the Assistant Chief and I don't run this organization. There are some programs that I can still implement in my current role. One of those is the "Taking Our City Back: Block By Block" initiative. I initially thought about implementing that when I took over the Field Services Bureau on July 6, 2019, however I felt it would be best to do it after our geographical policing sign-up this year. By waiting, when the officers get out and start meeting citizens in their areas of patrol, it will be more effective since those officers will be assigned to that area for 1 1/2 years. As far as other programs, I feel that since I am not the chief, my role is to support the programs you want to implement and help the Field Services Bureau embrace your visions.

**Image 13: Excerpt of FULK's March 1, 2020 email response to CHIEF HUMPHREY in which he asked her if she was living up to the ideals she espoused while competing for the chief position.**

221. Despite what she told CHIEF HUMPHREY in her **March 1, 2020** email, as of the date of the filing of the instant lawsuit, FULK has <u>not</u> implemented the "Taking Our City Back: Block By Block" initiative like she told CHIEF HUMPHREY she would.

222. On **March 1, 2020, at 8:25 pm**, FINKS sent an email to CHIEF HUMPHREY in which he responded to CHIEF HUMPHREY's February 26, 2020 email about maximizing his leadership potential.  In his March 1, 2020 response email, FINKS stated that there was "no expectation" that he assist shaping the vision of the department because he was "not selected for the job." *See Image 14 below.*

From: Finks, Hayward
Sent: Sunday, March 1, 2020 8.25 PM
To: Humphrey, Keith
Subject: Re: Take a look at this

Chief Humphrey,

You asked if I have delivered the type of service and implemented the programs I promised during my community forum as a candidate for the Chief of Police position. In my forum, I shared my vision for the department if I were to be selected as the Chief. To my knowledge, anytime a candidate speaks at a forum, interview, or panel discussion there is no expectation to carry out visions if they are not selected for the job.

**Image 14: excerpt of H. FINKS' March 1, 2020 email response to CHIEF HUMPHREY in which he asked him if he was living up to potential as assistant chief with the LRPD.**

223.    H. FINKS closed his **March 1, 2020** email to his superior officer, CHIEF HUMPHREY, by declining the chief's invitation to assist him in his assistant chief role.  *See Image 15 below.*

Thank you for the offer to assist me in reaching my goals and milestones. I do not currently have any goals or milestones in which I feel your assistance is necessary, but I do appreciate the offer.

Respectfully,

A/C Finks

ALLIN

**Image 15: Another excerpt of H. FINKS' March 1, 2020 email response to CHIEF HUMPHREY in which he asked if he was living up to his potential as assistant chief with the LRPD.**

224.    On **March 6, 2020**, Chief Buckner gave a deposition in *Davis, et al.* in which he was questioned about the prevalence of untruthfulness among LRPD officers during his tenure.  He was asked about a particular incident in which an officer was dispatched to a domestic abuse incident but did not open a case despite clear evidence of physical abuse.  The officer told investigators that she was unaware of the victim's injuries, but her MVR video footage proved that the victim showed her injuries and even physically demonstrated for the officer how the offender choked her.  Despite the video proof demonstrating that she lied in an official police report, the officer was not investigated by Chief Buckner or anyone for untruthfulness.

225.    At his **March 6, 2020** deposition, Chief Buckner was asked the following questions about the domestic incident and gave the following answers:

Q:    So in the final sentence of the second to last paragraph, Sergeant Van Watson, V-A-N Watson is talking about a conversation with Officer Kristen Watson, and he writes: "I asked Officer Watson if anyone mentioned anything about a physical assault or any injuries. Officer Watson advised no one told her anything about an assault or injuries."  I read that correctly, right?

A:    Yes, sir.

Q:    So Kristen Watson's statement to the Department in this investigation that no one said anything about any assault, about any injuries, correct?

A:    I only know what the statement you read according to what Van Watson said.

Q:    Okay. If you look at page 77, turn the page, Van Watson, after giving this statement from Officer Kristen Watson, he went and looked at the MVR videos. And he -- page 77?

A:    I'm on page 77.

Q:    Okay, and then after looking at the videos Van Watson writes: "On Officer Watson's video, Trueblood," the victim, T-R-U-E-B-L-O-O-D, "advised Officer Watson about the scratch on her arm several times. Ms. Trueblood also told Officer Watson about the scratch on her neck, and put her hands around her own neck to show how she was choked. On Officer Watson's video she could be heard talking to someone and is heard saying, 'we aren't here for that, we are only here for the service.'" <u>So my question to you Chief is, you agree with me that Kristen Watson told Van Watson an account of what happened that was contradicted by her own MVR video. Do you agree with that?</u>

A:    <u>If in fact the two statements that which you have highlighted are referencing the same thing, that would be a contradiction, yes, sir.</u>

Q:    <u>And so wouldn't it make Officer Watson untruthful?</u>

A:    <u>Not necessarily, sir.</u>

Q:    Well, why not?

A:    Well, I'll have to see what was said as to if that issue was raised for the contradictory statement or the language you use of untruthfulness, could there have been other information as to why there was a contradiction or why that charge was not considered. I don't see what the charges were.  (emphases added)

226.   On **March 12, 2020, at 7:17 pm**, CHIEF HUMPHREY received a phone call from Chief Anthony Williams of UALR Criminal Justice Institute (CJI) about PLUMMER's disruptive behavior in a recent continuing education course at CJI.  Chief Williams contacted CHIEF HUMPHREY due the "inattentive" and "unprofessional[]" behavior exhibited by PLUMMER during a CJI program discussion about police-involved shootings.  Chief Williams told CHIEF HUMPHREY that PLUMMER's outbursts was "the first time that [he] had gotten such vitriol" from a group of LRPD officers.

227.   Later on **March 12, 2020**, CHIEF HUMPHREY advised Bewley and Capt. Dustin Robertson ("Robertson") about PLUMMER's embarrassing transgressions.  CHIEF HUMPHREY further advised those command staff members that he felt compelled to apologize for PLUMMER to Dr. Cheryl May, Director of the UALR CJI.

228.   By **March 12, 2020**, CHIEF HUMPHREY was under the impression that FULK had already opened an IAD investigation on PLUMMER based on the information that she had falsified an official IAD report.

229. On **April 2, 2020**, the car of a Little Rock citizen, Karen Hunter, was stolen from the area of 1415 John Barrow Road. After Ms. Hunter called the police, Officer Michael Martin ("Martin") of the LRPD responded and drafted an incident report memorializing the incident. *See Image 16 below.*



### LITTLE ROCK POLICE DEPARTMENT INCIDENT REPORT

| JUVENILE INFORMATION | | | INCIDENT | | | Report generated: 4/14/2020 1:04 PM |
|---|---|---|---|---|---|---|
| INCIDENT NUMBER **2020-036415** | | UNIT ASSIGNED **1X64** | CALL DATE **04/02/2020** | CALL TIME **17:45:00** | TYPE OF CALL **THFTJO** | |
| INCIDENT DATE **4/2/2020 5:40:00 PM** | | | LOCATION OF INCIDENT (ADDRESS / BUSINESS NAME) 1415 JOHN BARROW RD | | DISTRICT **61** | |

| OFFENSE | | |
|---|---|---|
| INCIDENT OFFENSE TYPE 1: THFT MOTOR VEHICLE | OFFENSE STATUS | |

| VICTIM | | |
|---|---|---|
| VICTIM # **1** | NAME (Last, First, Middle) or BUSINESS **HUNTER, KAREN** | |
| ADDRESS 2022 | 72205 | |
| HOME PHONE 501 | WORK PHONE | MOBILE PHONE | OTHER PHONE |

Image 16: Karen Hunter's April 2, 2020 stolen vehicle LRPD incident report.

230. Lacking a means home after her car was stolen on **April 2, 2020,** Ms. Hunter called her friend CHIEF HUMPHREY, who said that he would come to the scene, which he did, even greeting Martin upon his arrival. CHIEF HUMPRHEY gave Ms. Hunter a ride home, however, when he dropped her off at her home, she left her incident report and other materials given to her by Martin in CHIEF HUMPHREY's SUV.

231. On the evening of **April 2, 2020**, Ms. Hunter called CHIEF HUMPHREY and informed him that she left the incident report and materials in his SUV. CHIEF HUMPHREY told Ms. Hunter that he could drop off the report and materials at her home the following morning, April 3, 2020, before he went to work out.

232. On **April 3, 2020, at approximately 6:15 am**, CHIEF HUMPHREY returned the stolen car police materials to Ms. Hunter and went inside her home for a cup of coffee and a brief chat.

233. On **April 3, 2020, at 6:15 am**, KEVIN SEXSON ("SEXSON") was apparently in the area when he spotted CHIEF HUMPHREY's SUV in the driveway of a house on Nichols and activated his dashboard camera. *See Image 17 below.*



**Image 17: CHIEF HUMPHREY's SUV (right) in the driveway of Ms. Hunter's residence.**

234. On **April 14, 2020, at 8:27 am**, RACOP sent an email to CHIEF HUMPHREY in which he called the chief a "scofflaw and a liar" and "an embarrassment to honest law enforcement officers." RACOP cc'ed Mayor Scott, the City Manager, the Board of Directors, the City Attorney and the Arkansas Times, among others to the belligerent email he sent to CHIEF HUMPHREY. *See Image 18 below*.



**Image 18: RACOP's April 14, 2020 email to CHIEF HUMPHREY call him a "scofflaw and a liar."**

235. In his **April 14, 2020** email, RACOP told CHIEF HUMPHREY that he should do the honorable thing and resign. RACOP closed his April 14 email by advising CHIEF HUMPHREY that "Walmart is hiring."

236. On **April 20, 2020, at 5:49 pm**, FINKS viewed SEXSON's MVR video showing CHIEF HUMPHREY's SUV in the driveway of Ms. Hunter's residence. FINKS did not export or copy the video.

237. On **April 22, 2020**, BURKS filed a retaliation lawsuit against CHIEF HUMPHREY on behalf of H. FINKS, DUANE FINKS ("D. FINKS") and REGINALD PARKS ("PARKS") (*Finks, et al. v. Humphrey, et al.*; 60CV-20-2718)(hereafter "*Finks, et al.*"). In the complaint, H. FINKS, D. FINKS and PARKS alleged retaliation and complained that CHIEF HUMPHREY "regularly yells, slams doors, and rages" against perceived enemies. FINKS complained that he was "lashed out" against by CHIEF HUMPHREY. FINKS complained that CHIEF HUMPHREY "angrily yelled." The litigants in *Finks, et al.* alleged that CHIEF HUMPHREY disagreed with the ruling reinstituting Starks as a LRPD officer and complained that their reputations were harmed.

238. On or about **April 23, 2020**, MOTOROLA SOLUTIONS d/b/a WATCHGUARD employee, MATT MURSKI ("MURSKI"), who is white, and who is also a former LRPD officer, traveled to the department headquarters and met with PLUMMER. During their meeting, MURSKI instructed PLUMMER on how to access and download video on the LRPD's MVR system. In April 2020, MOTOROLA SOLUTIONS d/b/a WATCHGUARD provided the LRPD with MVR services and/or equipment.

239. On **April 24, 2020, at 3:18 pm**, PLUMMER accessed SEXSON's MVR video and played it using FULK's work computer. PLUMMER played the video on FULK's work computer again at 3:19 pm. On **April 24, 2020, at 3:27 pm**, still using FULK's work computer, PLUMMER sent a copy of SEXSON's MVR video to an unknown recipient(s). on April 24, 2020, at 3:28 pm, PLUMMER downloaded SEXSON's MVR video from FULK's computer, which would allow copies to be made.

240. On **April 29, 2020**, one week after he filed *Finks, et al.*, BURKS filed a gender discrimination lawsuit against CHIEF HUMPHREY on behalf of FULK and PLUMMER (*Fulk, et al. v. Humphrey, et al.*; 60CV-20-2799)(hereafter "*Fulk et al.*"). In complaint, FULK alleged that CHIEF HUMPHREY retaliated against her because she provided testimony for Starks at his CSC hearing. FULK complained that she was "lashed out" against by CHIEF HUMPHREY. FULK and PLUMMER complained that CHIEF HUMPHREY "angrily yelled." The litigants in *Fulk, et al.* alleged that CHIEF HUMPHREY disagreed with the ruling reinstituting Starks as a LRPD officer and complained that their reputations were harmed.

241. On **April 30, 2020**, BURKS emailed ATLAS-EVANS complaining that HR had not yet opened an investigation on CHIEF HUMPRHEY. In closing, BURKS stated in his email "Please also consider this email notice of the City of Little Rock's ongoing refusal to open an investigation into Chief Humphrey."

242. On **May 5, 2020**, CHIEF HUMPHREY revised GO 202 (*Transfer and Assignment Requests*) to include a prohibition on nepotism, eliminating the prior practice of allowing blood relatives work together in the same division. Under the subsection "Restrictions on Transferred and Assignments," CHIEF HUMPHREY's new nepotism policy reads in part:

> *Nepotism—Transfers and Assignments involving relatives*
>
> *****
>
> *Relatives shall not be assigned to work together in Special Investigations Division, Major Crimes Division, Training Division, Administrative Services Section, 21st Century Community Policing Division, and Records and Support Division.*
>
> *****
>
> *Employees assigned to Patrol, Communications, and Special Operations who are related, may work in the same division but not the same shift or the same unit.* (emphases in original)

243. Many prior instances of nepotism at the LRPD have been revealed during civil rights litigation. In a 2011 police-involved shooting, Det. Mark Knowles participated in the in-house criminal investigation while his brother, Officer Jason Knowles, served as the shooter's companion officer, which the DRFB noted was a conflict that could compromise the entire process. Hastings, who shot and killed Bobby Moore had on the force with him a very influential, high-ranking father, two cousins, an uncle and a brother-in-law. Part of the allegations in *Perkins* was that Hastings was protected by his family and never held accountable for serious police misconduct leading up to his shooting of Bobby Moore. In

*Ellison*, the shooter's husband's division was responsible for building a criminal case against their boss' wife.  Lesher was not criminally charged in the shooting.

244.  The Office of the Chief of Police of Little Rock is absolutely vested with the authority to modify, change, add and eliminated police policies, including General Orders.  CHIEF HUMPHREY acted within his authority as Chief of Police when he added an anti-nepotism provision to GO 202 which, as he determined in his discretion, was "[i]n the best interest of the department" and would further "the goal of the Department to avoid creating circumstances in which the appearance or possibility of favoritism, conflicts or management disruptions" occurs.

245.  By revising GO 202 which abolished nepotism among divisional officer relatives, CHIEF HUMPHREY fulfilled another of Mayor Scott's campaign promises about bringing police reform and improving the quality of police services provided to Little Rock citizens.

246.  On **May 6, 2020, at 12:41 pm**, CHIEF HUMPHREY sent an email entitled "My First Year" to the entire LRPD.  In his May 6, 2020 email, CHIEF HUMPHREY thanked his officers for their service to the LRPD and the citizens of Little Rock.  In his May 6, 2020 email, CHIEF HUMPHREY stated that the department was still "working on ways to add additional initiatives that will provide more opportunities for employees to completely transition to 21st Century Policing."  CHIEF HUMPHREY asked his officers to take a look back at their accomplishments and then listed the changes he implemented in a mere twelve months:

- New transfer policy;

- New IAD process;

- Development of Citizens Review Board;

- Supervisor transfer/opportunity—Implementation of a rotation list;

- Elimination of policy that would not allow employees to be eligible for promotions due to suspensions;

- Chief's open door policy;

- Development of a new departmental nepotism policy;

- Modification of the pursuit policy;

- Commitment to leadership training;

- Establishment of field training units;

- Development of 21st Century community policing division;

- Hiring of departments first Civilian Public Information Officer;

- Developing a separate FOIA unit;

- Increase in staffing of FOIA unit to accommodate requests for body worn cameras;

- New facial hair and tattoo policy;

- Approval of baseball caps for officers;

- New uniforms for school resource officers; and

- Development of sole use vehicle program (2021-22 program would provide LRPD patrol officers marked take home units who live in Little Rock).

247. On **May 6, 2020, at 2:37 pm**, BURKS sent an email entitled "Documents and timeline proving City was not told truth by Chief Humphrey" to Mr. Carpenter.  In his email, BURKS wrote "I was told that your office is handling the investigation into whether the [] City staff/Directors were told the truth by and regarding Chief Humphrey and his background, and whether he is continuing to be honest."

248. The following day, **May 7, 2020, at 10:52 am**, BURKS emailed the City Attorney's Office, attaching a video screen shot from an LRPD dashboard camera showing CHIEF HUMPHREY's vehicle parked in the driveway of 2022 Nichols in Little Rock.  BURKS wrote:

> Once you ask Humphrey about what he was doing there that morning at the address of an applicant who would report to him (he will not be honest in my experience), you can ask Officer Sexson and he will tell you they talked, etc.
>
> Also, for what it's worth, the University of Oklahoma Police Chief position is open.  I believe that all the evidence I have presented would disqualify him for that position, but from the standpoint of cutting off further city liability, it would sure seem easier if he left to go there in my view.
> (emphasis added)

249. It is unclear what, if any, experience BURKS truly had with CHIEF HUMPHREY on or before May 7, 2020.

250. On **May 7, 2020, at 12:00 pm**, BURKS again emailed the City Attorney's Office.  In this email, BURKS stated that, in addition to FULK, PLUMMER, H. FINKS, D. FINKS and PARKS, there are "other city employees who have come forward with other claims against the Chief."  He continued:

> These other claims are that Humphrey has created a hostile work environment based on sexual comments and illegally favoring women for city employment under him that he is romantically involved with.

251. Moreover, in his **May 7, 2020** at 12:00 email, BURKS told the City Attorney's Office that "Sgt. Tori Trammell and the two women administrative assistants in the Office of the Chief of Police/command staff" also "have hostile work environment/harassment claims."  BURKS, a lawyer, reported that "[t]hese women were afraid to come forward until the two assistant Chiefs filed."

252. In his **May 7 at 12:00 pm** email, BURKS told the City Attorney's Office:

> [T]hat he has "direct corroborating evidence that Humphrey recommended a prospective female employee to be hired at that would report to him that he is romantically involved with.  The officer who is the source of this information was called to a house next door on 4/3/2020 for an unrelated issue, so it was entirely coincidental that he happened to run into the Chief at 6:30 a.m. that morning.  The officer reported that he saw the Chief to his patrol officers, and that is how we found out about it."

253. On **May 12, 2020, at 12:56 pm**, RACOP emailed a very specific Arkansas FOIA request to Mayor Frank Scott, CHIEF HUMPHREY, Moore, Mr. Carpenter, the City of Little Rock Board of Directors and the LRPD FOIA office. In the May 12 at 12:56 pm email, RACOP requested a copy of the recent City of Little Rock application for employment executed by Karen Hunter, an African American woman. RACOP provided Ms. Hunter's date of birth and residential address in his email.

254. On **May 12, 2020,** RACOP wrote an original story on his blog about the false claim that CHIEF HUMPHREY was involved in an extramarital affair with Ms. Hunter. RACOP referred to CHIEF HUMPHREY as a "deadbeat" and specifically referenced H. FINKS, D. FINKS, PARKS, FULK and PLUMMER's lawsuits against CHIEF HUMPHREY as evidence for his conclusions. In his **May 12, 2020** original article, RACOP stated that CHIEF HUMPHREY "has recommended that Hunter be selected to fill a position at LRPD that deals with the 80 million dollar budget…" RACOP cited "confidential sources" as source of the information he published in his May 12, 2020 blog.

255. On **May 12, 2020, at 4:46 pm**, BURKS filed a motion to transfer on behalf of FULK and PLUMMER which sought to have the case removed from the courtroom of Judge Alice Gray, an experienced African-American jurist, and transferred to Judge Chris Piazza, an experienced Caucasian jurist. The purported basis of BURKS, FULK and PLUMMER's motion was an interest in judicial economy. The motion to transfer was denied.

256. On **May 13, 2020, at 9:42 am**, RACOP emailed to CHIEF HUMPRHEY's wife a link to his blog containing a story he drafted about the false claim that CHIEF HUMPHREY was involved in an extramarital affair with Ms. Hunter. Above the link to the false story, RACOP posed a question to CHIEF HUMPHREY's wife on her work email account: "Any comments?"

257. On **May 14, 2020**, two City Board members publicly stated on radio and social media that they did not have confidence in CHIEF HUMPHREY, according to a KATV-7 piece entitled "*2 Little Rock city directors say they have 'no confidence' in LRPD Chief Keith Humphrey*." A basis for the lack of confidence cited by one of the members was the lawsuits filed by BURKS, H. FINKS, D. FINKS, PARKS, FULK and PLUMMER. "It's not just two assistant chiefs, it's rank and file people," one of the board members said.

258. On **May 14, 2020**, MORGAN issued a letter on behalf of the LRFOP which, again, targeted CHIEF HUMPHREY and noted the statements of the two City Board members:

> Brothers and Sisters:
>
> Since I sent out my letter to the membership on 05/07/2020, we have had several more negative developments involving Chief Humphrey, including public statements from at least two (2) City Board of Directors stating they have no confidence in Chief Humphrey.
>
> Your LRFOP representatives (Ronnie Morgan, Erik Temple, and Mark Ison) had a teleconference meeting with Chief Humphrey regarding a Grievance the LRFOP filed on behalf of the membership regarding the Chief's new nepotism policy. As expected, the Chief denied this grievance and we will be taking appropriate subsequent action.
>
> There have also been additional issues involving Chief Humphrey brought to light in the past week, and we expect to learn more in the coming days.
>
> *****

> We meet often via video and phone conferences and we have had several
> meetings with our legal counselors regarding numerous ongoing lawsuits
> and adverse actions perpetuated by Chief Humphrey.  We have assisted
> the members involved in the lawsuits and funded them via our legal aid
> fund.  We hear you!  We know you are frustrated and so are we!  Soon,
> we will meet and have a unified, member driven plan of action.
>
> Thank you for your support and continuing patience during these trying
> times as we face adversity from external as well as internal sources.
>
> Fraternally,
> Ronnie Morgan, President (emphases added)

259.  In the **May 14, 2020** KATV-7 piece, LRFOP president, MORGAN, appeared on the TV news, gave
an official statement on the board members' statements while standing in front of a prominently
placed LRFOP flag.  *See Image 19 below.*



**Image 19: Video Still of MORGAN's statement to KATV-7 about City
Board Members lack of confidence in CHIEF HUMPHREY.**

260.  In the **May 14, 2020** KATV-7 piece, MORGAN stated that he has never seen board members speak
out against a chief before in his career which "tells [him] that there's some kind of discord elsewhere."

261.  On **May 15, 2020, at 3:02 pm**, RACOP emailed another very specific Arkansas FOIA request to
Mayor Scott, Bruce Moore, Mr. Carpenter, CHIEF HUMPHREY and others.  In his May 15 at 3:02
pm email, RACOP requested any records regarding calls responded to by LRPD Officer KEVIN
SEXSON on Friday, April 3, 2020, including copies of 911 calls, incident reports and MVR recordings.

262.  On **May 16, 2020, starting at 7:36 am**, one of the unnamed co-conspirators of DEFENDANTS, who
is a white male, began a campaign of email harassment against CHIEF HUMPHREY via email.  The
unnamed co-conspirator used vile demeaning language and perpetuated, in a conspiratorial manner,
the false narrative that the chief was adulterous and "terrorize(s) good Women & Men." He defended
H. FINKS, FULK and STARKS.   The unnamed co-conspirator repeatedly referred to CHIEF
HUMPHREY as a "Lap Dog" and agreed to stop harassing him only if he entered into a deal:

> You apologize to every good Woman & Man you have targeted & harassed
> at the LRPD starting with Officer Starks, Chief Finks & Chief Fulk along
> with all their families then I will gladly stop call you a Lap Dog....Deal?

263. On **May 17, 2020, at 7:27 pm**, the unnamed co-conspirator of RACOP referenced the phony story concocted about CHIEF HUMPHREY via email and then openly made threats against CHIEF HUMPHREY:

> So I'm hearing a female staff member under you was not happy about your relationship with Ms. Hunter which was revealed Thu. ?...I'm told she showed to this displeasure with you on Fri....Care to comment ?
>
> I can name her....But I won't unless you give me no choice.

264. On **May 18, 2020, at 11:09 am**, CHIEF HUMPHREY emailed WITHERELL and alerted her that he had found out that PLUMMER and FULK were attempting to solicit female employees to concoct stories that he was inappropriate with female employees. In his May 18 email, CHIEF HUMPHREY reported that either PLUMMER or FULK had commented to female LRPD officers "You might as well get on this lawsuit train!"

265. In his **May 18, 2020** email, CHIEF HUMPHREY advised WITHERELL that PLUMMER had previously contacted female LPRD officers, asking them inappropriate questions about CHIEF HUMPHREY, in an attempt to falsely implicate him in a sexual harassment claim.

266. On **May 18, 2020, at 3:12 pm**, BURKS filed an *ex parte* motion for entry of an emergency injunction in *Finks et al.* In the motion, H. FINKS, D. FINKS and PARKS sought to prevent CHIEF HUMPHREY from opening an investigation into whom leaked MVR video footage to the media, an act which violates policy. In support of the motion, BURKS attached a KARK news article regarding SEXSON's statements to the media regarding his observation of CHIEF HUMPRHEY's vehicle at Ms. Hunter's home.

267. On **May 19, 2020, at 9:18 am**, CHIEF HUMPHREY emailed Mayor Scott, Mr. Carpenter and WITHERELL, indicating his lack of confidence in the integrity of the sexual harassment  investigation due to ATLAS-EVANS' friendship with FULK, one of the accusers. He explained his concern that all of the accusing parties have an association with FULK. In his May 19, 2020 email, CHIEF HUMPHREY stated that he wanted to make sure that the information that he provided to HR—that individuals were being solicited to make false sexual harassment claims against him—would be investigated.

268. In his **May 19, 2020** email, CHIEF HUMPHREY further explained his concerns that the questions comprising his interview of the prior day were not impartial. Specifically, CHIEF HUMPHREY stated that questions regarding RACOP formed part of the questioning and that this was inappropriate. Further, CHIEF HUMPHREY stated that he was concerned that ATLAS-EVANS had improper ulterior motives for prolonging the investigation.

269. On **May 19, 2020, at 4:22 pm**, BURKS filed a lawsuit on behalf of himself against CHIEF HUMPHREY alleging a violation of Arkansas FOIA statute, Pulaski County Case No. 60CV-20-3033. In his lawsuit, BURKS provided an inaccurate visual description of CHIEF HUMPHREY as depicted on SEXSON's MVR from April 3, 2020 though it was gratuitous and unnecessary for his pleading.

270. On **May 19, 2020, at 9:00 pm**, consistent with the mayoral platform on which he ran and won back in 2018, Mayor Scott announced that his office would order a third-party, independent investigation of the LRPD to identify any troubling patterns or practices at the department. Mayor Scott said:

> Since taking office, we have been committed to our ACT Plan–remaining Accountable, Clear, and Transparent as we govern. In recent weeks, both members of the Little Rock Police Department and department leadership

have called on the Mayor's Office to conduct an investigation stemming from three lawsuits filed against the chief of police and the City of Little Rock. Per our standard practice, we do not comment on or interfere with pending litigation. Because of that practice, we have no comment regarding the lawsuits. The facts relevant to those lawsuits will be adjudicated in a court of law.

However, as the elected Chief Executive Officer of this great city and after extensive discussion with our City Attorney, and in accordance with our ACT Plan, I am calling for an independent, third-party comprehensive review of the entire Little Rock Police Department's practices and procedures to determine what, if any, corrective actions need to be taken. The scope of this review will cover the following:

- Personnel Policies and Procedures;

- Handling of Private and Confidential Information; and

- Harassment and Misconduct.

The objective of this review is to ensure compliance with best practices in policy, procedure, and protocol within our Police Department. This review will also reassure residents of the LRPD's integrity. Understand that this review is not about one individual or one organization. It is an attempt to provide insight about any potential concerns with actions, behaviors, or decisions made. It will provide accountability and transparency for more effective policing and reliable governing.

If you are a resident of Little Rock, you may agree with me that it is long overdue. While I won't cite all of the systemic issues that exist within the department, here are a few:

- Nepotism;

- De-escalation tactics training and cultural competency;

- The Internal Affairs process; and

- Abuse of authority.

In the coming days, I will announce who will conduct this review. Even in the midst of this season of turbulence, we remain grateful for the daily sacrifices of our police officers. There are committed men and women who risk their lives every day to serve the residents of Little Rock. I am deeply appreciative and hopeful that this review shines a light on the hard work they do every day. Finally, I am optimistic that this review will foster a more unified police force to create a safer Little Rock. (emphases added)

271. On **May 25, 2020**, George Floyd, an African American Minnesota man, suffered excessive force at the hands of police officers with the Minneapolis Police Department, one of whom kneeled on his neck for nearly nine (9) minutes until Mr. Floyd died. Mr. Floyd's in-custody death sparked an international outpouring of sympathy for him and other victims of police brutality, along with the widespread demand for police reform. Civil rights protests of police misconduct and systemic racism

in the wake of Mr. Floyd's death (hereafter "Floyd protests") proliferated across the country, including in Little Rock.

272. On **May 26, 2020**, the day after Mr. Floyd's in-custody death, the LRFOP executive board, namely, MORGAN, ERIK TEMPLE, KEVIN SIMPSON, CARL HAMBY, STEVEN DODGE, MICHAEL MCVAY, CHRIS RINGGOLD, KYLE HENSON, TRAVIS CUMMING and MARK ISON (hereafter "LRFOP DEFENDANTS"), issued an LRFOP memo in which it urged LRFOP members to "Make Your Voice Heard" and asked them to consider a no-confidence vote against CHIEF HUMPHREY.

273. In the **May 26, 2020** memo, the LRFOP DEFENDANTS stated that CHIEF HUMPHREY had failed to meet the "highest standards of ethics, integrity, and honor."  The LRFOP DEFENDANTS stated:

> Evidence indicates that Chief Keith Humphrey has repeatedly misused or exceeded his authority, violated department policies, wrongfully attacked his subordinate officers, and tarnished hard-earned reputations in an attempt to evade accountability for his actions.  In short, he has fallen short of the basic standards of conduct required of every other officer on our force.

274. In the **May 26, 2020** memo, the LRFOP DEFENDANTS provided LRFOP members with reasons why they should vote "no-confidence" for CHIEF HUMPHREY, including, that he:

- terminated STARKS for the shooting of Blackshire "even after Officer Starks' entire chain of command found his actions to be justified and within policy";

- as the subject of "multiple lawsuits" alleging retaliation, hostile work environment" and failure to follow Arkansas law; and

- "sought to install a personal friend in an $80,000 a year position at the Police Department, even though this individual is not qualified for the job…"

275. In the **May 26, 2020** memo, the LRFOP DEFENDANTS criticized the reforms brought to the LRPD, including CHIEF HUMPHREY's anti-nepotism policy, claiming it "runs counter to established City-wide policies and will make our department less efficient in protecting our community."

276. In the **May 26, 2020** memo, the LRFOP DEFENDANTS stated that CHIEF HUMPHREY's anti-nepotism policy shows his "contempt for the experienced officers under his command."  The LRFOP DEFENDANTS closed their May 26 memo by stating that the "LRPD needs leadership.  The safety of our brother and sister officers and the safety of the citizens of Little Rock depends on it."

277. In the **May 26, 2020** memo, echoing BURKS' May 7, 2020 email to the City Attorney's Office, the LRFOP DEFENDANTS referenced the allegations which CHIEF HUMPHREY explained to ATLAS-EVANS and WITHERELL were solicited by FULK and others, stating that "numerous female officers and civilians have bravely come forward to report a disturbing pattern of inappropriate sexual comments and innuendos made by Chief Humphrey."

278. On **May 27, 2020**, KATV-7 published an online article entitled "*Little Rock police chief sued again, totaling 4 retaliation lawsuits by LRPD staff.*"  In the May 27 article, LRFOP president, MORGAN, stated:

> With two new lawsuits in less than 24 hours, the havoc being caused by the Chief's behavior continues to spread…This is precisely why our

members are currently actively voting on a resolution of no confidence. Our officers and the citizens of Little Rock deserve better. It's imperative that City leaders act quickly to resolve this crisis.  (emphasis added)

279. On **May 28, 2020**, Sgt. Yolanda McClendon ("McClendon"), a black female officer, submitted an official LRPD memo in which she expressed her concern over a group text message she received the day prior—May 27, 2020 at 10:50 pm—from a phone number she did not recognize.  The text message, which McClendon came to understand was from FULK, read:

> Angie, Debbie, Shorty, Linda and Marilyn- it's my understanding that u all hve heard inappropriate sexual remarks made by the chief.  HR has decided 2 close out the case and will only investigate those that come 4ward. I am willing 2 go on Friday and take any of y'all that want 2 go2 make an additional complaint. By no means do I want u 2 feel pressure 2 do this. I just don't want y'all 2 think he can get away with it and no one will stand up.  Pls let me know if u r interested in going 2 HR on Friday. This will snowball into more victims. Thx Alice.  (emphasis added)

280. In her **May 28, 2020** memo, McClendon stated that she is "well-versed with the protocol of making a Harassment Complaint."  She added that she felt "it was inappropriate to attempt to persuade me to file a complaint, when I do not have a complaint against Chief Humphrey."  (emphasis added)

281. In her **May 28, 2020** memo, McClendon explained that several individuals in the group text responded affirmatively to FULK's text solicitation.  McClendon confirmed her knowledge that one of the group text participants was Sgt. Debra Atkinson ("Atkinson"), a white woman, and PLUMMER's sister.

282. McClendon attached screenshot copies of the entire group text message exchange to her **May 28, 2020** memo.  *See Images 20 below.*

Angie, Debbie, shorty, Linda and Marilyn- it's my understanding that u all hve heard inappropriate sexual remarks made by the chief. HR has decided 2 close out the case and will only investigate those that come 4ward. I am willing 2 go on Friday and take any of y'all that want 2 go 2 make an additional complaint. By no means do I want u 2 feel pressure 2 do this. I just don't want y'all 2 think he can get away with it and no one will stand up. Pls let me know if u r interested in going 2 HR on Friday. This will snowball into more victims. Thx, Alice

**Image 20: FULK's May 27, 2020 text message to female LRPD officers soliciting sexual harassment complaints against CHIEF HUMPHREY.**

283. It was FULK who drafted the initial text to "Angie, Debbie, Shorty, Linda and Marilyn" and FULK was a participant in the May 27, 2020 group text message.  FULK's text was sent 20 days after BURKS'

email to the City Attorney's Office in which BURKS alleged that certain "women were afraid to come forward [with claims against CHIEF HUMPHREY] until the two assistant Chiefs filed."

284. In response to FULK's May 27 text message, one of the group text message participants at phone number (501) 920-5600 said, "<u>I feel like if several of us go, it's worth a shot. Strength in numbers….if they don't, then that looks worse than closing it</u>."   She later responded with a "thumbs up" emoji. (emphasis added)

285. In response to FULK's May 27 text message, Atkinson stated, "<u>I will go</u>." (emphasis added)

286. In response to FULK's May 27, text message, one of the group text message participants at phone number (501) 231-4055 answered "<u>Good for me</u>" when asked about going to HR on the following Monday.  (emphasis added)

287. In response to FULK's May 27 text message, one of the group text message participants at phone number (870) 672-1215 stated, "<u>I'll go</u>."  (emphasis added)

288. In response to FULK's May 27 text message, one of the group text message participants at phone number (501) 680-2524 said, "<u>Im out of state on vacay until 6/6 but will gladly go when I return</u>." (emphasis added)

289. Several of the participants of the May 27, 2020 group text message responded to FULK that they would be willing to file a sexual harassment complaint against CHIEF HUMPHREY.

290. Linda Hudson ("L. Hudson") was a participant in the May 27, 2020 group text message.  At all relevant times, L. Hudson was the LRFOP office manager and wife of T. Hudson, former LRFOP executive board member.

291. Atkinson was a participant in the May 27, 2020 group text message.

292. Marilyn Scott, a white woman, was a participant in the May 27, 2020 group text message.

293. Angie Carlock, a white woman, was a participant in the May 27, 2020 group text message.

294. On **May 30, 2020,** a sizable Floyd protest occurred at various locations in Little Rock.  On the evening of May 30, 2020, Little Rock protesters interrupted the flow of highway traffic on I-630.  Using the authority and discretion of his office, CHIEF HUMPHREY allowed the protesters to close down I-630 for approximately 30 minutes without using force or exacerbating the situation.  *See Images 21 and 22 below.*



**Image 21: May 30, 2020 protest in Little Rock over the in-custody death of George Floyd in Minneapolis (Photo by Brian Chilson/Arkansas Times).**



**Image 22: May 30, 2020 Little Rock protest on Interstate 630 over the in-custody death of George Floyd in Minneapolis (Photo by Arkansas DOT).**

295. On **May 30, 2020,** KATV-7 ran a piece on the Floyd protest in Little Rock, entitled "*Protesters temporarily block traffic on I-630 in downtown Little Rock.*"  The May 30 piece quoted LRPD spokesman officer Eric Barnes ("Barnes") who confirmed that a large number of protesters who gathered at the State Capitol on May 30 marched onto the interstate.  <u>According to KATV-7's May 30 piece, Barnes "said the demonstration was peaceful and that police were not interfering 'to make sure no one gets injured.'"</u>  The KATV-7 piece continued with information from the Arkansas State Police (ASP):

> Arkansas State Police spokesman Bill Sadler said the agency was responding to the demonstration and working to clear the interstate peacefully.  As of 8:45 p.m., state Department of Transportation cameras showed authorities were on the scene.  No demonstrators could be seen on the interstate.  (emphasis added)

296. On **May 30, 2020,** in the evening, approximately 50-60 LRPD officers and supervisors were staged behind War Memorial Stadium at the direction of H. FINKS. H. FINKS had ordered the officers to evacuate the 12th Street Station due to an alleged potential bomb threat. CHIEF HUMPHREY arrived

on the scene and observed the officers and supervisors standing around in one location with no clear plan for the situation.  Concluding that his command staff was failing to deploy the officers to various parts of the City to handle the Floyd protests, CHIEF HUMPHREY admonished his staff command and took control of the scene, giving his staff explicit directions to deploy the officers to various problematic areas of the City.

297.   The following day, **May 31, 2020**, CHIEF HUMPHREY issued an email statement to his officers in which he discussed the challenges of the Floyd protests and offered words of encouragement.  In his May 31, 2020 email, CHIEF HUMPHREY acknowledged the difficulties faced by his officers but also stressed the importance of citizen safety and officer accountability:

> Last night as we focused on the safety of citizens, property, and our employees, it is obvious that we would be encountering the unknown.  This is nothing new to us as law enforcement officers.  Even though they were not physically working on the streets with, our communication professionals were spot on as usual.
>
> \*\*\*\*\*
>
> [W]e as Little Rock officers did not initiate the nationwide anger.  However, we are blue.  That is the main focus of the protestors.  That is why it is important for us to always do the right thing.  I won't go into the true history of law enforcement when it comes to communities of color.  We all know the history of our city.  If you aren't aware of the history then I suggest that you quickly become familiar.  Our communities of color are simply, "Tired of being tired!"  It is not only the communities of color.  It is every ethnic group represented who continue to observe these horrific actions from law enforcement like those in Minneapolis.  As these types of incidents continue to occur the protests will become more frequent, larger, and volatile.
>
> There will be some who will frown upon this email.  They will see it as one sided and accusatory.  That simply is not true.  As long as I wear a blue uniform some will consider me an enemy.  This is not restricted to communities of color.  However, I knew when I took the oath 32 years ago my life would be forever changed.  As I have said before I am fortunate to serve in a dual role.  That being a proud African American male who is extremely proud to be a police officer.  I stand on the side of equality.  Not on the side of popularity or socio-economic status.
>
> So yes, I do see both sides.  Quite frankly, I am embarrassed from what I am seeing right now.  Not only in our country.  But within our department.  As I attended briefing events yesterday involving large groups of officers preparing to protect our citizens, property, and ultimately each other, I saw a segregated LRPD.
>
> \*\*\*\*\*
>
> The reason I am mentioning this is because our community feels the tension within LRPD.  There is a long standing perception in our community that racial problems exist within our department.  Even last night as I visited a staging location behind war memorial, and same behavior continued.  I was so disappointed and embarrassed that I ordered officers and supervisors to gear up and deploy.  Someone had to

cut the tension.  So, I acted as the knife.  Plus, there were so many areas that required attention.

\*\*\*\*\*

I have said from day one that I will never sugar coat anything.  I believe that this is a topic that I must not sugar coat.  No matter how uneasy this discussion may be I have to lead the conversation.  If we are going to make national news let it be related to positive community innovated initiatives.  (emphasis added)

298.  Regarding the segregation and racial strife within the LRPD to which CHIEF HUMPHREY referred in his email, civil rights litigation between the years 2011 and 2020 has revealed many instances of racial slurs and racial tension at the LRPD.  These incidents wholly support CHIEF HUMPHREY's conclusion that institutional racism exists at the LRPD.

299.  In 2014, a white LRPD officer, Arthur McDaniel ("McDaniel") was accused of calling a white woman in an interracial relationship a "nigger-loving whore," at a gas station after observing her African-American boyfriend while he was pumping gas with their two-year-old child.  The woman filed a citizen's complaint (IAD Case #12-01) and the LRPD initiated an investigation, but McDaniel was allowed by Chief Buckner to take an early retirement prior to the completion of the investigation.  The effect of McDaniel's retirement was that the IAD investigation was discontinued and never completed, regardless of the legitimacy of the citizen's allegations.

300.  At a 2016 deposition, McDaniel testified about his historical usage of racial slurs:

Q:    [Nigger is] a pretty offensive word, isn't it?

A:    It can be taken like that, yes.

Q:    When a white person says it to a black person, unless there's some very special relationship that they have, it's – you understand that to be offensive to be heard by a black person from a white person, don't you?

A:    Yeah, I would agree, but I don't – I don't say it to a black person –

Q:    I'm just saying –

A:    – out of respect.

Q:    When you use the word, you make sure there's no black people around?

A:    That is correct.  (emphasis added)

301.  In 2014, Officer James Christ ("Christ") was investigated for using racial slurs when he called black Little Rock citizens a "pack of spades."  Christ claimed the IAD investigation was a product of "reverse racism."  Like McDaniel, Christ was allowed to retire early during his investigation, which was then discontinued and never completed.  Earlier in his career, in November 2009, Christ shot and killed an African American mentally ill man without warning.

302.  In early 2016, Officer Jeff King ("King") sent emails with disparaging racist comments referring to President Barack Obama as a "Sambo," juxtaposed with a photograph of King in his LRPD uniform

guarding Air Force One at the Little Rock airport.  The United States Secret Service contacted the LRPD about King's slurs because the federal agency considered it to be dangerous hate speech.

303.  In March 2016, African American LRPD officer, Corey Hall ("Hall"), testified that Verkler, a former LRFOP president, used the slur "nigger" in Hall's company while Verkler was a high-ranking officer with the department.  Hall eventually filed a racial discrimination lawsuit against the City.

304.  In September 2016, African American civil rights lawyers, John W. Walker—a highly-respected state senator at the time—and Omavi Shakur, were arrested for filming the traffic stop of black motorist, which was a legal act.  *See Image 23 below*.  During the 2016 incident, one of the arresting officers called Mr. Walker a "race-baiter" and noted Mr. Walker's law degree before mocking his intelligence, all of which was captured on a LRPD body mic.  The following day, Chief Buckner was forced to apologize to Mr. Walker and advise him that all charges would be dropped.



**Image 23: Civil rights legend, John W. Walker, is arrested by LRPD officers In 2016 for legally video recording the traffic stop of a black man (LRPD Dashboard Camera Video Still).**

305.  In October 2016, Hastings testified in Perkins that a fellow officer, Thomas Moore, referred to a predominantly African American part of town as being the "Niggerhood."  Hastings also admitted to using the word "nigger," and added that his father, T. Hastings, had a history of using the slur around the house when Hastings was growing up, as did his Hastings' officer uncle, Ronnie Hastings.

306.  On **August 29, 2019**, Lt. Ken Temple ("K. Temple"), who is the father of TEMPLE, gave a sworn deposition in *Davis et al.* At his August 29, 2019 deposition, K. Temple testified that used the word "nigger" in a variety of settings, although he claimed he could not recall the last time he used the slur or at whom it was directed.

307.  On **May 31, 2020, at 12:12 pm**, the LRFOP issued a statement on Facebook in which it responded to the email CHIEF HUMPHREY sent to his officers regarding the George Floyd protests and his concerns about segregation at the department.  The LRFOP's statement praised H. FINKS and FULK and accused CHIEF HUMPHREY of "spreading tension and unease."  The LRFOP statement undermined CHIEF HUMPHREY's authority and read in pertinent part:

> Last night, the men and women of the Little Rock Police Department demonstrated the courage, integrity, and honor of true law enforcement professionals…<u>Assistant Chiefs Finks and Fulk demonstrated excellent leadership in the unified command post.</u>

Today, Chief Humphrey sent an email, in which he said he was embarrassed by what he saw sat briefings.  The chief claims that he saw a "segregated LRPD."  Where the chief saw division, we saw unity…

\*\*\*\*\*

While the unified command post was managing the incident, Chief Humphrey was spreading tension and unease.  He yelled at officers, and ordered them to leave the staging area and respond to the incident without a plan, violating one of the basic tenants (sic) of incident command.

\*\*\*\*\*

…Things are tough right now, and the police department needs leadership.

\*\*\*\*\*

LASTLY, YOU ARE NOT AN EMBARRASSMENT, EACH AND EVERY ONE OF YOU ACTED AS TRUE PROFESSIONALS! #LRFOPFAMILY #LRPDFAMILY #FOPSTRONG. (emphases added)(ALL CAPS in original)

308. On **May 31, 2020**, there was another Floyd protest in Little Rock, this one focused on the State Capitol.

309. On **June 2, 2020**, while Mayer Scott, CHIEF HUMPHREY and the City of Little Rock were under intense pressure due to responding to the Floyd protests, as well as the growing COVID-19 pandemic, the LRFOP held its "no-confidence" vote against CHIEF HUMPHREY.  The LRFOP "no-confidence" vote passed.

310. On **June 2, 2020,** moments after the "no-confidence" vote, the LRFOP released the following statement to the media which, among other things, repeated, once again in the media, the lawsuits filed by H. FINKS, D. FINKS, PARKS, FULK and PLUMMER:

By an overwhelming margin, members of the Little Rock Fraternal Order of Police voted to pass a Resolution of No Confidence against Police Chief Keith Humphrey. Chief Humphrey has been the subject of multiple lawsuits relating to allegations of retaliation, sexual harassment, improper hiring, as well as a potential criminal investigation into his illicit actions.

Ronnie Morgan, the President and Erik Temple, the Vice President, of the Little Rock Fraternal Order of Police, released the following statement regarding the vote:

The Little Rock Fraternal Order of Police is made up of a diverse group of races and creeds that represent 95% of our department's officers.  89.2% of our members voted on the resolution. The Resolution of No Confidence passed by a total of 83.83% constituting an overwhelming margin of our members in favor of "No Confidence" to 16.17% of our members in favor of "Confidence."

Unlike a political election, there is no cause for anyone to celebrate the

outcome.  <u>At a time when people across the nation are taking to the streets to demand moral and honest leadership from law enforcement, it is particularly disappointing the Chief's unethical and illegal actions have brought us to this point.</u>

The residents of Little Rock will not benefit from allowing any individual— especially the man responsible for leading our department—to be above the law and the basic code of ethics that we require of every officer.

<u>This moment of urgency should remind city leaders of the importance of having strong, honest and transparent leadership at the helm of our police department.</u>

<u>In the coming weeks, we will continue our fight to return integrity to the Chief's office and we stand ready to work with the Mayor and city leaders to do so.</u>  (emphases added)

311. In its **June 2, 2020** release, the LRFOP invoked the public outcry over the in-custody death of George Floyd as a basis for voting "no-confidence" against reform-minded CHIEF HUMPHREY.

312. On **June 8, 2020**, via City of Little Rock press release, Mayor Scott announced names of the individuals selected to empanel his third-party, independent investigation of the LRPD patterns and practices.  Among the diverse group selected are a former police officer, attorneys, educators, social scientists and a former federal prosecutor.  The group of nine members consists of: one (1) black male; three (3) white males; three (3) black women; and two (2) white women.

313. On **June 8, 2020**, via City of Little Rock press release, CHIEF HUMPHREY announced that the LRPD is in discussion with ASP to conduct investigations of all officer-involved shootings and in-custody deaths.  According to the June 8 press release, the LRPD will also create a duty to intervene policy, which would require officers who observe another officer using force to prevent further harm if the force being used is not reasonable and the officer has a reasonable opportunity to prevent harm. The new policy would require officers to promptly report any such observations to a supervisor.  Per the press release, <u>the goal of these changes is to "create more accountable investigations of deadly force and in-custody death cases as well as de-escalating incidents with the public."</u>  (emphasis added)

314. By having officer-involved shootings and in-custody deaths investigated by an independent law enforcement agency and by creating a duty to intervene policy, CHIEF HUMPHREY created LRPD policy which was consistent with the promises of police reform made by Mayor Scott on the campaign trial in 2018.

315. In the **June 8, 2020** press release, Mayor Scott stated:

<u>The independent review and other policy changes coming to LRPD are all in accordance with our ACT plan—to be accountable, clear, and transparent to the residents of Little Rock.</u>  There are long-standing issues within our police department, and I am optimistic that this review will foster a more unified police force to create a safer Little Rock.  <u>Fortunately, we began this work of police department reforms more than a year ago.</u>  Since taking office, we created a new no-knock warrant policy to limit its use and will be finalizing the purchase of body-worn cameras in July.  We also created a Citizens Review Board that will meet for the first time later this month.  <u>These are bold changes that will help us fully achieve the 21st Century Policing Model.</u>  (emphases added)

316. In the aftermath of the George Floyd in-custody death, national discussion began to focus on the oversized role of police unions, such as LRFOP Lodge #17 in Little Rock. On **June 8, 2020**, Sheriff Hubert Peterkin of Hoke Co., NC, was a guest on CNN's Anderson Cooper 360 program. *See Image 24 below.*



**Image 24: Sheriff Hubert Peterkin discusses the challenges faced by reform-minded police chiefs who attempt to rid their departments of bad officers.**

317. On the June 8, 2020 CNN piece, Sheriff Peterkin discussed the difficulty faced by reform-minded chiefs who fire bad cops only to have them return due to the undue influence of police unions:

> One thing I would say that would help reform: If I have fired an officer in my office—and I've done it many times, for excessive force, discrimination—and I fire him, he should not be allowed to go the next county over and get a job. (emphasis added)

318. During the **June 8, 2020** CNN broadcast, Sheriff Peterkin talked about the notion of police department transparency and how bad officers' background can be hidden from public view to the detriment of the public at large:

> If the law enforcement officials…chiefs… [] if they're not going to be transparent, if they're not going to have integrity and hold to the morals and values of our oath, then something needs to be passed—all the way to Washington if we have to—to make [officers' backgrounds] available…[W]e shouldn't even be have to be having this conversation. We're supposed to do what's right, and we're not doing what's right if we're hiding and protecting officers who don't need to be in this business. (emphasis added)

319. On **June 9, 2020, at 3:27 pm**, RACOP began another email harassment campaign against CHIEF HUMPHREY, cc'ing Mayor Scott, Mr. Moore, the City Board of Directors, Mr. Carpenter, Mr. Brantley, BURKS and others. In his June 9, 2020 email, RACOP threatened to spread false rumors about CHIEF HUMPHREY. RACOP ended his June 9, 2020 email with a reference to BURKS appearing on a local radio program to "rip" CHIEF HUMPHREY "a new one." RACOP wrote: "Enjoying then (sic) rip you a new one on 102.9 with guest Chris Burks."

320. On **June 15, 2020**, CHIEF HUMPHREY was asked to participate in a live stream of a City, County and Local Affairs Joint Committee hearing on the recent protests in Little Rock and activities that

transpired at the State Capitol on May 31, 2020.  The purpose of the hearing was to analyze aspects of the Floyd protests in order to guard against any future protest activity.  At the outset of the hearing, State Sen. Gary Stubblefield commented on the record that he has closely known State Capitol Chief Darrell Hedden ("Hedden") for ten years and that Hedden was previously his personal bodyguard.

321. At the **June 15, 2020** hearing, Hedden claimed that protesters put him and his officers "in fear of [their] lives" but they had discussed beforehand that they would not use deadly force against the protesters because they "would immediately be considered the aggressor."

322. At the **June 15, 2020** hearing, Hedden pointed the finger at the Little Rock police for the Capitol being "desecrated." He claimed he could get no help from the LRPD. He went out of his way to dispute statements by Mayor Scott and CHIEF HUMPHREY that outside forces were responsible for some of the property damage.  He disrespectfully referred to CHIEF HUMPHREY as "that man."

323. At the **June 15, 2020** hearing, CHIEF HUMPHREY explained the extent of his authority and discretion to respond to emergency situations in Little Rock.  CHIEF HUMPHREY also stressed the importance of 21st Century Policing techniques, which, he posited, were essential to avoiding death or serious bodily in the city.  He stated: "If we would've used deadly force based on property damage, this city would have burned...I did not want this city to burn, people to get hurt, officers to die, based on property.  And I won't apologize for that."  (emphasis added)

324. At the **June 15, 2020** hearing, CHIEF HUMPHREY stated: "To have a peer sit here and call me 'that man' and say that he doesn't trust me is insulting, it is borderline xenophobic, it is disrespectful…and it is disheartening."

325. BURKS spoke at the **June 15, 2020** hearing although it is unclear what role he occupied there.  It is unclear who invited BURKS to address the committee.  At least one of the committee members questioned BURKS' role at the hearing but she was not given an answer.  BURKS used the committee appearance to disparage CHIEF HUMPHREY, calling his testimony "disappointing." BURKS called the testimony of Hedden and CHIEF HUMPHREY an "ego fest."

326. On **June 15, 2020, at 1:23 pm**, The Arkansas Times published an article entitled, "*Chief Humphrey defends himself against legislative scapegoating in Capitol demonstrations.*"  In the June 15, 2020 piece, Max Brantley noted that the state legislative panel was "seemingly anxious to fault [the LRPD] for their work in the opening days of George Floyd demonstrations when property was damaged, including graffiti on the Capitol."

327. On **June 17, 2020,** in the wake of the death of George Floyd, Mayor Scott announced that he would issue an executive order banning the use of chokeholds by LRPD officers.  Mayor Scott's announcement was covered by THV11 and, in their piece, CHIEF HUMPHREY stated that officers with the LRPD need to engage in more de-escalation tactics.

328. By banning chokeholds by LRPD officers, CHIEF HUMPHREY implemented a policy which was intended to lessen police violence in the field, and which was consistent with the campaign promises made by Mayor Scott to the citizens of Little Rock in 2018.

329. On **July 1, 2020**, CHIEF HUMPRHEY circulated a memo entitled "Full Implementation of Nepotism Policy," in which he advised that his May 2020 revision to GO 202 were slated to take effect the first pay period of January 2021.  CHIEF HUMPHREY reiterated that employees falling within the relationship guidelines of GO 202 C.2.b shall be required to transfer, with the division commander having authority to make the decision as to which employee will be transferred.

330. By creating an anti-nepotism policy, CHIEF HUMPHREY sought to avoid the serious professional conflicts pervading the LRPD for decades, which is reflective of the promises of Mayor Scott, who successfully ran on a platform of brining anti-corruption measures to the LRPD.

331. In **July 2020**, CHIEF HUMPHREY continued to receive harassing and threatening emails from various unnamed co-conspirators of DEFENDANTS.   On **July 1, 2020, at 11:37 am**, one such unnamed co-conspirator emailed CHIEF HUMPHREY, making unsubstantiated claims against a black LRPD officer, and accusing CHIEF HUMPHREY of professional malfeasance for "hiding" a file relating to alleged claims against the black officer.

332. On **July 1, 2020, at 11:55 am**, CHIEF HUMPHREY responded to the unnamed co-conspirator's email declining to discuss personnel issues.

333. One minute later, on **July 1, 2020, at 11:56 am**, RACOP responded to CHIEF HUMPHREY's email to the unnamed co-conspirator.   In his profane response, RACOP called CHIEF HUMPHREY's decision not to engage "another shit move by a fucking scofflaw," and cc'ed BURKS and FULK along with various city officials, including Mayor Scott, the city manager and city directors.  *See Image 25 below.*

---

Begin forwarded message:

From: badlittlerock <badlittlerock@gmail.com>
Date: July 1, 2020 at 11:56:31 AM CDT
To: "Humphrey, Keith" <khumphrey@littlerock.gov>, Ean Lee Bordeaux <aidcommission@gmail.com>
Cc: "Davis, Domkua" <dxdavis@littlerock.gov>, Matthew Campbell <matt@pinnaclelawfirm.com>, "Moore, Bruce" <bruce@littlerock.gov>, "Brown, Le'Quanna" <LBrown@littlerock.gov>, Board <board@littlerock.gov>, "Scott Jr., Frank" <fscottjr@littlerock.gov>, Seth Bowman <seth@irattorney.com>, Chris Corbitt <chris@corbittlawfirm.com>, "Chris W. Burks" <chris@wh.law>, Eric Higgins <erichogginsforsheriff@gmail.com>, Cheryl Hall <CHERYL.Hall@arkansasag.gov>, "little.rock@ic.fbi.gov" <little.rock@ic.fbi.gov>, Max Brantley <maxbrantley@arktimes.com>, "Fulk, Alice" <AFulk@littlerock.gov>, "Ford, Michael R." <mford@littlerock.gov>, "Sloan, James" <JSloan@littlerock.gov>, "Carpenter, Tom" <TCarpenter@littlerock.gov>
Subject: Re: FOI #0798

another shit move by a fucking scofflaw.

---

Image 25: One of RACOP's profane emails to CHIEF HUMPHREY from July 1, 2020.

334. One minute after his first email, on **July 1, 2020, at 11:57 am**, RACOP again responded to CHIEF HUMPHREY's email by stating, "let's talk about your side chick."

335. On **July 1, 2020, at 12:01 pm**, CHIEF HUMPHREY responded to RACOP's July 1 at 11:57 am email with a request: "Sir I am requesting you to stop making false comments about me."

336. Three minutes later, on **July 1, 2020, at 12:04 pm**, RACOP—referring to himself as a "Publisher"— responded to CHIEF HUMPHREY's request that RACOP stop making false comments about the chief, cc'ing nearly twenty (20) different individuals, including the city manager, Mayor Scott, the city directors, the City Attorney, BURKS and FULK.  RACOP's response was only three words—"Sue me fucker." (emphasis added)  *See Image 26 below.*



From: "bad@littlerock@gmail.com" <bad@littlerock@gmail.com>
Date: July 1, 2020 at 12:04:20 PM CDT
To: "Humphrey, Keith" <khumphrey@littlerock.gov>
Cc: Ean Lee Bordeaux <adcommssion@gmail.com>, "Daws, Domika" <dxdaws@littlerock.gov>, Matthew Campbell <matt@pinnaclelawfirm.com>, "Moore, Bruce" <bruce@littlerock.gov>, "Brown, Le'Quanna"
<L.Brown@littlerock.gov>, Board <board@littlerock.gov>, "Scott Jr., Frank" <fscottjr@littlerock.gov>, Seth Bowman <seth@irationomey.com>, Chris Corbitt <chris@corbittlawfirm.com>, "Chris W. Burks" <chris@wh.law>, Eric
Higgins <erichigginsforsheriff@gmail.com>, Cheryl Hall <CHERYL.Hall@arkansasag.gov>, "little.rock@ic.fbi.gov" <little.rock@ic.fbi.gov> Max Brantley <maxbrantley@arktimes.com>, "Fulk, Alice" <AFulk@littlerock.gov>
"Ford, Michael R." <mford@littlerock.gov>, "Sloan, James" <JSloan@littlerock.gov>, "Carpenter, Tom" <TCarpenter@littlerock.gov>
Subject: RE: FOI #0798

Sue me fucker

Russ Racop - Publisher

**Image 26: Another profane RACOP email to CHIEF HUMPHREY from July 1, 2020.**

337. On **July 2, 2020, at 8:09 am**, RACOP sent an email to Mayor Scott, the city manager, CHIEF HUMPHREY, BURKS and others in which he mockingly referenced CHIEF HUMPHREY being "so tied up with lawsuits," meaning the lawsuits filed by BURKS. RACOP ended his July 2, 2020 email with hashtags: "#FTP  #FireChiefKeef  #RecallMayorScott"

338. On **July 20, 2020**, CHIEF HUMPHREY sent a memo entitled "21st Century Community Policing Division" to H. FINKS. In his **July 20, 2020** memo, CHIEF HUMPHREY described changes made to the LRPD public affairs and FOIA units and the creation of new, unprecedented civilian-led Media Relations and Community Relation Units. Among the matters on which the new units will focus is crime prevention, homeless initiatives, LGBTQ liaison program, summer youth camp and safety programs.

339. By instituting new policies which give Little Rock citizens more input in city media relations and LRPD community relations, and by creating police units that focus on crime, social issues and diversity, CHIEF HUMPHREY is following through on the promises made by Mayor Scott that Little Rock citizens would have a greater say in how their city functions.

340. On **August 25, 2020, at 2:23 pm**, on his self-published website, RACOP posted dashboard video from his vehicle in which he falsely claimed that he "caught" CHIEF HUMPHREY "spying on protesters" in a parking lot which caused him to "bolt[] like a scared rabbit" when RACOP "discovered" him. *See Image 27 below.*



**Image 27: A video still of RACOP's phony dashboard video as published on his blog and Facebook page.**

341.   The vehicle allegedly chased by RACOP on or about **August 25, 2020** was not driven by CHIEF HUMPHREY.  RACOP's claim that he discovered and chased CHIEF HUMPHREY is totally false.

342.   On **September 11, 2020**, STARKS submitted a resignation letter to CHIEF HUMPHREY, which was promptly submitted to various media outlets.  In his September 11, 2020 letter, STARKS stated that his "resignation is because of the manner in which I have been treated by you or at your direction since having to use deadly force to protect myself.  You and Mayor Scott have never acknowledged that Mr. Blackshire put my life in danger."  STARKS complained about a "toxic environment" caused by CHIEF HUMPHREY and stated that it has resulted in mental health issues for him.  In closing, STARKS stated "I have concluded that it is impossible for me to work at the Little Rock Police Department as long as you remain Chief."

343.   On **September 15, 2020**, ten members of the LRPD command staff—Bewley, H. FINKS, FULK, K. Temple, Robertson, Helton, Marcus Paxton, Russell King, Allen and Michael Miller—submitted a letter to Mayor Scott and the city directors in which the senior officers "ask[ed] for your assistance in fixing a catastrophic problem within the Little Rock Police Department."  They added, "[t]he problem we are referring to is Chief Keith Humphrey."

344.   In their **September 15, 2020** plea, the command staff officers complained, without evidence, that CHIEF HUMPHREY "has created a very toxic, hostile, and explosive work environment that has resulted in the Little Rock Police Department becoming a very dysfunctional police department, which we feel has resulted in putting the safety and welfare of the citizens served by the Little Rock Police Department at risk."  The command staff officers' letter reflects the allegations made in the complaints brought by H. FINKS, D. FINKS, PARKS, FULK, PLUMMER and BURKS, and was presented to various media outlets for publication.

345.   White was quoted in a **September 15, 2020** KATV-7 article as spokesperson for the LRBPOA.  In the article, White voiced the group's support for CHIEF HUMPHREY, noting that, in terms of toxic environments, the command staff had been helping run the LRPD far longer than the chief and, therefore, they must bear greater responsibility for departmental defects.

346.   According to the **September 15, 2020** article, "White said he hopes that the city board sees that the complaint is a 'political move' by people who were in the running to be chief"—H. FINKS and FULK— and who "did not get the job."  White was quoted: "We want the chief to be able to run the department the way that he sees fit and hold people accountable…And [the command staff] don't want that to happen."

347.   On **September 16, 2020**, the LRBPOA submitted a letter in support of CHIEF HUMPHREY to Mayor Scott and the city directors.  The LRBPOA letter addressed the command staff opposition letter of the prior day, stating the group's belief that the command staff's letter "was drafted solely to defy Chief Humphrey's attempt to eradicate years of the Little Rock Police Department (LRPD) operating under a 'Good Ole Boy' system of policing: a system built on friendships, nepotism, and racism" which existed long before CHIEF HUMPHREY's arrival.

348.   In the **September 16, 2020** letter, the LRBPOA made the connection between the flurry of similar lawsuits filed against CHIEF HUMPHREY and internal demands by members of the command staff that CHIEF HUMPHREY be investigated for vague, dubious claims:

> This behavior leads practical and logical minds to arrive at the same conclusion City Attorney Tom Carpenter articulated in his May 25[th] memorandum to the Mayor and The City of Little Rock Board Of Directors, that these actions are not an attempt to resolve a conflict in an employment relationship, instead it is an effort to terminate Chief Humphrey's

employment.  "The lawsuit is not about damages but attempts to use the courts for a political end."

349.  The LRPBOA made a simple, reasonable request on **September 16, 2020**:

> We want Chief Humphrey to be afforded due process and most importantly a fair opportunity to succeed in his job without insubordination, defiance and abuse of process by certain police administrative personnel.

350.  On **September 29, 2020**, following an extended period of time out of the office, FULK announced her retirement from the LRPD.  On **September 29, 2020**, KARK reported that FULK confirmed that she will be taking over the position of State Capitol chief of police upon the retirement of Hedden.

351.  On **September 30, 2020**, because he is entitled to run his department precisely the way he alone sees fit, CHIEF HUMPHREY filed a federal civil rights lawsuit in the Eastern District of Arkansas Federal District Court, alleging violations of the First and Fourteenth Amendments of the U.S. Constitution, as well as abuse of process, defamation and civil conspiracy, *inter alia*.