**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

KEITH HUMPHREY

      Plaintiff,

v.

ALICE FULK, individually,
and in her official capacity,
CRISTINA PLUMMER, individually,
HAYWARD FINKS, individually,
and in his official capacity,
DUANE FINKS, individually,
REGINALD PARKS, individually,
LITTLE ROCK FRATERNAL ORDER OF
POLICE, LODGE #17, a non-profit corporation,
RONNIE MORGAN, individually,
ERIK TEMPLE, individually,
KEVIN SIMPSON, individually,
KENNETH HAMBY, individually,
STEVE DODGE, individually,
MICHAEL MCVAY, individually,
CHRIS RINGGOLD, individually,
KYLE HENSON, individually,
TRAVIS CUMMING, individually,
MARK ISON, individually,
JOHN GILCHRIST, individually,
KEVIN SEXSON, individually,
CHARLES STARKS, individually,
SHELLA ATLAS-EVANS, individually,
MATT MURSKI,
MOTOROLA SOLUTIONS d/b/a
WATCHGUARD and
RUSS RACOP,

      Defendants.

Case No. 4:20-CV-1158 JM


***JURY TRIAL DEMANDED***


**AMENDED COMPLAINT**

NOW COMES Plaintiff, KEITH HUMPRHEY (hereafter "PLAINTIFF"), by and

through his attorneys, LAUX LAW GROUP, and for his cause of action against Defendants,

ALICE FULK, individually, and in her official capacity, CRISTINA PLUMMER, individually, HAYWARD FINKS, individually, and in his official capacity, DUANE FINKS, individually, REGINALD PARKS, individually, LITTLE ROCK FRATERNAL ORDER OF POLICE, LODGE #17, a non-profit corporation, RONNIE MORGAN, individually, ERIK TEMPLE, individually, KEVIN SIMPSON, individually, KENNETH HAMBY, individually, STEVE DODGE, individually, MICHAEL MCVAY, individually, CHRIS RINGGOLD, individually, KYLE HENSON, individually, TRAVIS CUMMING, individually, MARK ISON, individually, JOHN GILCHRIST, individually, KEVIN SEXSON, individually, CHARLES STARKS, individually, SHELLA ATLAS-EVANS, individually, MATT MURSKI, MOTOROLA SOLUTIONS d/b/a WATCHGUARD and RUSS RACOP, and states as follows:

INTRODUCTION—A HOUSE DIVIDED

On June 16, 1858, at the Republican State Convention in Springfield, Illinois, State Senator Abraham Lincoln arose from his seat, to great applause, and with a long, slow stride, took his place behind the podium.  A majority of the convention delegates had just selected him to be the Illinois' next candidate for the U. S. Senate.  Addressing an anxious electorate split by ongoing social strife over the institution of slavery, State Sen. Lincoln delivered what has come to be known as his "House Divided" speech.  The distinguished lawyer and former rail splitter explained to the assembly the perils of trying to maintain a functioning governing body while an insidious infestation pervades and gnaws at that very body from within:

> **Mr. President and Gentlemen of the Convention.**
>
> If we could first know *where* we are, and *whither* we are tending, we could then better judge *what* to do, and *how* to do it.
>
> We are now far into the *fifth* year, since a policy was initiated, with the *avowed* object, and *confident* promise, of putting an end to slavery agitation.

2

> Under the operation of that policy, that agitation has not only, *not ceased*, but has *constantly augmented*.
>
> In *my* opinion, it *will* not cease, until a *crisis* shall have been reached, and passed.
>
> "A house divided against itself cannot stand."
>
> I believe this government cannot endure, permanently half *slave* and half *free*.
>
> I do not expect the Union to be *dissolved*—I do not expect the house to *fall*—but I *do* expect it will cease to be divided.
>
> It will become *all* one thing, or *all* the other.

PLAINTIFF submits that the grave dilemma long ago described by Sen. Lincoln exists today, in the current matter, with near equal urgency. PLAINTIFF files the instant complaint because the remnants of the deep racial inequities articulated by State Sen. Lincoln remain firmly embedded in the fabric of our social institutions, including our police departments. Indeed, it is prevalent within the Little Rock Police Department and has been for generations.

Now, like in 1861, there is an open, illegitimate revolt against a duly elected, legitimate governmental body seeking to cure societal and racial ills while simultaneously charting a forward course. This revolt seeks to stifle—and ultimately destroy—the embodiment of social reform Little Rock's citizens demanded at the polls in a decisive December 2018 mayoral election. The revolt is being led by the LITTLE ROCK FRATERNAL ORDER OF POLICE, LODGE #17 ("LRFOP") and a sizable group of disgruntled individuals who fear their free ride is coming to end.

## JURISDICTION

1.      Jurisdiction and venue of this Court are invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1391 and 42 U.S.C. § 1983. The unlawful conduct and constitutional violations alleged to have been committed against PLAINTIFF were committed in the State of Arkansas, and in

Pulaski County, Arkansas. PLAINTIFF expressly references by association, adopts and incorporates herewith the Addendum attached hereto as Exhibit 1.

## PARTIES

2.      At all relevant times, PLAINTIFF was and is a citizen of the United States of America, and he is, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.

3.      PLAINTIFF is also Chief of Police of the Little Rock Police Department (LRPD). As such, when acting his official capacity, PLAINTIFF is the final policymaker at the LRPD. Per policy and by design, the LRPD Chief of Police possesses the final authority relating to departmental vision, officer discipline and the promulgation of police policies. At the LRPD, chiefs of police have the responsibility and authority to implement final municipal policy with respect to a particular course of action.

4.      PLAINTIFF came to Little Rock after having been Chief of the Norman (OK) Police Department from 2011 to 2019.

5.      PLAINTIFF started as an officer with the City of Fort Worth (TX) Police Department in 1988. In 1995, he joined the City of Arlington (TX) Police Department, being promoted to Sergeant (2000) and later Commander (2005) in that department. In 2008, he was named the Chief of Police of Lancaster (TX) serving in that position until 2011, before taking the position as the City of Norman's Police Chief.

6.      At all relevant times, ALICE FULK (hereafter "FULK") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions

occurring there.  Moreover, FULK, who was both an Interim Chief of Police and Assistant Chief of Police with the LRPD, acted in both her individual and official capacities at all relevant times.

7.      At all relevant times, CRISTINA PLUMMER (hereafter "PLUMMER") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, PLUMMER was a lieutenant with the LRPD.

8.      At all relevant times, HAYWARD FINKS (hereafter "H. FINKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, H. FINKS, who was both an Interim Chief of Police and Assistant Chief of Police with the LRPD, acted in both his individual and official capacities at all relevant times.

9.      At all relevant times, DUANE FINKS (hereafter "D. FINKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, D. FINKS was a police officer with the LRPD.

10.      At all relevant times, REGINALD PARKS (hereafter "PARKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, PARKS was also a police officer with the LRPD.

11.     At all relevant times, the LRFOP was a police union and non-profit organization, physically located at 1700 E. 2nd Street, Little Rock, AR 72202, in Pulaski County.  At all relevant times, the LRFOP is and was the exclusive bargaining agent for the City of Little Rock.

12.     At all relevant times, RONNIE MORGAN (hereafter "MORGAN") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, MORGAN was a police officer with the LRPD and a president/director of the LRFOP.

13.     At all relevant times, ERIK TEMPLE (hereafter "TEMPLE") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, TEMPLE was a police officer with the LRPD and a director of the LRFOP.

14.      At all relevant times, KEVIN SIMPSON (hereafter "SIMPSON") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, SIMPSON was police officer with the LRPD and a director of the LRFOP.

15.     At all relevant times, KENNETH HAMBY (hereafter "HAMBY") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, HAMBY was a police officer with the LRPD and a treasurer of the LRFOP.

16.     At all relevant times, STEVE DODGE (hereafter "DODGE") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, DODGE was a police officer with the LRPD and member of the LRFOP executive board.

17.     At all relevant times, MICHAEL MCVAY (hereafter "MCVAY") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, MCVAY was a police officer with the LRPD and member of the LRFOP executive board.

18.     At all relevant times, CHRIS RINGGOLD (hereafter "RINGGOLD") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, RINGGOLD was a police officer with the LRPD and member of the LRFOP executive board.

19.     At all relevant times, KYLE HENSON (hereafter "HENSON") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, HENSON was a police officer with the LRPD and member of the LRFOP executive board.

20.     At all relevant times, TRAVIS CUMMING (hereafter "CUMMING"), was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts

or omissions occurring there.  Moreover, at all relevant times, CUMMING was a police officer with the LRPD and member of the LRFOP executive board.

21.     At all relevant times, MARK ISON (hereafter "ISON"), was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, ISON was a police officer with the LRPD and member of the LRFOP executive board.

22.     At all relevant times, JOHN GILCHRIST (hereafter "GILCHRIST") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, GILCHRIST was a police officer with the LRPD and former LRFOP president.

23.     At all relevant times, KEVIN SEXSON (hereafter "SEXSON") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, SEXSON was a police officer with the LRPD.  Upon information and belief, SEXSON was member of the LRFOP at all relevant times.

24.     At all relevant times, CHARLES STARKS (hereafter "STARKS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, STARKS was a police officer with

the LRPD.  Upon information and belief, STARKS was a member of the LRFOP at all relevant times.

25.     At all relevant times, SHELLA ATLAS-EVANS (hereafter "ATLAS-EVANS") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.  Moreover, at all relevant times, ATLAS-EVANS was an employee of the City of Little Rock, working in the Human Resources division.

26.     At all relevant times, MATT MURSKI (hereafter "MURSKI") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.

27.     At all relevant times, MOTOROLA SOLUTIONS d/b/a WATCHGUARD (hereafter "MOTOROLA") was a corporation duly organized under the laws of the State of Arkansas and, further, was the employer of MURSKI.

28.     At all relevant times, RUSS RACOP (hereafter "RACOP") was a citizen of a county in the Central Division and a resident of the State of Arkansas and, therefore, subject to the jurisdiction of the Eastern District of Arkansas Federal District Court for any acts or omissions occurring there.

## FACTUAL BACKGROUND

29.     In 2000, Lawrence Johnson (hereafter "Chief Johnson"), an African American man, was named Chief of Police of the LRPD.  See Ex. 1 at ¶ 2.  Almost immediately after he started, Chief Johnson began to bring reforms to the department, including transparency in handling citizen complaints and Internal Affairs Division (IAD) investigations.  See Ex. 1 at ¶¶

3-4.  Moreover, promotions of female and minority officers—previously scant—enjoyed an increase under Chief Johnson's tenure because of his deliberate efforts to advance diversity.  See Ex. 1 at ¶¶ 5-6.

30.     The LRFOP, a police union dominated by white males, strongly opposed Chief Johnson's reforms.  See Ex. 1 at ¶¶ 2, 8.  At all relevant times, the LRFOP was the exclusive bargaining agent for the City of Little Rock.  See Ex. 1 at ¶ 29, 215-217. As early as 2000, the LRFOP began a campaign of harassment and insubordination, intended to undermine Chief Johnson's authority and frustrate his reform efforts.  See Ex. 1 at ¶¶ 2, 8-11.  After several years of open revolt, the LRFOP successfully eroded Chief Johnson's stature among rank-and-file officers which signaled an end to his tenure.  See Ex. 1 at ¶¶ 12-13.  In 2005, Chief Johnson's contract was not renewed, and he left the LRPD.  See Ex. 1 at ¶ 13.

31.     In 2005, Stuart Thomas (hereafter "Chief Thomas"), a former LRPD officer, came out of retirement to become Little Rock's next police chief.  See Ex. 1 at ¶ 14.  Chief Thomas made clear his intent to undo the reforms implemented by Chief Johnson, and he did so.  See Ex. 1 at ¶¶ 14-15.  Chief Thomas was favored by the LRFOP and, under his leadership, the police union's power grew.  See Ex. 1 at ¶¶ 28-30.  Under Chief Thomas' leadership, there was also an increase in police-involved shootings, departmental retaliation and general police misconduct. Chief Thomas retired from the LRPD in June 2014.  See Ex. 1 at ¶¶ 32-33, 37.

32.     In 2014, LRFOP-endorsed candidate, Kenton Buckner (hereafter "Chief Buckner"), replaced Chief Thomas as Little Rock's new chief.  See Ex. 1 at ¶ 38.  Chief Buckner was noncommittal when asked about racial issues and police reform, which was favored by the LRFOP.  See Ex. 1 at ¶¶ 39, 65, 79-80.  Under Chief Buckner's tenure, significant police misconduct occurred, including alleged constitutional violations in the service of "no-knock"

warrants, departmental employment discrimination against women and minorities and investigatory malfeasance during internal criminal and administrative reviews of LRPD police-involved shootings.  See Ex. 1 at ¶¶  46-48, 52, 55-61, 67-76, 85, 89-90.  This police misconduct resulted in civil rights litigation which made local and national news. See Ex. 1 at ¶¶  50-51, 89, 223.

33.     In November 2018, Chief Buckner announced that he would end his tenure as LRPD chief of police to take a police chief position at the Syracuse Police Department.  See Ex. 1 at ¶ 95.  Evidencing the close relationship between Chief Buckner and the LRFOP, Chief Buckner advised then-LRFOP president, GILCHRIST, about his pending departure before he told his employer, the City of Little Rock.  See Ex. 1 at ¶ 79.

34.     On November 13, 2018, City Manager Bruce Moore sent a memorandum entitled "INTERIM POLICE CHIEF APPOINTMENTS" to all LRPD personnel.  See Ex. 1 at ¶ 96.  In his memo, Mr. Moore announced that the search for a new chief had begun that day and was expected to take approximately ninety (90) days.  See Ex. 1 at ¶ 96.  In his memo, Mr. Moore advised that the LRPD's three assistant chiefs— FULK, H. FINKS and Wayne Bewley ("Bewley")—each would serve as Interim Chief of Police, based on the following schedule:

- FULK: November 17, 2018 to December 17, 2018;

- H. FINKS: December 18, 2018 to January 18, 2019; and

- Bewley: January 19, 2019 to February 19, 2019.  See Ex. 1 at ¶ 96.

35.     During the respective times they served as Interim Chief of Police, FULK, H. FINKS and Bewley were final policymakers having the responsibility and authority to implement final municipal policy with respect to a particular course of action.  Per policy and by

11

design, the LRPD Chief of Police possesses the final authority relating to departmental vision, officer discipline and the promulgation of police policies.

36.     The rate of police-involved increased during the time the assistant chiefs were charge when compared with Chief Buckner.

37.     Both FULK and H. FINKS applied for the open LRPD police chief position vacated by Chief Buckner.  See Ex. 1 at ¶ 129.

38.     Throughout 2018, there was a mayoral race afoot in Little Rock and the candidates who qualified for a December 2018 run-off election were Frank Scott and Baker Kurrus.  See Ex. 1 at ¶¶  84, 86-87, 91-94, 114.  During their months-long campaigns, Frank Scott and Baker Kurrus distinguished themselves considerably and generally presented to Little Rock citizens visions of significant reform and promises of *status quo*, respectively.  See Ex. 1 at ¶¶ 105, 119-120.  The LRFOP strongly backed Baker Kurrus.  See Ex. 1 at ¶¶  98, 109-111.

39.     During his campaign, Frank Scott vowed to revise the LRPD's "no-knock" warrant policy to bring it within the confines of the law.  See Ex. 1 at ¶¶  92-93.  He proposed the creation of an independent citizen review board to increase accountability among officers.  See Ex. 1 at ¶ 115.  Frank Scott promoted the notion of community policing, known by this time as "21st Century Policing."  See Ex. 1 at ¶ 115.  These proposed reforms were very similar to the ones instituted by Chief Johnson nearly twenty years earlier.  See Ex. 1 at ¶¶ 3-6.

40.     By way of contrast, when Baker Kurrus was asked about the propriety and legality of the LRPD's execution of "no-knock" warrants, he responded that revisions were unnecessary because mechanisms were already in place to handle such things.  See Ex. 1 at ¶¶ 93-94.

41.     Frank Scott's citizen-empowering vision was met with stiff opposition from the LRFOP and others, such as CHRIS BURKS (hereafter "BURKS"), a Little Rock lawyer.  See Ex. 1 at ¶¶ 96-97, 105-108, 111-113, 116-118.  For instance, as reported in local media, BURKS commissioned a biased poll in which he planted questions designed to portray Frank Scott as intolerant homophobe, and then provided the results of the poll to the press without fully disclosing his involvement.  See Ex. 1 at ¶¶ 116-118.  BURKS supported Baker Kurrus, the mayoral candidate strongly backed by the LRFOP.  See Ex. 1 at ¶¶ 98, 109-111, 120.

42.     Likewise, the LRFOP posted messages and photographs on its official Facebook page which attempted to paint Frank Scott as a criminal and took to the airwaves to disparage his character.  See Ex. 1 at ¶¶ 98, 109.  The Facebook attack was widely panned by the public as an obvious race-tinged smear attempt on Frank Scott who, if successful, would become the city's first elected African American mayor.  See Ex. 1 at ¶¶ 112-113.

43.     The LRFOP's racist Facebook post garnered bad national press for the police union.  See Ex. 1 at ¶¶ 110, 112-113.  In fact, Frank Scott was invited onto CNN where he explained the LRFOP's naked political attack against him, causing his popularity to increase at an even sharper rate.  See Ex. 1 at ¶¶ 115.  In discussing the attack, Frank Scott avoided retribution, instead lamenting the unfortunate nature of the LRFOP's actions.  See Ex. 1 at ¶¶ 105-106, 115.  Despite countless opportunities, the LRFOP refused to apologize to Frank Scott or admit the false, divisive nature of its post.  See Ex. 1 at ¶¶ 107-108, 111.

44.     On December 4, 2018, Frank Scott (hereafter "Mayor Scott") was elected mayor of Little Rock.  See Ex. 1 at ¶ 121.  He immediately began to implement the reform he promised to the citizens of Little Rock, including a revised "no-knock" policy, independent citizen review

of police-involved shootings, an increase in community policing and a top-to-bottom independent third-party investigation of the LRPD's patterns and practices.  See Ex. 1 at ¶ 121.

45.     In March 2019, Mayor Scott selected PLAINTIFF—well known for the institutional reforms he brought to the Norman Police Department from which he came—to be the new Chief of Police of the LRPD.  See Ex. 1 at ¶¶ 131-133, 137-138.  Thus, Mayor Scott opted against naming LRPD insiders FULK and H. FINKS chief.

46.     From May 14, 2019 through May 20, 2019, PLAINTIFF put H. FINKS in charge of the LRPD, making him acting chief of police and, necessarily, final policymaker, during that timeframe.  See Ex. 1 at ¶¶ 163-164.

47.     On April 16, 2019, PLAINTIFF decided to meet with a group of citizens protesting a recent police-involved shooting of a black motorist committed by STARKS.  See Ex. 1 at ¶¶ 145-146.  This community-oriented act by PLAINTIFF confirmed to FULK, H. FINKS and other defendants that PLAINTIFF intended to follow through on the statements he made as a private citizen, *prior* to becoming LRPD chief of police.  Moreover, PLAINTIFF's decision to meet with protesters suggested to FULK, H. FINKS and other defendants that PLAINTIFF would terminate STARKS for the shooting, which would signify a philosophical shift within the department antithetical to the interests of the LRFOP and the other defendants. The LRFOP and the other defendants prefer the lax leadership they enjoyed for years prior to PLAINTIFF's arrival, one which allowed police misconduct to go virtually unchecked.  See Ex. 1 at ¶¶  46-48, 52, 55-61, 67-76, 85, 89-90.

48.     By mid-April 2019, it was clear that PLAINTIFF would use his discretion as police chief to bring serious reforms to the LRPD, the very type of which Mayor Scott repeatedly promised throughout his successful mayoral campaign and which Chief Johnson instituted nearly

twenty years earlier.   Accordingly, exercising his authority as chief of police, PLAINTIFF terminated STARKS. See Ex. 1 at ¶¶  152-156.  Soon thereafter, PLAINTIFF was met with a fierce backlash from the LRFOP, as well as H. FINKS, FULK and STARKS, for this decision.

Evidence of a Meeting of the Minds

49.    The LRFOP vehemently opposed the reforms PLAINTIFF was likely to implement, ones articulated by Mayor Scott on the campaign trail and desired by Little Rock citizens as evidenced by the result of the mayoral election.   Starting in April 2019, FULK, PLUMMER, H. FINKS, D. FINKS, PARKS and the other defendants, began a conspiratorial campaign of false workplace allegations, phony legal claims, harassment, insubordination and subterfuge, all designed to frustrate PLAINTIFF's First Amendment rights and terminate him outright or, at least, severely damage his chosen profession, which is a protected liberty interest. See Ex. 1 at ¶¶ 160-161, 173-174, 177, 200, 202-205, 220-221, 236, 241-250, 256-265, 267-279, 283-301, 307, 323-325, 333, 336, 339-340, 343, 346. 348-349. 351-353, 356-360 and 366.  Thus, the defendants now seek to do to PLAINTIFF what several of them did to Chief Johnson when he tried to implement lasting reform measures nearly twenty years ago.

50.    The goal of the defendants' conspiratorial campaign against PLAINTIFF is to remove him from his position as LRPD Chief of Police or damage his reputation so severely that he is unable to lead the department.

51.    In furtherance of this conspiracy, certain individuals—FULK, PLUMMER, H. FINKS, D. FINKS and PARKS—resorted to illegal and underhand tactics, including:

    a)  filing abusive lawsuits in court;

    b)  initiating and perpetuating false rumors alleging misconduct committed by PLAINTIFF, a black man, such as the sexual harassment of white women;

    c)  sabotaging response to George Floyd protests; and

    d)  other conspiratorial acts.

52.    FULK, PLUMMER, H. FINKS, D. FINKS and PARKS have abused the legal process with baseless lawsuits against PLAINTIFF, which were filed by their lawyer, BURKS, the same individual who commissioned the biased poll targeting Mayor Scott, the opponent of Baker Kurrus, the mayoral candidate strongly backed by the LRFOP.

53.    BURKS, on behalf of his clients, FULK, PLUMMER, H. FINKS, D. FINKS and PARKS, drafted an email to the City Attorney's Office wherein he claimed that women would come forward with sexual harassment claims if PLAINTIFF did not step down from his position as chief.  See Ex. 1 at ¶¶ 259-260.  No women ever came forward with such claims.  Litigation related to these lawsuits has revealed that FULK attempted to solicit female LRPD employees to report false harassment allegations against PLAINTIFF to HR. See Ex. 1 at ¶¶ 259-260.

54.    BURKS, on behalf of his clients, FULK, PLUMMER, H. FINKS, D. FINKS and PARKS, made threats against the City of Little Rock, attempting to coerce PLAINTIFF into stepping down from his position as chief and taking a lesser law enforcement job out of state. See Ex. 1 at ¶¶ 257, 259-260.  This substantiates the City Attorney's belief that the lawsuits brought by BURKS on behalf of FULK, PLUMMER, H. FINKS, D. FINKS and PARKS were not brought in good faith but rather were "attempts to use the courts to accomplish a political end.  [The lawsuits] also suggest[] considerable cooperation between the various plaintiffs, if not others."  See Ex. 1 at ¶ 318.

55.    Upon information and belief, these abusive lawsuits are funded, at least in part, by the LRFOP, with the money flowing to BURKS' firm.  Other individuals, namely MORGAN, TEMPLE, SIMPSON, HAMBY, DODGE, MCVAY, RINGGOLD, HENSON, CUMMING,

ISON and GILCHRIST—most of whom comprise the executive board of the LRFOP—have made false, scurrilous claims to local media about the baseless lawsuits and otherwise impugned PLAINTIFF's character in the community, in furtherance of the conspiracy against him.

56.     Yet other individuals—including, FULK, PLUMMER, FINKS, MURSKI, SEXSON and RACOP—have furthered the conspiratorial campaign initiated by their co-defendants insofar as they each have either themselves knowingly made untruthful claims against PLAINTIFF in the community and media, or have arranged for false, damaging information to be made on their behalf.

57.     Little Rock citizen Karen Hunter, a friend of PLAINTIFF who applied for a job with the City of Little Rock, had her application and personal information leaked from the City's computers to RACOP.  See Ex. 1 at ¶¶ 262-265.  On his original content blog, RACOP posted Ms. Hunter's application and personal information on his blog, along with knowingly false claims that she and PLAINTIFF were involved in an extramarital affair.  See Ex. 1 at ¶ 263.  On his blog, RACOP represented that he received Ms. Hunter's personal information from his "confidential sources" at the LRPD.

58.     SEXSON deleted exculpatory video and audio footage of PLAINTIFF when he was filmed by SEXSON  at Ms. Hunter's home.

59.     Upon information and belief, former LRPD officer, MURSKI, who now works for MOTOROLA, which is the LRPD's bodycam provider, assisted his co-defendant PLUMMER access and download confidential police video footage of PLAINTIFF's vehicle at the home of a friend in order to use the footage to damage PLAINTIFF.  See Ex. 1 at ¶ 246.

60.     These conspiratorial acts were jointly performed by MURSKI and PLUMMER so that PLUMMER (or another of her co-defendants) could leak the video footage to a third co-

defendant, RACOP, who would then release it to the public on his original content blog along with the knowingly false accusation that PLAINTIFF was engaged in an extramarital affair with Ms. Hunter.

61.     The video was, in fact, leaked to RACOP by PLUMMER.

62.     On May 18, 2020, through a press release issued by her lawyer, Ms. Hunter requested an internal investigation at the LRPD to determine who at the department leaked her application and personal information to RACOP.  See Ex. 1 at ¶ 273.  At the time of Ms. Hunter's lawyer's press release, BURKS knew the identity of the LRPD employee who leaked Ms. Hunter's application and personal information: PLUMMER, his client.

63.     One week later, on May 25, 2020, in an attempt to frustrate any investigation of the leak of Ms. Hunter's application and her personal information, and in furtherance of the conspiratorial campaign against PLAINTIFF, BURKS contacted the Arkansas Office of Professional Conduct, attempting to report Ms. Hunter's lawyer for a baseless claim of unauthorized practice of law.  See Ex. 1 at ¶ 281.  BURKS' attempts at using the authority of institutions as unwitting instruments for his bullying is consistent with allegations supporting PLAINTIFF's abuse of process claims against FULK, PLUMMER, H. FINKS, D. FINKS and PARKS, who are BURKS' clients.

64.     The false story of PLAINTIFF's extramarital affair—which was covered by local media—was then used as a basis for motion practice in the cases involving FULK, PLUMMER, H. FINKS, D. FINKS and PARKS.  In short, these individuals created false stories and then cyclically treated those false stories as newfound facts to use as ammunition in their lawsuits, repeat *ad nauseum*.

65.     Worse yet, while the City of Little Rock burned and her citizens faced great peril of body and property during the June 2020 George Floyd protests, and continuing the conspiratorial campaign begun by FULK and H. FINKS, those defendants intentionally sabotaged the LRPD response in order to make PLAINTIFF look bad, to harm his professional reputation and to create yet more ammunition to use in the abusive lawsuits filed by H. FINKS, D. FINKS, PARKS, FULK and PLUMMER.

66.     These reckless, callous actions indeed had the desired effect, as PLAINTIFF was scapegoated on local television during a post-protest hearing at the State Capitol which reviewed law enforcement response to the protests.  See Ex. 1 at ¶¶ 334-340.  Indeed, FULK, PLUMMER, H. FINKS, D. FINKS and PARKS' lawyer, BURKS, was present at the hearing and publicly criticized PLAINTIFF for an emergency police response compromised by the conspiratorial acts of his own clients.  This willful conduct by these defendants threatens PLAINTIFF's protected liberty interest.

67.     While certain defendants attack PLAINTIFF in court, and while others undermine his authority and control in the field, RACOP barrages PLAINTIFF and PLAINTIFF's wife with profane, creepy, threatening and violent emails and original-content blog postings which impugn PLAINTIFF.  See Ex. 1 at ¶¶ 220, 346-357.  RACOP releases into the public the ill-gotten gains supplied by his LRPD co-defendants.  This willful conduct has caused significant emotional damages.

### COUNT I
### LRFOP, FULK AND H. FINKS
### FIRST AMENDMENT RETALIATION/*MONELL*

68.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through sixty-seven (67) as though fully alleged in Count I.

69.     As shown by the rank insubordination and systematic undermining of the authority of Chief Johnson which was conceived and enforced by the LRFOP nearly twenty years ago, the LRFOP has a well-defined history of violently opposing reform measures sought to be implemented at the department.

70.     At certain relevant times, including, but not limited to, November 17, 2018 to January 18, 2019, and April 16, 2019 to April 21, 2019, FULK and H. FINKS were not only state actors, but also final policymakers who possessed the responsibility and authority to implement final municipal policy with respect to a particular course of action.

71.     Because FULK and H. FINKS were final policymakers, their conduct is susceptible to single act *Monell* liability.

72.     The LRFOP is the exclusive bargaining agent for the City of Little Rock. Therefore, the LRFOP is a state actor, endowed by the state with powers or functions governmental in nature.  *Chicago Teachers Union Local No. 1 v. Hudson*, 475 U.S. 292, 301, 106 S. Ct. 1066, 1073 (1986).  The LRFOP is therefore an agency or instrumentality of the state and subject to its constitutional limitations.

73.     Alternately, the LRFOP was a willful participant in joint action with the state— namely, FULK, H. FINKS, STARKS and others.  The joint action among and between these defendants is shown in the following ways:

    a)  Orchestrating frivolous lawsuits with BURKS;

    b)  Funding the frivolous lawsuits brought by BURKS;

    c)  Making false media announcements and coordinating media campaigns against PLAINTIFF;

    d)  Attempting to solicit individuals to make false claims of sexual harassment against PLAINTIFF; and

      e)  Other conspiratorial acts.

74.     Therefore, the LRFOP was jointly engaged with the state and acting under color of law for purposes of § 1983 at all relevant times.

75.     Retaliation by a government actor in response to an exercise of First Amendment rights forms a basis for § 1983 liability.  To establish such a claim, a plaintiff must prove (1) he or she engaged in a protected activity, (2) the defendant responded with adverse action that would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

76.     In the current matter, PLAINTIFF engaged in protected activity as a private citizen when he—*prior* to his official hire as LRPD police chief—discussed his policing philosophy which included: a) instilling a sense of value and respect for diversity of race, gender and religion; b) nurturing a culturally responsive police force; c) enhancing citizen input in excessive force review; and d) other features of 21st Century Policing.

77.     PLAINTIFF's protected social philosophy includes many aspects which are consistent with the measures instituted by Chief Johnson nearly twenty years earlier. PLAINTIFF's protected social philosophy is antithetical to LRFOP and threatens the LRFOP's consolidation of power within the department.

78.     PLAINTIFF's private citizen speech—occurring *prior* to his employment as LRPD Chief of Police—was related to a matter of political and social concern to the community and thus was a matter of public concern.  An adverse employment action is that which would likely dissuade a reasonable person from engaging in protected conduct.  Coercion and threats—like those made by BURKS, on behalf of his clients, FULK, PLUMMER, H. FINKS, D. FINKS

21

and PARKS, and those made by RACOP—are adverse employment actions committed by conspiratorial actors.

79.     At all relevant times, including late 2018, the LRFOP, BURKS, FULK, H. FINKS and all defendants were aware of PLAINTIFF'S policing philosophy, and were aware that the public at large was being apprised of the reform measures he intended to implement. PLAINTIFF's policing philosophy and the social tenets he finds important—in other words, his pre-employment protected speech—played a substantial part in the LRFOP, BURKS, FULK and H. FINKS' decision to take adverse action against him *prior* to his employment and once he was employed.   PLAINTIFF's pre-employment protected speech was also the impetus for the conspiracy campaign conceived by BURKS, FULK and H. FINKS and in which the other defendants willfully engaged.

80.     The LRFOP, BURKS, FULK and H. FINKS violated PLAINTIFF's First Amendment rights when they engaged in various instances of adverse employment acts, such as engaging in conspiratorial conduct against PLAINTIFF and using the legal system to coerce PLAINTIFF to leave his position as LRPD Chief of Police, or otherwise obtain his termination.

81.     The LRFOP, FULK and H. FINKS are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against the LRFOP, FULK and H. FINKS in an amount which will fully and fairly compensate him for damages suffered.

**COUNT II**
**LRFOP, FULK AND H. FINKS**
**EQUAL PROTECTION UNDER THE**
**FIFTH AND FOURTEENTH AMENDMENTS VIA 42 U.S.C. § 1983**

82.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one eighty-one (81) as though fully alleged in Count II.

83.     PLAINTIFF has a protected liberty interest in his reputation and his occupation.

84.     To act under color of state law for 42 U.S.C. § 1983 purposes does not require that the defendant be an officer of the State.  Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.

85.     The Equal Protection Clause of the U.S. Constitution requires that the government treat all similarly situated people alike.

86.     Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment.  Discriminatory intent implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker selected or reaffirmed a particular course of action at least in part because of–not merely in spite of–its adverse effects upon an identifiable group.

87.     In the current matter, PLAINTIFF, an African American male, alleges that he is intentionally being treated differently by the LRFOP, FULK and H. FINKS due to his race.  PLAINTIFF's race is not a legitimate basis to treat him differently than his similarly situated white counterparts, *i.e.*, prior Caucasian LRPD chiefs of police.

88.     Historically, the LRPD does not perpetrate a conspiracy against white chiefs of police when he determines that one of his officers has violated the use of force policy during a police-involved shooting and disciplines the officer.  Therefore, because of the conspiratorial and retaliatory conduct of the LRFOP, FULK and FINKS, PLAINTIFF submits he is being denied equal protection on the basis of his race.

89.     Alternatively, PLAINTIFF alleges that he is intentionally being treated differently by the LRFOP, FULK and H. FINKS, and there is no rational basis for the difference in treatment, *i.e.*, discrimination against a "class of one."  PLAINTIFF's intent to implement reform measures at the LRPD, including 21st Century Policing, is not a legitimate basis to treat him differently than his similarly situated counterparts.

90.     PLAINTIFF does not allege that the State treated him differently from others in the capacity of a public employee-employer relationship for his "class of one" claim. PLAINTIFF's "class of one" claim is not based on a public employee grievance.   Rather, PLAINTIFF alleges he suffered an equal protection violation occurring pre-employment, when he was speaking as a private citizen on a matter of public concern.

91.     Furthermore, successful equal protection claims may be brought by a "class of one" where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

92.     When the conspiracy was conceived and acted upon, LRFOP, FULK and H. FINKS were acting as a sovereign and not as an employer, in terms of PLAINTIFF's "class of one."   Accordingly, PLAINTIFF was not a public employee at the time the conspiracy was conceived, initiated and acted upon by LRFOP, FULK and H. FINKS.

93.     The LRFOP, FULK and H. FINKS' conduct is irrational and wholly arbitrary and motivated by ill will resulting from PLAINTIFF's race and/or his policing philosophy.

94.     The LRFOP, FULK and H. FINKS acted either with the intent to deprive PLAINTIFF of his rights or in reckless disregard of his rights.

95.     The LRFOP, FULK and H. FINKS are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against the LRFOP, FULK and H. FINKS in an amount which will fully and fairly compensate him for damages suffered.

**COUNT III**
**FULK, PLUMMER, H. FINKS, D. FINKS AND PARKS**
**ABUSE OF PROCESS—ARKANSAS STATE LAW**

96.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one ninety-five (95) as though fully alleged in Count III.

97.     The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding.  Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required.

98.     The standard has elsewhere been articulated as requiring, among other things, a willful act in the use of legal process after its issuance that is not proper in the regular conduct of the proceeding.

99.     The test of process abuse is not whether the process was originally issued with malice and without probable cause.  It does not matter, when considering abuse of process, whether the legal procedure set in motion was indeed founded upon probable cause because the second requirement is that the procedure must have been perfected to accomplish an ulterior purpose for which it was not designed.

100.    In the current matter, BURKS, FULK, PLUMMER, H. FINKS, D. FINKS and PARKS, and each of them, have abused the legal system in the Pulaski County Circuit Court by filing baseless, vexatious lawsuits against PLAINTIFF, not to further the ends of justice or to seek redress, but rather to inflict personal pain, distress and embarrassment upon PLAINTIFF and to force him out of his position as LRPD Chief of Police.

101.    Through BURKS, their lawyer, FULK, PLUMMER, H. FINKS, D. FINKS and PARKS have made issued coercive threats to PLAINTIFF and City officials regarding PLAINTIFF's job as chief of police.   Indeed, the City Attorney has opined that the lawsuits brought by BURKS "attempts to use the courts to accomplish a political end" which were suggestive of a conspiracy against PLAINTIFF.

102.    FULK, PLUMMER, H. FINKS, D. FINKS and PARKS are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against FULK, PLUMMER, H. FINKS, D. FINKS and PARKS in an amount which will fully and fairly compensate him for damages suffered.

## COUNT IV
## LRFOP, STARKS AND RACOP
### DEFAMATION/LIBEL

103.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one hundred-two (102) as though fully alleged in Count IV.

104.    To recover for defamation, a plaintiff must prove six elements: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) the damages suffered by the plaintiff.

105.    In the current matter, the LRFOP, STARKS and RACOP repeatedly defamed PLAINTIFF by publishing incendiary and knowingly false statements on their respective websites and blogs, including:

       a)  false accusations that PLAINTIFF was having an extramarital affair;

       b)  spying on Little Rock citizens; and

26

    c)   engaging in dangerous highspeed chases or otherwise engaging in improper or illegal acts;

    d)   other impermissible acts.

106.   At all relevant times, the LRFOP holds itself out as a "publisher" of its blog.  The LRFOP, therefore, is an information content provider.  The LRFOP does not merely archive, cache or provide access to content that is created by third parties.  The LRFOP publishes original content.

107.   Upon information and belief, STARKS is the publisher of "Make Little Rock Great Again," a website he facilitates.  At all relevant times, STARKS holds himself out as a "publisher" of his blog.  STARKS, therefore, is an information content provider.  STARKS does not merely archive, cache or provide access to content that is created by third parties.  STARKS publishes original content.

108.   At all relevant times, the RACOP holds himself out as a "publisher" of his blog.  RACOP, therefore, is an information content provider.  RACOP does not merely archive, cache or provide access to content that is created by third parties.  RACOP publishes original content.

109.   LRFOP, STARKS and RACOP have acted with actual malice when they knowingly publish false accusations which were reasonably calculated to harm PLAINTIFF's reputation and standing in his family and in the community.

110.   The LRFOP, STARKS and RACOP are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against LRFOP, MORGAN, STARKS and RACOP in an amount which will fully and fairly compensate him for damages suffered.

## COUNT V
## ALL DEFENDANTS
## CIVIL RIGHTS CONSPIRACY

111.    PLAINTIFF hereby incorporates and re-alleges Paragraphs (1) through one hundred-ten (110) as though fully alleged in Count V.

112.    In order to show a civil rights conspiracy under 42 U.S.C. § 1985(3), plaintiffs must prove: (1) the defendants conspired, (2) with the intent to deprive them, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4)…they were deprived of exercising any right or privilege of a citizen of the United States.

113.    In the current matter, DEFENDANTS, and each of them, have engaged in various overt acts establishing the basis of a widespread conspiracy, such as:

   a) filing abusive lawsuits against PLAINTIFF in order to chill his First Amendment rights;

   b) coercing PLAINTIFF to quit his job, threatening to publish false information about PLAINTIFF if he does not quit his job;

   c) attempting to intimidate PLAINTIFF with threats of embarrassment;

   d) improperly assisting co-conspirators with technical expertise so as to leak information to the press; and

   e) other conspiratorial acts.

114.    DEFENDANTS are liable to PLAINTIFF in damages, including compensatory damages, punitive damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANTS in an amount which will fully and fairly compensate him for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, KEITH HUMPHREY, by and through his attorneys, LAUX

LAW GROUP, seeks the following relief for the conduct described above:

1.   That DEFENDANTS be required to pay PLAINTIFF's compensatory damages;

2.   That DEFENDANTS be required to pay punitive damages;

3.   That DEFENDANTS be required to pay reasonable costs and attorney fees per 42 U.S.C. § 1988; and

4.   That PLAINTIFF receive any other equitable, legal and just relief as this Honorable Court deems appropriate.

Respectfully submitted,

_____
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for Plaintiff
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
        mikelaux@icloud.com